**No. 21-3762**
**Consolidated with No. 22-3479**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**
———————————————

**SET SHAHBABIAN, M.D.**

**Plaintiff/Appellant**

**vs.**

**TRIHEALTH, INC.**
**TRIHEALTH G, LLC**
**MAYFIELD CLINIC, INC.**

**Defendants/Appellees**
———————————————

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**
**TRIAL COURT NO. 1:18-CV-00790**
———————————————

**BRIEF OF APPELLANT SET SHAHBABIAN, M.D.**
———————————————

**MARK J. BYRNE (0029243)**
**Jacobs, Kleinman, Seibel &**
**McNally, LPA**
**Cincinnati Club Building**
**30 Garfield Place, Suite 905**
**Cincinnati, Ohio 45202**
**Tel: (513) 381-6600**
**Fax: (513) 381-4150**
**Email: mbyrne@jksmlaw.com**
*Attorney for Plaintiff/Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT
## NO.  21-3762
## CONSOLIDATED WITH NO. 22-3479

### SET SHAHBABIAN, M.D.

**Plaintiff/Appellant**

vs.

### TRIHEALTH, INC.
### TRIHEALTH G, LLC
### MAYFIELD CLINIC, INC.

**Defendants/Appellees**

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST BY PLAINTIFF/APPELLANT

Pursuant to 6th Cir. R. 25, Plaintiff/Appellant Set Shahbabian, M.D. will make

the following disclosures:

1. Is said party a subsidiary or affiliate
   of a publicly owned corporate?                  No.

2. Is there a publicly owned corporation,
   not a party to the appeal, that has a
   financial interest in that outcome?             No.

/s/   *Mark J. Byrne*
**MARK J. BYRNE (0029243)**
Jacobs, Kleinman, Seibel & McNally, LPA
Cincinnati Club Building
30 Garfield Place, Suite 905
Cincinnati, Ohio  45202
Tel:   (513) 381-6600
Fax:   (513) 381-4150
Email:  mbyrne@jksmlaw.com
*Attorney for Plaintiff/Appellant*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF CONTENTS....................................................ii, iii, iv, v, vi

TABLE OF CASES, STATUTES AND OTHER AUTHORITIES ....... vii, vii, ix, x

I.      STATEMENT IN SUPPORT OF ORAL ARGUMENT.............................1

II.     STATEMENT OF SUBJECT MATTER AND APPELLATE
        JURISDICTION .................................................................1

III.    STATEMENT OF THE ISSUES ................................................2

IV.     STATEMENT OF THE CASE .................................................3

V.      SUMMARY OF THE ARGUMENT ...........................................4

VI.     STANDARD OF REVIEW .....................................................5

VII.    ARGUMENT ......................................................................6

        STATEMENT OF THE FACTS ...............................................6

        A.    Shahbabian's Causes of Action...........................................6

        B.    Mayfield Begins a Campaign to Transition Shahbabian's Patient
              Base to itself Through TriHealth...........................................7

        C.    Shahbabian's History at Good Samaritan and the Sale of His
              Practice ...................................................................9

        D.    TriHealth Negotiates with Mayfield to Run the Neurosurgical
              Department at Good Samaritan and Bethesda North .........................11

        E.    Shahbabian Continues to Provide Excellent Quality of Care to his
              Patients Admitted at Good Samaritan .................................13

        F.    TriHealth and Mayfield Sign the First Agreement .............................13

G.  Mayfield Physicians Begin to use a Sham Peer Review Process to Transition Shahbabian's Neurosurgical Practice to Mayfield ...........16

    1.  First and Second Peer Review Cases Presented by Ringer ..........16

H.  While the Peer Review Process is Pending, TriHealth Attempts to Disqualify Shahbabian from Performing Surgery by Falsely Claiming that his Age Mandates a Medical Examination While Withdrawing Resident Support from him in Caring for his Patients .....................................................................................17

I.  Dr. John Tew Reviews the Peer View Cases Initiated by Ringer and McPherson and Finds no Deviation of Standard of Care by Shahbabian ..............................................................................19

J.  Mayfield and Ringer Continue to use the Peer Review Proceedings to Justify the Transition of Shahbabian's Surgical Practice to Mayfield .................................................................................22

K.  Shahbabian Continues to Provide Good Quality of Care to his Patients Admitted to Good Samaritan..................................................23

L.  TriHealth Hires Gail Donovan to Promote the Retirement of Shahbabian .....................................................................................23

    1.  In early 2016, Donovan meets with Farrington to Accelerate the Retirement of Shahbabian ..............................................................23

    2.  Donovan confirms TriHealth's intention to involuntarily retire Shahbabian.....................................................................25

M.  The TriHealth/Mayfield Partnership Evolves from a Shahbabian Practice Transition to a Violation of the Anti-Kickback Statute ("AKS").........................................................................................26

    1.  TriHealth and Mayfield exchange surgical numbers and plan for the involuntary transition of Shahbabian's patients to Dr. Zachary Tempel when he arrives in July of 2017........................26

N.  On October 31, 2016, Kerlakian and Collins Meet with Shahbabian to try and Convince him to Retire Because he is an "Old Warhorse" ..............................................................................30

O.  In late 2016, Ringer and Kerlakian Determine Shahbabian is Mentally and Physically Sound to Continue Performing Surgery ......31

P.  Gracey Reviews the Illegal Agreement Between TriHealth and Mayfield and Gives it his Blessing .......................................................32

Q.  TriHealth and Mayfield Continue to Devise a Scheme to Involuntarily Retire Shahbabian From His Surgical Practice Even Though Quality of Care Issues do not Exist .......................................33

R.  TriHealth uses a Sham Peer Review Process to Involuntarily Retire Shahbabian from Surgery so that his Surgical Practice Can be Transitioned to Tempel .........................................................................35

S.  Knowing that Tempel is to Arrive in July 2017, Ringer and McPherson Falsely Offer a Hospitalist Position for Shahbabian's Consideration Hoping he will Resign his Surgical Privileges ............40

T.  After Having Made Working Conditions Intolerable, Shahbabian sends a Letter Resigning his Surgical Privileges ............41

U.  Ringer Recommends a Level 2 Finding of Shahbabian......................41

V.  Tempel Arrives to Assume Shahbabian's Surgical Referral Base at Good Samaritan ................................................................................43

W.  Mayfield withdraws the Shahbabian Hospitalist Offer.......................43

X.  Donovan and Cercek Become Alarmed Because Mayfield is not Providing the Full Complement of Surgical Referrals Farrington Promised as Part of the 2017 Agreement ............................................45

Y.   Due to the Involuntary Retirement of Shahbabian's Surgical
     Practice, TriHealth seeks a Clawback of the Compensation it
     Voluntarily Paid to Shahbabian from May 2017 through March
     2018 ................................................................................46

VIII.   LAW AND ARGUMENT ..........................................................47

     A. The Applicable Legal Standards Require this Case be Presented
        to a Jury...................................................................................47

     FIRST ISSUE PRESENTED FOR REVIEW ............................................49

Material Issues Of Fact Exist As To Whether TriHealth, Inc.
Discriminated Against Shahbabian Because Of His Age In Violation
Of The ADEA And State Law Pursuant To Counts Two, Four, Five
And Seven Of His FAC

SECOND PRESENTED FOR REVIEW.....................................................64

Issues Of Material Fact Exist Regarding Shahbabian's Claims
Against Mayfield For Aiding And Abetting And Conspiring
To Discriminate Against Shahbabian In Counts Seven And Ten
Of The FAC

THIRD ISSUE PRESENTED FOR REVIEW ...........................................65

The District Court Erred In Denying Shahbabian's Motions For
Leave To File The Murphy Declaration And Then Denying His
Motion For Reconsideration

FOURTH ISSUE PRESENTED FOR REVIEW .......................................66

Shahbabian's State Law Claims For Breach Of Contract (Count One),
Common Law Fraud (Count Eight), Tortious Interference (Count
Nine), And Common Law Civil Conspiracy (Count Ten) Are Not
Barred By The Immunity Set Forth In Ohio Revised Code §2305.251(A)
Because Issues Of Fact Exist Regarding The Defendants' Actual
Malice

FIFTH ISSUE PRESENTED FOR REVIEW ............................................68

Shahbabian Established A Material Issue of Fact Regarding His
Claim For Disability Discrimination Under Federal And State
Law With Respect to Counts Eleven and Twelve Of His FAC

SIXTH ISSUE PRESENTED FOR REVIEW............................................71

Material Issues Of Fact Exist In The Record As To Shahbabian's
Retaliation Claims Under Federal And State Law Set Forth In
Counts Three And Six Of The FAC

SEVENTH ISSUE PRESENTED FOR REVIEW  ...................................73

A  Material Issue of Fact Exists As to Shahbabian's Claim Of Fraud
Pursuant to Count Eight Of The FAC

EIGHTH ISSUE PRESENTED FOR REVIEW ........................................74

Material Issues of Fact Exist As To Whether TriHealth G Is Entitled
To The Clawback Payment Of $679,711.61 That It Claims Was Paid
To Shahbabian During The Years 2017 and 2018

IX.    CONCLUSION............................................................................75

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................76

CERTIFICATE OF SERVICE ...............................................................77

DESIGNATION OF APPENDIX CONTENTS.......................................78

# TABLE OF AUTHORITIES

**Cases** **Page**

*Babb v. Maryville Anesthesiologists P.C.,* 942 F.3d 308, 319
(6th Cir. 2019) ................................................................................. 70

*Beekman v. Office Depot, Inc.*, No. 1:05-cv-00638, 2007 U.S. Dist.
LEXIS 49061 at ¶¶17-18 (S.D. Ohio, July 6, 2007) ................................ 51

*Braverman v. Penobscot Shoe Co.*, 859 F. Supp. 596, 601(D. Me. 1994) ........... 1,55

*Chattman v. Toho Tenas America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) ............ 72

*DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004) .............................................. 71

*Doe v. Directions for Youth & Families, Inc.*, No. 1:15-cv-2861, 2016
U.S. Dist. LEXIS 144798 at ¶33-34 (S.D. Ohio, Oct. 19, 2016) ........................... 51

*Fernandez v. City of Pataskala*, No. 2:05-cv-75, 2006 U.S. Dist. LEXIS
82136, ¶¶25-26 (S.D. Ohio, Nov. 6, 2006) ............................................................. 57

*Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013) ...................................... 5

*Gahman v. BST N. Am. Inc.*, No. 19-153-DLB-CJS, 2021 U.S. Dist.
LEXIS 173, 150 at ¶23 (E.D. Ky., Sept. 19, 2021) ................................................... 55

*Geiger v. Tower Auto.,* 5709 F.3d 614, 622 (6th Cir. 2009) ..................................... 50

*Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) ......................................... 51

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 129 S. Ct. 2343,
174 L. Ed. 2d 119 (2009) ......................................................................................... 50

*Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979) rev'd in part
on other grounds, 446 U.S. 754, 100 S. Ct. 1987, 64 L. Ed. 2d 670 (1980) ........... 65

*Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) ............... 48,52

*Hosea Project Movers, LLC v. Waterfront Assocs.,* No. 1:15-cv-799, 2014 U.S. Dist. LEXIS 109556 *31 (S.D. Ohio, July 14, 2017)............................47

*Imwalle v. Reliance Medical Prod. Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) ...........72

*Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) ......................................49

*Johnson v. Swift Transp. Co. of Ariz, LLC*, No. 3:10-cv-352, 2013 U.S. Dist. LEXIS 29007 *4 (S.D. Ohio, Mar. 4, 2013)....................................................47

*Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) .........................72

*Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 1995 Ohio 61, 650 N.E.2d 863 (1995)..................................................................................64

*Keweenaw Bay Indian City v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) ..............47

*Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. P'ship*, 508 F. App'x 404, 410-11 (6th Cir. 2012)............................................................................................50,56

*LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 512 N.E.2d 640 (1987) ..............................................................................................64

*Lowe v. Hamilton Cty. Dep't of Job & Family Servs.,* No. 1:05-cv-117, 2012 U.S. Dist. LEXIS 74018*11 (S.D. Ohio May 29, 2012) ................................48

*Mancini v. City of Providence*, 909 F.3d 32, 45-46 (1st Cir. 2018) ........................70

*Manzer v. Diamond Shamrock Chemicals*, 29 F.3d 1078, 1081 (6th. Cir. 1994) ....................................................................................................56

*Marie v. Am. Red Cross*, 771 F.3d 344, 366 (6th Cir. 2014)......................................5

*Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 541 (6th Cir. 2002)..............................................................................................65

*Mickey v. Zeidler Tool & Dye Co.*, 516 F.3d 516, 521-522 (6th Cir. 2008) .......56,72

*Miller v. Alza Corp.*, 759 F. Sup.2d 929, 942 (S.D. Ohio 2010).............................48

*Minarik v. Nagy*, (1963), 8 Ohio App.3d 194, 193 N.E.2d 280 ..............................64

*Moran v, Al Basit LLC*, 788 F.3d 201, 206 (6th Cir. 2015).................................48,52

*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) ....................................51

*Muhlman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 1:20-cv-813, 2021, U.S. Dist. LEXIS 152162 at ¶12 (S.D. Ohio, April 26, 2021) .....................67

*Oster v. Huntington Bancshare's Inc.,* No. 2:15cv2746, 2017 U.S. Dist. LEXIS 77651 at ¶46 (S.D. Ohio, May 19, 2017) ................................................48,52

*Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 477-78 (6th Cir. 2002).........................49

*Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) ........................................................................................................50

*Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 538-39 (6th Cir. 2002) ..................49

*Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) ....................50

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L.Ed. 2d 105 (2000) ................................................................72

*Sharp v. Aker Plant Servs., Group*, 726 F.3d 78 (6th Cir. 2013)............................55

*Sharp v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003) ...............................................73

*Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll.*, 795 F.3d 698, 706 (7th Cir. 2015) ..........................................................................................................70

*Sloat v. Hewlett-Packard Enter. Co.*, 18 F. 4th 204, 211 (6th Cir. 2021) ....1,51,55,60

*Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001) .........................................47

*Spengler v. Williams Cylinders*, 615 F.3d 492-93 (6th Cir. 2010) ..........................71

*Swanson v. UAW Int'l Union*, No. 14-12581, 2015 U.S. Dist. LEXIS 117546 at ¶17 (E.D. Mich., Sept. 5, 2015) .......................................................48, 52

*Tennial v. United Parcel Serv., Inc.,* 840 F.3d 292, 302 (6th Cir. 2016) ................49

*United States SEC v. Sierra Brokerage Servs.*, 712 F.3d 321, 327 (6th Cir. 2013) ........................................................................................................48

*Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) ..............................71

*Weigel v. Baptist Hospital of East Tenn*., 302 F.3d 367, 378 (6th Cir. 2002) ..........72

*Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 1998 Ohio 294, N.E.2d 859 (1998) ......................................................................................64

*Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) ..........................1,55

*Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) ........................................................................................................72

## Statutes

28 U.S.C. §1331(a)(1) ................................................................................1

28 U.S.C. §1367 et seq. ..............................................................................1

O.R.C. §2305.251(A) ........................................................................4,66,67

O.R.C. Chapter 4112 ................................................................................64

O.R.C. §4112.02(J) ..................................................................................64

42 U.S.C. §12102(3)(A) ............................................................................68

42 U.S.C. §12102(1) ................................................................................69

42 U.S.C. §12112(a) ................................................................................69

O.R.C. §4112.02 ......................................................................................71

O.R.C. §4112.99 ......................................................................................71

## I.  STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff/Appellant Set Shahbabian, M.D. ("Shahbabian") submits that oral argument in this matter is appropriate as it will highlight the district court's improper legal analysis in which it weighed the evidence in favor of TriHealth, Inc. ("TriHealth"), TriHealth G, LLC ("TriHealth G"), and Mayfield Clinic, Inc. ("Mayfield") as opposed to construing the evidence in the record in the light most favorable to Shahbabian, and in some instances completely ignoring evidence in the record favorable to Shahbabian.  It will also allow the Court to reconcile the significance of an employer's reference to "retirement" and "retirement age" in light of the conflicting opinion in *Sloat v. Hewett-Packard Enter. Co.*, 18 F.4th 204, 211 (6th Cir. 2021) versus *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) citing to *Braverman v. Penobscot Shoe Co.*, 859 F. Supp. 596, 601 (D. Me. 1994).

## II.  STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Shahbabian filed this action on November 14, 2018 in the United State District Court for the Southern District of Ohio under Civil Action 1:18-vs-00790. (Complaint, RE 1, PAGEID #1-32)  Shahbabian filed an amended complaint ("FAC") on January 8, 2019 (FAC, RE 21, PAGEID #102).  Jurisdiction for the FAC exists under federal law pursuant to the ADEA and ADA and federal question under 28 U.S.C. §1331(a)(1).  Jurisdiction for Shahbabian's state law claims exists pursuant to the Court's supplemental jurisdiction under 28 U.S.C. §1367 et seq.

1

This appeal arises from the district court's Order Granting Motion for Summary Judgment on behalf of TriHealth, TriHealth G, and Mayfield and entering Judgment on their behalf. (Order, RE 213, PAGEID #16764-16803).  A timely notice of appeal was filed on August 23, 2018.  (Appeal, RE 214, PAGEID #16804). This appeal was taken as a matter of right pursuant to Fed. R. App. P. 4(a)(1).

## III.  <u>STATEMENT OF THE ISSUES</u>

The issues presented in this Appeal are whether the district court erred to the prejudice of Shahbabian in granting summary judgment on his claims (1) of age discrimination against TriHealth and TriHealth G; (2) aiding and abetting and civil conspiracy against TriHealth, TriHealth G, and Mayfield; (3) breach of contract, common law fraud, and tortious interference with contractual relations against TriHealth, TriHealth G, and Mayfield; (4) disability discrimination against TriHealth and TriHealth G; (5) discriminatory retaliation against TriHealth and TriHealth G; (6) fraud against TriHealth; and (7) whether TriHealth G is entitled to a clawback of $679,711.61 it claims to have overpaid Shahbabian pursuant to a five year employment contract.

Shahbabian also raises the issue of whether the district court abused its discretion in refusing to allow the filing of the declaration of third party witness Timothy Murphy and in failing to grant Shahbabian's request for reconsideration of that order.

## IV.   <u>STATEMENT OF THE CASE</u>

Shahbabian filed his FAC on January 8, 2019 (FAC, RE 21, PAGEID #102)

After a period of discovery, the parties filed motions for summary judgment.

(TriHealth, TriHealth G MSJ, RE 137, PAGEID #3828-3864; Mayfield MSJ, RE

138, PAGEID #4333-4370)  Shahbabian responded on April 1, 2020. (Response, RE

186, PAGEID #13912-14017)

After the summary judgment motions were filed, Shahbabian asked the Court

for leave to file the declaration of an additional witness named Timothy Murphy.

(RE 201, PAGEID #15675-15682)   The district court denied the motion. (Order,

RE 207, PAGEID #16303-16306)  Shahbabian asked the court to reconsider that

decision. (Reconsideration, RE 209, PAGEID #16485-16742)  The Court denied the

request on July 22, 2021. (Order, RE 212, PAGEID #16761-16763)  On the same

day, the district court granted the Defendants' motions for summary judgment and

awarded TriHealth G the amount of $671,711.61 plus prejudgment interest. (Order,

RE 213, PAGEID #16764-16803; Order RE 216, PAGEID #16808-16809)

Shahbabian filed a timely Notice of Appeal on August 23, 2021. (Appeal, RE 214,

PAGEID #16804)  A second appeal was refiled on May 19, 2022.  (Appeal RE 217,

PAGEID #16810-16812)

## V.  SUMMARY OF THE ARGUMENT

The district court summary judgment opinion must be reversed.  In regard to Shahbabian's age discrimination claims, the district court refused to recognize the existence of direct evidence of age animus and, in analyzing a circumstantial case, ignored alternative methods to establish a prima facie case.  As a consequence, Shahbabian's claims against Mayfield for aiding and abetting and conspiring with TriHealth to discriminate against Shahbabian were also dismissed.

Additionally, the district court wrongly determined that Shahbabian's state law claims for breach of contract, fraud, tortious interference, and civil conspiracy against all Defendants were barred by the immunity set forth in Ohio Revised Code §2305.251(A).  The court disregarded the evidence in the record which established the actual malice of the Defendants which removes the protection of immunity for the unlawful actions of the Defendants.

The district court disregarded direct evidence of disability discrimination uttered by the Defendants' agents in dismissing Shahbabian's substantive, discriminatory, and retaliation claims under the ADA and corresponding state law. The district court also failed to consider the facts which established Shahbabian's claim of fraud.

Moreover, the district court's erred in awarding the amount of $679,711.61 to TriHealth G.  This clawback amount represents the gross compensation TriHealth

claims it overpaid to Shahbabian including taxes that were withheld. TriHealth's Rule 30(b)(6) representative Brad Hall testified that any clawback amount TriHealth G allegedly seeks from its physicians is limited to the net amount overpaid to the physician and does not include the taxes that are withheld and paid to the United States government. On December 8, 2021, the district court tacked on prejudgment interest of $68,031.32. The district court committed error in finding that the recovery sought by TriHealth G was not prohibited by its unlawful conduct in violation of the federal Anti-Kickback Statute.

Finally, the district court abused its discretion in not allowing the filing of the declaration containing the testimony of Timothy Murphy for its consideration in ruling on Shahbabian's claims of discrimination and in determining the contractual compensation clawback award by TriHealth G.

## VI. <u>STANDARD OF REVIEW</u>

The standard of review on Shahbabian's appeal regarding summary judgment is *de novo*. *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013). The standard of review on Shahbabian's appeal of the district court's decision refusing to allow the filing of the Murphy declaration and a rejection of Shahbabian's reconsideration of that decision is an abuse of discretion. *Marie v. Am. Red Cross*, 771 F.3d 344, 366 (6th Cir. 2014).

# VII.  ARGUMENT

## STATEMENT OF THE FACTS

### A. Shahbabian's Causes of Action.

In Shahbabian's FAC, he asserted the following causes of action:

- Count One – Breach of contract against TriHealth and TriHealth G, LLC. (RE 21, PAGEID #118-120);

- Count Two – Federal age discrimination in violation of 29 U.S.C. §626 et seq. against TriHealth and TriHealth G, LLC (RE 21, PAGEID #120-122);

- Count Three – Retaliation in violation of 29 U.S.C. §626(d) against TriHealth and TriHealth G, LLC. (RE 21, PAGEID #122-123);

- Count Four – Violation of Ohio Revised Code §4112.14(A) against TriHealth (RE 21, PAGEID #123);

- Count Five – Violation of Ohio Revised Code §4112.02(A) and §4112.99 against TriHealth and TriHealth G, LLC (RE 21, PAGEID #123-124);

- Count Six – Retaliation against TriHealth and TriHealth G, LLC pursuant to Ohio Revised Code §4112.02(I) and §4112.99 (RE 21, PAGEID #124-125);

- Count Seven – Aiding and Abetting against TriHealth, TriHealth G, LLC, and Mayfield in violation of §4112.02 and §4112.99 (RE 21, PAGEID #125-126);

- Count Eight – Common law fraud against TriHealth and TriHealth G, LLC (RE 21, PAGEID #126-128);

- Count Nine – Tortious interference with contractual and prospective business relationships against Mayfield (RE 21, PAGEID #128-129);

- Count Ten – Common law civil conspiracy against TriHealth, TriHealth G, LLC, and Mayfield (RE 21, PAGEID #129-130);

- Count Eleven – Federal disability discrimination against TriHealth and TriHealth G, LLC (RE 21, PAGEID #130-131);

- Count Twelve – State (handicap) disability discrimination against TriHealth and TriHealth G, LLC (RE 21, PAGEID #132) in violation of Ohio Revised Code §4112.02(A) and §4112.99 (RE #137, PAGEID #3862-3863).

Shahbabian also is a third party defendant to TriHealth G's affirmative claim for breach of contract and unjust enrichment. It asserted that it is entitled to repayment under Shahbabian's employment contract because it overpaid him $679,711.61 above what he was allegedly entitled to, based upon a contractual baseline production metric in his employment contract that he failed to achieve in 2017 and 2018. (RE 137, PAGEID #3862-3863)

## B. **Mayfield Begins a Campaign to Transition Shahbabian's Patient Base to itself Through TriHealth.**

The story of this case begins with the acknowledgment that Dr. Set Shahbabian is a neurosurgeon who over the last 45 years has performed the largest number of neurosurgical procedures at Good Samaritan Hospital ("Good Samaritan"). Defendants TriHealth and TriHealth G are part of a health system based in Cincinnati, Ohio. (RE 213, PAGEID #16764). Mayfield is a physician group that practices brain and spine care at most Cincinnati hospitals including the ones that are affiliated with TriHealth. (*Id.*)

The Defendants' scheme to steal Shahbabian's surgical practice and force his retirement because of his age began in October of 2012 when Mayfield conspired with TriHealth to involuntarily transfer Shahbabian's surgical practice to it and force Shahbabian to retire. At that time, Mayfield attempted to convince TriHealth to transition Shahbabian's surgical practice to a new resident Mayfield was considering for employment named John DePowell. Mayfield's employment of DePowell was contingent upon TriHealth's transition of Shahbabian's surgical practice to Mayfield. In an October 19, 2012 email to the Mayfield shareholders, including Dr. Ringer and Dr. McPherson, Mark Farrington wrote in part[1]:

> …As you will recall, the final decision during the [Mayfield Board of Directors] meeting was that we should recruit [Dr.] John DePowell under the stipulation that there be a working arrangement between [Good Samaritan], Dr. Shahbabian and Mayfield regarding a "transition" of Set's practice.

(RE 153-1, PAGEID #8984)

Farrington further explained:

> We had a perceived long term opportunity for John DePowell because of Dr. Shahbabian's practice on the Westside. However, with no definite "end date", the group attempted to create 'multiple opportunities' to put surgical patients with DePowell to cost justify

---

[1] Mark Farrington is the Mayfield Chief Executive Officer. (RE 153, PAGEID #8747) Dr. Andrew Ringer is a Mayfield physician and a member of the Board of Directors from 2013 through 2018. (RE 171, PAGEID #11594) He is also chief of Neurosciences at Good Samaritan from 2017 to the present and a member of the Good Samaritan Surgical Quality Assurance since 2015. (RE 171, PAGEID #11594-11595 and PAGEID #11721) Dr. McPherson is a Mayfield physician and a member of its Board of Directors. (RE 179, PAGEID #12935)

> the position. The feeling was Mayfield could do this until Dr.
> Shahbabian's <u>retirement</u>… (Emphasis added)

(RE 153-2, PAGEID #8985)

Farrington believed the only way to guarantee John DePowell and Mayfield would be able to build a successful neurosurgery practice within a reasonable period of time that would not significantly impact other surgeons in the Mayfield group would be for Mayfield to assimilate Dr. Shahbabian's current practice to DePowell over the next few years. (RE 153-2, PAGEID #8986) Farrington thought that he could convince TriHealth to assimilate Shahbabian's practice to Mayfield because Good Samaritan had an interest in keeping Shahbabian's referral pattern at that hospital on a long term basis. (RE 153, PAGEID #8815, Lines 4-15)

Two days later, on October 31, 2012, at an Executive Committee meeting, McPherson expressed his opinion that Mayfield should do whatever it could to transition Shahbabian's patients to Mayfield and DePowell as Shahbabian moved towards <u>retirement</u>, in order to "build the [Mayfield] pie". (Emphasis added) (RE 153-5, PAGEID #8992)

**C. <u>Shahbabian's History at Good Samaritan and the Sale of His Practice</u>.**

By January of 2011, Dr. Kerlakian realized that Shahbabian represented approximately 350 of the 505 or over 50% neurosurgical cases performed at Good

Samaritan per year.[2] (RE 175, PAGEID #12526, Lines 1-6; RE 175-26, PAGEID #12711) As a key stakeholder, it was imperative that TriHealth retained Shahbabian as a neurosurgeon within its hospital. (RE 175-28, PAGEID #12715)  This would allow TriHealth to eventually transition Shahbabian's practice to Mayfield.

Consequently, TriHealth decided in mid-2012 to buy Shahbabian's practice and offer him employment.[3] (RE 175-29, PAGEID #12717-12718)  Shahbabian was unaware of the negotiations that were occurring between Mayfield and TriHealth relating to the transition of his practice to Mayfield upon Mayfield's hiring of DePowell. (Shahbabian Dec, RE 186-1, PAGEID #14020, ¶3)

On June 7, 2013, Shahbabian met with Kerlakian, Robinson, and others.[4] As an inducement for Shahbabian to execute an employment agreement and sell his assets to TriHealth, Robinson promised that once the employment agreement was signed, Shahbabian, as part of the neurosurgery expansion, would become the Director of the Department of Neurosurgery for Good Samaritan. (*Id.*) Robinson further stated to Shahbabian that TriHealth would hire three additional neurosurgeons between the date Shahbabian signed his employment agreement and

---

[2] Dr. Kerlakian is the Chairman of the Dept. of Surgery at Good Samaritan and the Medical Director for the TriHealth physicians. (RE 175, PAGEID #12500)
[3] Kerlakian believed the best surgeon at Good Samaritan in 2012 was Shahbabian. (RE 175-30, PAGEID #12720)
[4] Dr. Robinson was the Senior Vice President of Operations at TriHealth until 2016. (RE 177, PAGEID #12796)

mid-2017 so he could gradually transition some of his surgical referrals from the west side family practice physicians to those newly employed neurosurgeons that TriHealth promised to hire. (*Id.*)  Shahbabian did not know, nor was he told by Robinson, that TriHealth had agreed to not hire any additional neurosurgeons as part of a proposed co-management clinical agreement with Mayfield. (*Id.*)

### D. <u>TriHealth Negotiates with Mayfield to Run the Neurosurgical Department at Good Samaritan and Bethesda North.</u>

While TriHealth was promising Shahbabian that he would be named Director of Neurosurgery at Good Samaritan, Oliphant[5] and Farrington were discussing Mayfield's participation in a potential co-clinical management agreement. (RE 153, PAGEID #8820, Lines 13-18)  Oliphant told Farrington that TriHealth wanted a closer and more formal working relationship with Mayfield. (RE 153, PAGEID #8820, Lines 19-20)

On July 31, 2013, Robinson wrote to Oliphant indicating he had met with Shahbabian a few days prior and withheld information that TriHealth/Good Samaritan did not intend to hire three residents as previously promised.  Robinson wrote:

> I met with Set a few days ago and will be sitting down in the next week or two to meet the three residents he is interested in just to listen to their perspectives... <u>I never told him that we are not going</u>

---

[5] Jerry Oliphant was the Executive Vice President and Chief Operating Officer of Good Samaritan. (RE 165, PAGEID #10944, Lines 7-17)

to recruit those residents and indeed have shown interest in them...
(Emphasis added)

(RE 165-7, PAGEID #11096)

On August 19, 2013, Mayfield and TriHealth exchanged a draft of a proposed Co-Management Agreement. (MJB Dec., RE 186-3, PAGEID #14025-14068) Under this Agreement, Mayfield would provide on-call professional services to TriHealth's emergency room neurosurgery patients at Good Samaritan and Bethesda North, and would be the sole recipient of any unassigned TriHealth neurosurgery patients at both Good Samaritan and TriHealth.

During the Fall of 2013, Robinson and Farrington continued to negotiate the proposed 2014 Agreement while Robinson was promising Shahbabian that once he became an employee and TriHealth purchased his assets, he would assume the role of Director of the Neurosurgery Department of Good Samaritan. On January 5, 2014, another draft of the Co-Management Agreement was exchanged. For the first time, it contained a provision set forth in paragraph 9.2.3 which provided:

> Employment of Neurosurgeons by TriHealth. Except as described on Exhibit 9.2.3, attached hereto, during the term of this Agreement (including any Renewal Term), TriHealth shall not recruit or employ any new neurosurgeons.

(MJB Dec., RE: 186-5, PAGEID #14108-14154)

Three days later on January 8, 2014, Farrington met with Oliphant regarding the formation of the closer relationship between Mayfield and TriHealth. (RE 153,

PAGEID #8828-8830) During the discussion, Oliphant told Farrington that Dr. Shahbabian would only be employed by TriHealth for two years. (*Id.*; RE 153-11 PAGEID #9013) After the two years, Oliphant expected Mayfield to have Shahbabian's replacement ready to go so that a new Mayfield neurosurgeon would assume Shahbabian's referral patterns and maintain his surgical case volume from referring physicians on the west side of Cincinnati for Good Samaritan. (RE 153, PAGEID #8831)

A fifth draft of the proposed agreement was completed on February 3, 2014 which precluded TriHealth from hiring any additional neurosurgeons other than Drs. Shahbabian, Borden, and Horn unless the new hire was agreed upon by both TriHealth and Mayfield. (MJB Dec., RE: 186-6, PAGEID #14155-14201)

### E. <u>Shahbabian Continues to Provide Excellent Quality of Care to his Patients Admitted at Good Samaritan.</u>

On January 2, 2014, Kerlakian sent a letter to Shahbabian stating the results of a focus review performed on Shahbabian from 2013. (RE 171-27, PAGEID #12002-12003) Kerlakian found that the results of the review were impressive. (*Id.*)

### F. <u>TriHealth and Mayfield signs the first Agreement.</u>

On June 2, 2014, TriHealth and Mayfield signed the Co-Clinical Management Agreement. In the Agreement, Mayfield – not Shahbabian - was to receive all unassigned neurosurgical and cranial patients that arrived at the emergency rooms of both Good Samaritan and Bethesda North. (RE 153-13, PAGEID #9025,

13

¶2.1(i)(A) and (B))  Mayfield was also designated as the medical provider for all office consultations for TriHealth's unassigned patients which included primary care physicians patient referrals. (RE 153-13, PAGEID #9025, ¶2.1(C))  Mayfield was to be paid $80,417.00 per month as on-call compensation, $230,000.00 a year for medical director services, and $175,000.00 a year for achieving what is defined as Quality Initiative ("QI") Targets. (RE 153-13, PAGEID #9059)  TriHealth agreed that it would not recruit or employ any neurosurgeons other than Shahbabian, Borden, or Horn.  (RE 153-13, PAGEID #9039, ¶9.2.3, and RE 153-13, PAGEID #9071)

Mayfield wished to hire another physician named Chris Koebbe, but needed to eliminate Shahbabian's practice to make room for Koebbe on the west side of town.  Accordingly, Farrington offered the following artifice: One way to force Shahbabian to transition his practice to Mayfield was to eliminate physician support for Shahbabian and leverage the lack of call and resident coverage for him.  On November 6, 2014, Farrington wrote to McPherson and Ringer:[6]

> I received a call last week from John Robinson... The reason
> Robinson called me is he needs to be able to have cross-coverage
> for Borden (only for times he is out of town).  This has always been
> a concern for TriHealth.  Surprisingly, it has never come up in
> relation to Shahbabian.  My thought is the potential to use the cross

---

[6] Ringer was the Chief of the Neurosurgery section for Good Samaritan and the person responsible for making presentations regarding Shahbabian's quality of care to Good Samaritan's peer review panels.

coverage issue as leverage for a Shahbabian deal.  That being that he would agree to give up/reduce/transition his practice to Mayfield along an agreed upon timeline related to Koebbe coming to Mayfield.  My understanding is that Set had a bad outcome with a case recently and asked for Andy's assistance.  <u>TriHealth can believe that a 72? y/o surgeon performing 400 cases a year who is having bad outcomes is good for business</u>.

(RE 153-16, PAGEID #9080)  When asked about this email in his deposition, Farrington testified that the reference to a "Shahbabian Deal" was to use the cross coverage issue as leverage in order to obtain a timeline from TriHealth for a date when "Shahbabian might slow his practice down."  (RE 153, PAGEID #8846, Lines 7-14)

> "Q. The deal you're talking about leveraging here is a deal where TriHealth sets a timeline <u>for Set's retirement</u>? (Emphasis added)
>
> A.  Right. . .

(RE 153, PAGEID 8848, Line 13 to PAGEID #8849, Line 12)

Three weeks later, at 3:10 p.m. on November 9, 2014, Arthur Arand, the Chairman of the Board of Directors for Mayfield, laid out the plan to eliminate Shahbabian as a competitor which required pushing "<u>TriHealth to expedite Set's retirement to 12-18 months</u>." (Emphasis added) (RE 153-16, PAGEID #9077) Ringer believed that Shahbabian would be amenable to transitioning his practice because, "<u>he had a – kind of a tired look about him you know. He seemed to be worn out a little bit</u>." (Emphasis added) (RE 171, PAGEID #11705, Lines 8-17)

### G. **Mayfield Physicians Begin to use a Sham Peer Review Process to Transition Shahbabian's Neurosurgical Practice to Mayfield.**

#### 1. **First and Second Peer Review Cases Presented by Ringer.**

On February 19, 2015, McPherson presented a case to the surgical Good Samaritan Quality Assurance ("QA") committee claiming that Shahbabian did not meet the standard of care for a Good Samaritan patient. (RE 179, PAGEID #12940; RE 179-2, PAGEID #13020) Consequently, a letter was sent by the Department of Surgery QA to Shahbabian regarding a laminectomy and the non-usage of a microscope during an operation that occurred on October 31, 2014. (RE Sealed 164-6, PAGEID #10750-10757) Shahbabian responded on March 4, 2015 explaining the case and indicating that it is the decision of the physician on a case by case basis as to whether a microscope is appropriate. (RE Sealed 164-6, PAGEID #10761-10762) Ringer, as the Neurosurgery Section Chair, presented the case to a peer review committee and stated that this case was unusual and included a significant injury.

Shahbabian sent a follow up letter on April 8, 2015, explaining that his care for this patient was appropriate. (RE Sealed 164-6, PAGEID ##10763-10765)

A second case was presented by Ringer to the peer review committee. Consequently, a second letter to Shahbabian from the Department of Surgery QA Committee was delivered, asking for his rationale for ordering the antibiotic Vibranycin for a patient. (RE Sealed 164-6, PAGEID 10740) Shahbabian responded by letter dated February 9, 2015 offering a valid explanation for using

16

Vibranycin as a pre-operative antibiotic. (RE Sealed 164-6, PAGEID ##10744-10745)  On March 19, 2015, the case was presented by Ringer, the section chair, to the Department of Surgery QA Committee  (RE Sealed 164-6, PAGEID 10742)  In preparation for a quality assurance meeting, Kerlakian wrote his administrative assistant and asked, "What's Shahbabian DOB?" She responded, "1890?" (Emphasis added)   (RE 171-34, PAGEID #12010)

On April 8, 2015, Shahbabian sent another follow up letter identifying his rational for using Vibranycin. (RE Sealed 164-6, PAGEID #10747)

### H. While the Peer Review Process is Pending, TriHealth Attempts to Disqualify Shahbabian from Performing Surgery by Falsely Claiming that his Age Mandates a Medical Examination While Withdrawing Resident Support From him in Caring for his Patients.

By March 6, 2015, Shahbabian complained to TriHealth about the lack of resident coverage for him at Good Samaritan which was promised to him in the contract negotiations in 2013-2014.   (RE 181-3, PAGEID #13793)   Only one resident was available to provide coverage for Shahbabian. (*Id.*)  Shahbabian told Easterling[7] that he needed resident coverage. Easterling told Shahbabian that resident coverage was under the control of Ringer and McPherson.  (*Id.*)  Easterling promised resident help for Shahbabian. (*Id.*)  The additional resident help never materialized.

---

[7] James Easterling was an executive at Good Samaritan.

One week later on March 12, 2015, Kerlakian told Shahbabian that he would be receiving a letter from TriHealth that Shahbabian should be checked once a year to verify his competency and make sure there are no existing health issues. (RE 181-3, PAGEID #13794) Kerlakian stated that even though no age restriction for surgeons existed at TriHealth, TriHealth believed <u>he should be examined because he was over 70</u>. (Emphasis added) (*Id.*) Shahbabian was told that the medical exam request was initiated by Collins.[8] (RE 181-3, PAGEID #13795)

The following week, on or about April 2, 2015, Shahbabian met with Collins, Kerlakian, and Dr. Helen Koselka.[9] Collins stated that TriHealth wished for Shahbabian to be evaluated by a professional or TriHealth would initiate a request with the Good Samaritan Executive Committee and force Shahbabian to undergo a medical examination with the results to be disclosed to the hospital Medical Staff. (RE 181-3, PAGEID #13798) Collins falsely told Shahbabian that TriHealth was in the process of having medical evaluations mandatory for all medical staff over the age of 65. During this meeting, Shahbabian asked Kerlakian that Dr. Tew, as an independent consultant, review the pending quality of care cases that McPherson and Ringer had brought to the Good Samaritan peer review committees. (RE 175, PAGEID #12565) Kerlakian agreed.

---

[8] Robert Collins was the Chief Medical Officer at Good Samaritan until December 2017. (RE 169, PAGEID #11245, Lines 7-11)
[9] Helen Koselka was a member of the Good Samaritan physicians staff.

## I. **Dr. John Tew Reviews the Peer Review Cases Initiated by Ringer and McPherson and Finds no Deviation of Standard of Care by Shahbabian.**

On April 9, 2015, Shahbabian met with Jay Koch[10], Easterling, and Robinson. Shahbabian reiterated his concern for the lack of resident coverage for his patients at Good Samaritan.  (RE 181-3, PAGEID #13801)  Shahbabian responded that he was capable of performing surgery at Good Samaritan.  Koch also asked Shahbabian if he was open to having another neurosurgeon use his office in order to introduce this physician to Shahbabian's patients. (RE 181-3, PAGEID #13802)  Robinson suggested that in the future Shahbabian may wish to give the hard surgical cases to McPherson or Mayfield, or alternatively, join Mayfield as an employee.  (RE 181-3, PAGEID #13803)  Robinson stated that by agreeing to do smaller cases, Shahbabian would not need to make a yearly quota and that he would continue to be paid by TriHealth. (RE 181-3, PAGEID #13805)

Shahbabian responded by claiming that TriHealth/Good Samaritan was using the credentialing process as an avenue to disqualify him from performing future surgeries. (Emphasis added) (RE 181-3, PAGEID #13804)  The meeting ended with Robinson again suggesting that Shahbabian undergo a medical examination by a physician chosen by TriHealth. (RE 181-3, PAGEID #13802)

---

[10] Jay Koch was an executive at the Good Samaritan.

On April 9, 2015, Kerlakian wrote to Koselka, Collins, and Robinson indicating that he had in his possession three years of Shahbabian's cases.  He stated that he had "spoken to Dr. Tew" for an independent evaluation.  (RE 175-7, PAGEID #12654)   Tew told Kerlakian he had reviewed the pending peer review cases and he was satisfied with Shahbabian's quality of care for those patients. (RE 175, PAGEID #12566, Lines 23-25)   Tew later memorialized the oral opinions he provided to Kerlakian.  (RE 175-9, PAGEID ##12657-12658)

On April 13, 2015, the Shahbabian peer review process included the review of the duro tear comparisons between Shahbabian, McPherson, Mandybur,[11] and Ringer for Kerlakian's consideration for the time period 2010-2014. (RE 175-8, PAGEID #12655) The results showed that, as a percentage comparison, Ringer and Mandybur had higher duro tears than Shahbabian for the laminectomies they performed during that same period of time at Good Samaritan. (RE 175-8, PAGEID #12656)   Furthermore, McPherson and Shahbabian were statistically equal in the percentage comparison for the duro tears in the laminectomies they performed on patients during that time period. (RE 175-8, PAGEID #12656)[12]

---

[11] Mandybur was a Mayfield neurosurgeon.

[12] Per Ringer, the fact that a duro tear occurs during surgery doesn't mean that a physician performed below the standard of care. (RE 171, PAGEID #11736, Lines 15-19)

On April 14, 2015, Shahbabian's cases were presented to the Good Samaritan

Patient Care peer review committee by Ringer.  The notes from that meeting state:

> A specific outside review of the case was requested by Shahbabian
> and the reviewer did not think a microscope was needed on the case.
> However, Kerlakian stated this was a surgeon from the same era as
> the surgeon in question and that he is no longer practicing and,
> therefore, it is not known whether or not he has kept up on standards.
> The younger practicing surgeons are the ones stating the microscope
> is the standard of care... (Emphasis added)

(RE 164-6, PAGEID #10760)

Shahbabian met with members of the peer review committee to discuss a third

patient.  (RE 181-3, PAGEID #13810)  Kerlakian and Ringer attended the meeting.

During the meeting, they suggested that Shahbabian may consider retirement.

(Emphasis added) (*Id*.)  Additionally, Ringer required that in any large or difficult

case scheduled by Shahbabian in the future, that a Mayfield physician be consulted.

(RE 181-3, PAGEID #13811)

The third case was reviewed by the Peer Review Committee after it was

initiated by Ringer on May 12, 2015.  (RE Sealed 164-6, PAGEID #10767)

Shahbabian responded that his care for the third patient was appropriate.  (RE Sealed

164-6, PAGEID #10769-10771)  Although Shahbabian provided explanations that

his cases met community standards for all three cases that Ringer presented in the

peer review proceedings, and Dr. Tew had given an opinion that Shahbabian's

treatment of his patients was consistent with the community standard of care,

Shahbabian agreed in the future to limit his complex and multi-level surgical practice at the insistence of Kerlakian and Ringer.  (RE 164-6, PAGEID #10773)

### J.   Mayfield and Ringer Continue to use the Peer Review Proceedings to Justify the Transition of Shahbabian's Surgical Practice to Mayfield.

Less than two weeks after Ringer insisted that Shahbabian limit his surgical practice through a corrective action plan, he recommended to Mayfield at a Mayfield Board meeting that it hire another physician to "pick up" Shahbabian's current practice.  (RE 153-20, PAGEID #9089)

Ringer believed that given the reduced scope of Shahbabian's practice arising from the peer review corrective action process, the surgeries Shahbabian would no longer be able to perform could be assumed by a newly hired Mayfield surgeon. (RE 171, PAGEID #11756, Lines 5-24)  In conjunction with Ringer's suggestion that Mayfield hire a neurosurgeon to "pick up" Shahbabian's practice, Mayfield and TriHealth continued to negotiate the transition of Shahbabian's practice for Mayfield under the 2014 Agreement.  One of the measures in the 2014 Agreement included a bonus payment of $175,000 to Mayfield by TriHealth for the:

> "Recruitment of a Mayfield employed neurosurgeon to establish a presence/practice on the west side to begin an orderly transition of Dr. Shahbabian's practice and his patients and referring physician base to maintain volume of cases at Good Samaritan."  (RE 155-32, PAGEID #9773)

Shortly after Ringer's suggestion that a new Mayfield physician be hired to "pick up" Shahbabian's practice, Shahbabian reluctantly, on July 14, 2015, signed

the Amendment to his employment agreement limiting his surgical procedures to laminectomies no greater than three levels. (RE 175-42, PAGEID #12740-12741)

### K. **Shahbabian Continues to Provide Good Quality of Care to his Patients Admitted to Good Samaritan.**

On January 7, 2016, TriHealth summarized its review of Shahbabian's cases from September 1st through the end of December 2015. During this time, Shahbabian performed approximately 100 surgeries and had "no significant complications." (RE 208-11, PAGEID #16359; RE 164-7, PAGEID #10800; RE 171; PAGEID #11757, Lines 12-17)

### L. **TriHealth Hires Gail Donovan to Promote the Retirement of Shahbabian.**

#### 1. **In early 2016, Donovan meets with Farrington to accelerate the retirement of Shahbabian.**

In December 2015, Gail Donovan was hired as TriHealth's Chief Operating Officer.  During the first quarter of 2016, Donovan began implementing plans to eliminate physicians throughout the TriHealth system who were 65 or older.  Those actions began with discussions between Clement[13], Donovan, and others associated with the Chartis Group.[14]  In early 2016, Farrington met with Donovan relating to

---

[13] Mark Clement is the President and Chief Executive Officer for TriHealth since January of 2016. (RE 157, PAGEID #9782, Lines 21-25)

[14] As admitted by TriHealth in a pleading filed with the Court, the Chartis Group was "specifically engaged to act as TriHealth's agent in advising on the negotiations between TriHealth and Mayfield." (RE 86, PAGEID 704)  Chartis was supporting TriHealth's work. (RE 152, PAGEID #7790, Lines 20-24)

furthering the partnership between TriHealth and Mayfield.  On April 14, 2016, several major issues were identified, the resolution of which would allow the formation of a closer Mayfield/TriHealth partnership. One issue involved Mayfield's level of financial commitment to TriHealth in the future. (RE 153-21, PAGEID #9096)  This involved a determination of the additional surgical cases Mayfield was willing to direct to Good Samaritan in return for a capital equipment investment in the Neurosurgery Department by TriHealth.  (RE 152, PAGEID #7769-Line 12- #7770, Line 5)  Another issue was the elimination of Shahbabian as a TriHealth neurosurgeon to allow his surgical practice to be assumed by a Mayfield replacement.  In an April 14, 2016 email, Farrington wrote to Donovan:

> The last question/issue is related to Dr. Shahbabian.  Previous TriHealth leadership (Oliphant and Robinson) has stated that if Mayfield were to hire another neurosurgeon for the west side that they would promote that person as a TriHealth preferred physician and the _____ "replacement" for Shahbabian.

(RE 153-21, PAGEID #9096)

In response to Farrington's query, Donovan sought the advice of TriHealth's agent, Chartis.  Peter Shorett of Chartis advised TriHealth:

> I think [Mayfield's] desire to accelerate/formalize the transition from Shahbabian (who is 72 years old) to a new recruit is central to the discussion and probably in both parties' interests.

(RE 153-52, PAGEID #9292)

**2.** **Donovan confirms TriHealth's intention to involuntarily retire Shahbabian.**

On April 19, 2016, Donovan expressed her thoughts relating to the Mayfield/TriHealth partnership. (RE 152, PAGEID #7772 Lines 12-20)  Donovan had not talked to Shahbabian about retirement or replacing him with Mayfield physicians. (RE 152, PAGEID #7775, Lines 13-18)  She was "committed to a plan to replace Dr. Shahbabian as soon as possible as he moves towards retirement." (Emphasis added) (RE 153-52, PAGEID #9291) In a phone conversation, Donovan told Farrington that TriHealth was committed to transitioning Shahbabian's practice to Mayfield. (RE 153, PAGEID #8866, Lines 1-7)   In an April 26, 2016 Mayfield Executive Committee meeting, Farrington reported that:

> That Ms. Gail Donovan had agreed to several items moving forward as part of Mayfield's involvement with the strategic planning initiative and Mayfield's partial funding of the planning cost.  She agreed that TriHealth would actively support and assist in the transition of Dr. Shahbabian's practice to a Mayfield employed neurosurgeon that would be located in our west side office... (Emphasis added)

(RE 153-22, PAGEID #9099)

In an email dated May 12, 2016, Farrington informed Ringer, McPherson and others that Donovan had agreed to "a formal written plan to transition Set's practice to Mayfield. They will promote the 'Set replacement' to his current referral base." (Emphasis added) (RE 153-23, PAGEID #9103)

The next day on May 13, 2016, Farrington, in a Mayfield Shareholders meeting, stated that he had "two additional candidates who might be possibilities for either Mercy West and/or as a Dr. Shahbabian replacement for TriHealth…" (RE 153-24, PAGEID #9107)   The two young candidates were Dr. Tempel and Dr. Jimenez. (RE 179, PAGEID #12988, Line 20 - #12989, Line 16)

## M. The TriHealth/Mayfield Partnership Evolves From a Shahbabian Practice Transition to a Violation of the Anti-Kickback Statute ("AKS").

### 1. TriHealth and Mayfield exchange surgical numbers and plan for the involuntary transition of Shahbabian's patients to Dr. Zachary Tempel when he arrives in July of 2017.

The written transition of Shahbabian's practice to Mayfield began in the Fall of 2016.  On September 1, 2016, Kappel[15] wrote to Donovan enclosing an initial draft of the Neuroscience Implementation Tasks for the TriHealth/Mayfield partnership. (RE 152-38, PAGEID ##8372-8374)  The physician platform for the Neuroscience Implementation Tasks included the bullet point "facilitate the transition of Dr. Shahbabian on a more accelerated timeline with a new Mayfield recruit." (RE 152-39, PAGEID #8378)  By September 1, 2016, the new Mayfield recruit was anticipated to join Mayfield and assume patients at Good Samaritan in July 2017. (*Id.*)

---

[15] Kevin Kappel was an employee of The Chartis Group.

On September 8, 2016, Donovan sent an email to Farrington identifying the goals and agenda for a scheduled meeting to occur between the two groups on September 12, 2016. (RE 153-25, PAGEID ##9112-9114)   Attached to the email was a "Neuro Implementation Action Plan Priorities – For Review by Mayfield." One of the action plans was to "facilitate the transition of Dr. Shahbabian on a more accelerated timeline (new Mayfield recruit to start 7/17 with identified Mayfield surgeons serving on an interim basis)".  (RE 153-25, PAGEID #9114)

On September 12, 2016, Donovan requested, and Farrington provided, Mayfield surgery statistics for procedures performed by its physicians. (RE 152-4, PAGEID #7974-7975; RE 152, PAGEID #7816, Line 11-#7818, Line 16)   The purpose was to understand future surgical volume Mayfield intended to redirect to TriHealth in order to subsidize the capital investments at Good Samaritan that TriHealth intended to make on Mayfield's behalf. (*Id*.)

On September 13, 2016, Kappel wrote to Collins identifying that "another key element of the neurosciences implementation is planning for the transition of Dr. Shahbabian." (RE 154-13, PAGEID #9522) <u>Collins confirmed that at that time there were no quality of care issues associated with Shahbabian</u>. (Emphasis added) (RE 169-13, PAGEID #11558)   On September 12, 2016, Collins forwarded a request to

Dr. Tom Tami[16] and others for a September 13, 2016 meeting to discuss the "Shahbabian Transition". (RE 169-26, PAGEID #11560)

At the September 13, 2016 meeting, Collins and Tami looked at a number of options for Shahbabian including an emeritus position, foundation, and research. (RE 154-15, PAGEID #9525)  He stated:

> [Shahbabian] still has 2.5 years on his contract.  Need to connect with Gail [Donovan] on how much TriHealth is willing to spend on a buyout." (*Id.*)  Additionally, "Ringer/McPherson/Kachmann are committed to seeing the [Shahbabian] patients that might be lost. We then need to identify transitioning from a multiple person model to Dr. Tempel without losing those patients... (*Id.*)

Kappel sent a document on September 14, 2016 summarizing the discussions that occurred between Donovan and Farrington at a joint meeting.  Farrington testified:

> Q. At least at this point, September 15th, it was anticipated that Dr. Tempel would be the recipient of the transition of Dr. Shahbabian's practice?
>
> A. According to TriHealth and Chartis, yes. (RE 153, PAGEID #8889, Lines-21-24)

On September 28, 2016, Kappel updated Donovan on the neuroscience line implementation.  By this date, it was agreed that Mayfield would move a number of procedures from UC Health to Good Samaritan and Bethesda North, focusing on neurospine and cranial surgeries.  (RE 152-45, PAGEID #8412) Dr. Tempel was

---

[16] Thomas Tami was a management physician employed by TriHealth. (RE 154, PAGEID #9419, Lines 18-21; RE 169-24, PAGEID #11491, #11532)

identified as the anticipated replacement for Shahbabian who would assume 80-90% of Dr. Shahbabian's fiscal 2012, 2013, and 2014 surgical volume. (*Id.*)

On October 4, 2016, Farrington met with Cercek[17] to review Mayfield surgery case volumes and the projected shift of those volumes to TriHealth facilities. (RE 157-20, PAGEID #10085)  Farrington and Robert Cercek discussed not only the incremental inpatient admissions to TriHealth by Mayfield physician, but the volume that could be expected for the "Shahbabian replacement." Cercek thanked Farrington for his time for helping the parties "get this model as close as possible to the future reality." (RE 157-20, PAGEID #10085-10086)

Mayfield's intent to offer these surgical cases in return for Shahbabian's referral base was reflected in an October 6, 2016 email from Farrington to Mayfield Shareholders.  In this email, he writes:

> I wanted to bring you all up to date on the TriHealth situation.
>
> I just had a meeting with Gail Donovan and Rob Cercek and I have to say that I am impressed by their commitment and also excited about life in a post UC world. (Someone referred to February 11 as the Apocalypse, I am referring to it as the Emancipation).
>
> Here are the basics:
>
> They are reviewing case volumes of the potential cases that Andy, Norberto, Vince and George [Mayfield's surgeons] (long term) will

---

[17] Robert Cercek is Executive Vice President for TriHealth Physicians Partners (RE 159, PAGEID #10120, Lines 5-7)  He began his employment with TriHealth on August 22, 2016. (*Id.*)

be bringing.  Also what Tempel will be doing in a post Shahbabian situation (which they are fully committed to)…

(RE 153-29, PAGEID #9119; RE 171-62, PAGEID #12068; RE 171, PAGEID #11785, Lines 14-18)

On November 7, 2016, Donovan confirmed with Cercek, Tami, and Collins that the TriHealth/Mayfield partnership was an illegal kickback:

> "The new proforma (with additional anticipated MD vol) is the critical path item to secure review/approval for expanded co-management agreement – and all operating/capital expenses.  Once approved, we can share the draft revised agreement with Mayfield." (Emphasis added)

(RE 152-58, PAGEID #8513)

### N. On October 31, 2016, Kerlakian and Collins Meet with Shahbabian to try and Convince him to Retire Because he is an "Old Warhorse".

Having decided that Tempel would replace Shahbabian, TriHealth focused on convincing Shahbabian that he should involuntarily retire from neurosurgery.  In an email dated Wednesday, October 12th, Cercek wrote to Donovan, "I just spoke with Bob Collins regarding Dr. Shahbabian.  Bob and George [Kerlakian] are going to have the conversation about retirement and are going to do it in the next week or two. (Emphasis added) (RE 159-34, PAGEID 10459)   Collins perceived that Shahbabian looked "rickety" because he was holding onto walls.  (RE 169, PAGEID #11314, Lines 7-13)   Cercek agreed, observing that Shahbabian shuffled his feet. (RE 159, PAGEID #10161, Lines 9-11)

Kerlakian and Collins met with Shahbabian on October 31, 2016 to discuss retirement.   (RE 159, PAGEID #10163, Lines 6-23)   Shahbabian recorded the meeting between the three of them.

At the October 31, 2016 meeting, Collins and Kerlakian made the following statements to Shahbabian:

> (Attendee) …"You know we have to start preparing for retirement because we all retire… (laughter…) and, we retire at a good point, on our own grounds, as opposed to being forced into retirement. We wanted to see what it is that you need.  First of all, what are your ideas in terms of how you are going to "back out of things"?  You know, you and I are old war horses. (Emphasis added)  (Laughter)[18] (RE 181-3, PAGEID #13829)

Shortly after the Halloween meeting, Collins wrote to Tami with a copy to Kerlakian:  He opined that:

> Set is willing to consider options which will allow him to slowly pull away from the operating room setting but I am not sure that his timetable corresponds with that of the neuroscience service line projection... (Emphasis added)

(RE 154-10, PAGEID #9517)

## O. In late 2016, Ringer and Kerlakian Determine Shahbabian is Mentally and Physically Sound to Continue Performing Surgery.

In December of 2016, Ringer and Kerlakian submitted their evaluation to Good Samaritan for the reappointment of Shahbabian to the Medical Staff for the

---

[18] Collins admitted in his deposition that he asked Shahbabian about whether he thought about retirement. (RE 169, PAGEID #11315, Lines 5-8)

next two years.  They both determined that Shahbabian should continue to have active medical staff privileges including surgery because of his satisfactory performance.  (RE 154-18, PAGEID #9552)  Ringer and Kerlakian's 2016 evaluation mirrored their satisfactory evaluations for Shahbabian in 2012 and 2014 (RE 154-18, PAGEID #9553, #9556).

## P.   Gracey Reviews the Illegal Agreement Between TriHealth and Mayfield and Gives it his Blessing.

On January 6, 2017, Steve Gracey[19], TriHealth's Chief Legal Counsel, reviewed documents from Kappel; one of which was the "Projected Incremental Volume by Physician" for surgeries that Mayfield intended to redirect from UC Hospital to TriHealth as part of the anticipated 2017 partnership agreement. (RE 151-11, PAGEID ##7633-7644) The document included the original volume projections provided by Farrington to Donovan in September 2016, identifying the referrals Mayfield intended to redirect to TriHealth from UC Hospital as part of the kickback.  (RE 151-11, PAGEID ##7635-7636)  The document also included the surgical volume projections for the total incremental surgeries to be redirected by Mayfield to TriHealth. (RE 151-11, PAGEID ##7637-7638)   The volume

---

[19] Steve Gracey is employed by TriHealth as a lawyer.  In 2016, he became interim general counsel reporting to Clement. (RE 151, PAGEID #7209, Line 17- #7210, Line 1)  In April 2017, he became the permanent general counsel for TriHealth. (RE 151, PAGEID #7210, Lines 8-9)

projections were tied to the proposed 2017 Agreement in which Mayfield was to be paid for medical director services.   (RE 151-11, PAGEID #7638)

Gracey was provided a pdf document titled "Cases by Surgical Category, by Surgical Type" for Mayfield surgeons which identified surgeries to be redirected to TriHealth by Mayfield.  (RE 151-11, PAGEID #7633-7643)  To erase any doubt about the conclusion that the Mayfield/TriHealth partnership was dependent upon surgery case volume from Mayfield, Gracey was provided a document titled "Projected Case Volume at TriHealth". (RE 151-11, PAGEID #7644)   That attachment to the email states, "TriHealth anticipates a five year ramp up period to transfer cases currently performed at UC Hospital over to [Good Samaritan] and [Bethesda North]." (*Id.*)   The attachment is broken down by "Mayfield Current and Projected Volume by Physician." (*Id.*)  Shahbabian's surgery totals were assigned to Tempel as they were "being included in Mayfield's [surgery totals] for purposes of showing anticipated incremental volume" for TriHealth by Mayfield. (*Id*.)

### Q. <u>TriHealth and Mayfield Continue to Devise a Scheme to Involuntarily Retire Shahbabian From His Surgical Practice Even Though Quality of Care Issues do not Exist</u>.

Having failed to convince Dr. Shahbabian to retire, Cercek sought Collins' advice as to how Shahbabian could be removed from his surgical practice.  At 8:40 a.m. on Saturday, February 11, 2017, Cercek wrote to Collins, "Bob, do I need to do anything with Dr. Shahbabian?" (RE 159-29, PAGEID #10446)  Collins responded:

> In terms of winding down Shahbabian clinical footprint, from a medical staff tool viewpoint, the only thing we have is a sledgehammer around quality performance or behavior.  <u>He has not stepped out of line in any of these areas so we have no foot hold to push there</u>... (Emphasis added)

(RE 169-12, PAGEID #11448)  Collins confirmed in his deposition that as of mid-February 2017, there were no behavioral or quality of care issues that existed with Shahbabian.  (RE 169, PAGEID #11334, Lines 22 - #11335, Line 1)

By April 10, 2017, Collins and Tami were desperately looking for a way to transition Shahbabian's  surgical practice to Mayfield.  (RE 169, PAGEID #11387, Lines 2-14)  On April 10, 2017, Tami sent Collins an email with the subject "Set Shahbabian".  (RE 169-37, PAGEID #11581)   Tami wrote:

> I reviewed Set's contract.  He makes around $980K per year and his contract is up in January 2019.  So, to buy out his contract would cost around $1.7M.

Tami and Collins decided to schedule a meeting with Shahbabian to discuss his practice transition to Mayfield.  (RE 152-68, PAGEID #8667)

On May 3, 2017, Collins and Tami met with Shahbabian.   Collins told Shahbabian <u>that he was a legend</u>.  <u>He asked Shahbabian if he was 75 years old</u>.  Tami stated that Mayfield was bringing in a new physician and that Good Samaritan would transfer Shahbabian's patients to the new physician for their surgical treatment.  (RE 181-3, PAGEID #13843)   But that could not be accomplished if Shahbabian maintained his clinical surgery practice.

In anticipation of the new patient referrals from Mayfield, TriHealth and Mayfield signed a new 2017 Agreement on May 10, 2017.  (RE 179-15, PAGEID #13063-13113)   In the agreement, Mayfield was awarded the opportunity to treat all TriHealth neurosurgical patients who arrived at the emergency rooms at Good Samaritan and Bethesda North. (RE 179-15, PAGEID #13066-13067)

On May 15, 2017, Cercek wrote Collins and Tami asking, "Bob and Tom: What are the next steps with Set?"  (RE 154-11, PAGEID #9518)  Cercek was in a panic because the agreement with Mayfield had been signed five days earlier and Shahbabian's practice had not yet been transitioned to Mayfield. (RE 169, PAGEID #11340, Lines 17-20)

### R. TriHealth Uses a Sham Peer Review Process to Involuntarily Retire Shahbabian From Surgery so that his Surgical Practice Can be Transitioned to Tempel.

Unable to convince Shahbabian to voluntarily transition his surgical practice to Mayfield, TriHealth decided to use a peer review process to force him to retire his surgical privileges.  TriHealth used two cases that arose in early 2017.

In the first case, Kerlakian sent a letter to Shahbabian regarding an alleged quality of care issue for a patient whom Shahbabian had performed surgery three months earlier on January 24, 2017. (RE Sealed 164-8, PAGEID #10807) Shahbabian responded to the request on May 9, 2017 and explained why the surgery was necessary and his care was appropriate. (RE Sealed 164-8, PAGEID #10812-

10813)  Kerlakian sent a second letter on May 9, 2017 regarding surgery on a second patient that occurred on March 18, 2017.  (RE Sealed 164-9, PAGEID #10825) Shahbabian also responded to this inquiry on May 9, 2017, identifying the appropriate standard of care for the surgery performed on this patient. (RE Sealed 164-9, PAGEID #10829-10830)  Shahbabian testified in his deposition that his treatment of both of these patients was considered to be within the standard of care for a neurosurgeon in this community. (RE 181-1, PAGEID #13501, Line 23-25; PAGEID #13508, Lines 17-22)

On the morning of May 18, 2017, Ringer presented the two Shahbabian cases to the Surgery Quality Assurance Committee. (RE 175, PAGEID #12503, Lines 19-23; RE Sealed 164-8, PAGEID #10808-10810; RE Sealed 164-9, PAGEID #10826-10827)  In the first case,  Ringer stated to the committee that the "cervical MRI showed disc bulges not traumatic but with degenerative changes."  Ringer felt that the treatment for the January 2017 surgery was more aggressive than [Shahbabian's] peers.  (RE Sealed 164-8, PAGEID #10809)

The second case was also presented by Ringer, and he told the Committee that a 3 level laminectomy performed was not in the best interest of the patient. (RE 175, PAGEID #12504, Lines 10-14; RE Sealed 164-9, PAGEID #10827)  Based upon Ringer's presentation, the Committee concluded further evaluation of Shahbabian was necessary.  No level of care determination was assigned to either case at this

time so there was nothing for Shahbabian to appeal. (*Id.*)  TriHealth's documents state that:

> The Committee concluded further evaluation to be conducted and no Case level was assigned at this time.  There was much discussion by the Committee regarding this physicians quality and competency in the OR and changes in observed physician characteristics that may be affecting movement performance.  Options to address this included initiating another focus review and the consideration to entertain retirement.  The Executive Medical Director to [follow up] with the [Chief Medical Officer] to determine [appropriate] course of action.  (Emphasis added) (*Id.*)

Dr. Smith, one of the physicians on the Committee, commented on Shahbabian's gait as a physical impairment because he shuffles when he walks down the hall. (RE 175, PAGEID #12507, Lines 19-25; PAGEID #12508, Lines 11-15) Kerlakian did not believe the Committee member's perception of an unsteady gate affected Shahbabian's ability to perform surgery. (RE 175, PAGEID #12508, Lines 1-3) Regardless, Ringer agreed that Shahbabian's surgical privileges should be terminated even though the peer review committee did not recommend a suspension. (RE 171, PAGEID #11820, Lines 23-24; RE 169, PAGEID #11349)

As Chairman of the peer review committee, Kerlakian accurately recorded his thoughts of the proceeding in writing that morning.  (RE 175, PAGEID #12505, Line 24-#12506, Line 1; RE 175-22, PAGEID #12703)  Kerlakian wrote:

- "I really think we did not follow due process in how we dealt with [Shahbabian]."

- "We asked him to make changes three years ago which he followed religiously."

- "About one year ago we stopped reviewing every case, and reverted to reviewing only the ones that fell out.  He complied with every requirement."

- "I think there was a lot of grandstanding and not much substance.  One of the section heads commented on his gait and wondered how any patient could trust him…"

- "Even though I don't have an ulterior motive, I feel that he deserves an advocate.  He has been a loyal member of the staff longer than many of the section heads who continue to have outside financial interests.  I would also argue that both Mayfield and Beacon have a vested interest in seeing him retired because they have spine surgeons on the west side of town who could capture his business."[20]

- "This decision to stop him from performing surgery occurred over a two hour period without full knowledge of all the facts.  There was no clear imminent danger to our patients."

- "I will continue to present a 'common front' and I do understand the hierarchy in decision-making, but I can't help but be conflicted.  Feel free to call me anytime this weekend, you don't have to respond by email." (Emphasis added)

(RE 175-22, PAGEID #12703)

After the peer review meeting, Collins was approached by Koselka.  (RE 169,

PAGEID #11341, Line 15 - #11342, Line 3)  Koselka told Collins that the peer

review committee had determined that either she have Shahbabian voluntarily resign

his privileges, or the committee intended to make a recommendation to the Medical

---

[20] One of the physicians on the committee that had a conflict was Ringer.

Executive Committee to have that done. (RE 169, PAGEID #11352, Line 21 -
#11353, Line 4)   Dr. Peggy LeMasters, who was the Chief of the Medical Staff, was
contacted by Collins. (RE 169, PAGEID #11345, Lines 8-16)  LeMasters, Koselka,
and Collins then met with Donovan and Gracey. (RE 175, PAGEID #12614, Lines
5-16; RE 151, PAGEID #7339, Lines 11-18)  After this meeting, Collins obtained
documentation for the Shahbabian meeting from TriHealth's in-house counsel,
Katrina Trimble. (RE 169, PAGEID #11358, Line 9 - #11359, Line 6)

At approximately 3:00 p.m. that afternoon, Shahbabian met with Collins,
LeMasters, and Koselka. (RE 181-3, PAGEID #13843-13844) Contrary to
Kerlakian's opinion, Collins told Shahbabian at the meeting that he was a danger to
society, a danger to patients, and a danger to the hospital. (*Id.*)   Collins handed a
document to Shahbabian and insisted that he sign the document, which was an
involuntary resignation of his surgical privileges.  Collins told Shahbabian that by
signing the document, nothing would happen to him. Collins threatened, however,
that if Shahbabian did not sign the document, that "they will take Shahbabian's
license away".  (RE 181-3, PAGEID #13845)  Collins gave instructions to the
Department of Surgery that afternoon to stop scheduling Shahbabian's surgical
cases. (RE 159-7, PAGEID #10264)

Within 45 minutes of the completion of the 3:00 p.m. meeting, and before
Shahbabian had decided upon any course of action, Donovan wrote that "there needs

39

to be a discussion about Dr. Shahbabian's employment status given his change in privileges and likely move of patients to another health system. Can/should his employment be terminated." (RE 159-7, PAGEID #10263) Collins agreed there should be discussions about Shahbabian transitioning his surgical practice. (*Id*.) Clement thanked Collins for handling the transition of Shahbabian's practice and added, "many hospitals have created standard practices requiring regular fitness to practice evals once a certain age has been reached." (*Id*.) Collins responded that he would be "working with Tom [Tami] to help us shape a resolution for Set's transition. (RE 159-7, PAGEID #10262) Collins agreed that a system wide process of evaluating for continued competency related to aging should be developed. (*Id.*) TriHealth's decision to transition Shahbabian's practice occurred prior to any resignation by Shahbabian of his surgical privileges.

Shahbabian threatened to sue TriHealth in 2017. (RE 151, PAGEID #7223, Lines 23-25). The threats included allegations by Shahbabian through his lawyer that he had been discriminated against. (RE 151, PAGEID #7225, Lines 6-11)

**S.** **Knowing that Tempel is to Arrive in July 2017, Ringer and McPherson Falsely Offer a Hospitalist Position for Shahbabian's Consideration Hoping he will Resign his Surgical Privileges.**

One week after the peer review meeting, on May 25, 2017, McPherson asked Cercek if Shahbabian would consider being a neurosurgery hospitalist for Mayfield patients at Good Samaritan. (RE 179-16, PAGEID #13115) McPherson told Cercek

that the Mayfield physicians "all trust his medical judgment and feel he would be an

<u>excellent surgeon to provide care to the post-surgical patients on [floor] 12</u>."

(Emphasis added) (*Id.*)

### T. <u>After Having Made Working Conditions Intolerable, Shahbabian sends Letter Resigning his Surgical Privileges</u>.

Faced with intolerable working conditions, the threat of a report to the state

medical board, and the transition of all future surgical patients to Mayfield,

Shahbabian sent a letter to LeMasters relinquishing his surgical privileges at Good

Samaritan on June 7, 2017.  He wrote, "After 48 years I want and need to take care

of my patients without the rigor of being in the operating room every day.  Over the

next two years I hope to help my patients to transition to a new neurosurgeon and to

provide mentoring and clinical patient care as I have done in the past". (RE 151-37,

PAGEID ##7705-7706)

### U. <u>Ringer Recommends a Level 2 Finding of Shahbabian.</u>

On June 15, 2017, Ringer, as the Neuroscience Surgery Chair, discussed the

two cases he previously presented to the Patient Care Committee on May 18, 2017.

In regard to both of those cases, he informed the Surgery QA Committee that he did

not believe that there was any evidence of malicious intent or intentional disregard

of policies or protocols by Shahbabian.  Ringer did state, "I wonder if medical

impairment makes the most sense.  Physical capacity has been questioned, there was

a syncope incident during surgery in the recent past and the cases in question due

require some degree of physical stamina." (RE Sealed 164-8, PAGEID #10811; RE 164-9, PAGEID #10827)  The incident of syncope referred to by Ringer occurred three and one half years earlier in January of 2014, even before Shahbabian signed his contract with TriHealth; not in the recent past. (RE 171-66, PAGEID #12098)

On June 16, 2017, the QA Committee issued a letter indicating that it believed a surgical correction was not necessary on the January 2017 patient.  (RE Sealed 164-8, PAGEID #10814)  The Surgery QA Committee determined that Shahbabian had acted in good faith, but had "at risk" behaviors.  Therefore, a case level 2 was assigned.  (RE Sealed 164-8, PAGEID #10811)  In regard to the March 2017 patient, the Committee issued a letter stating that "from all reviewers, it was felt a posterior approach was not necessary." (RE Sealed 164-9, PAGEID #10831)  A case level 2 was assigned. (RE Sealed 164-9, PAGEID #10828)

One June 22, 2017, TriHealth executives recognized that if Shahbabian was no longer doing surgery, his contract would place him at a negative situation. (RE 162-15, PAGEID #10636)  They knew Shahbabian could not make the same amount of RVUs if he wasn't able to perform surgery.  (RE 157-18, PAGEID #10065)  Consequently, if any new employment agreement was dramatically different from Shahbabian's current contract, he would accrue a significant deficit in a short period of time. (RE 162-15, PAGEID #10635)

### V. **Tempel Arrives to Assume Shahbabian's Surgical Referral Base at Good Samaritan.**

Zachary Tempel was born in 1984. (RE 155, PAGEID #9563, Line 9)   On September 27, 2016, Tempel wrote to Farrington to, "Expect a signed contract soon." (RE 155-13, PAGEID #9711)   Farrington responded, "I love the fact that [Mayfield] will have young guys who can develop strong relationships for the next 30 years at Mayfield." (RE 155-13, PAGEID #9711)   After several additional discussions relating to his employment contract, Tempel finalized his decision to join Mayfield on October 16, 2016. (RE 155, PAGEID #9603, Lines 4-7) He agreed that his starting date would be July 17, 2017. (RE 155, PAGEID #9610, Lines 10-13)

Upon starting at Mayfield on July 17, 2017, Tempel and Lindsay Fenton, a Mayfield physician liaison, visited various TriHealth physicians to inform them that Tempel would be performing spinal surgery at TriHealth hospitals.  (RE 155, PAGEID #9607, Lines 14-25; RE 179, PAGEID 12974, Lines 8-22)  According to Farrington, Tempel assumed some of Shahbabian's referral base. (RE 153, PAGEID #8871, Lines 19-24)

### W. **Mayfield withdraws the Shahbabian hospitalist offer.**

While TriHealth was attempting to complete a contract addendum for Shahbabian, Collins asked Ringer what Mayfield needed in terms of Shahbabian's support for their in-house clinical hospitalist that they proposed May. (RE 179-18,

PAGEID #13120)   Based on their response, Collins issued a proposed addendum to Shahbabian's employment contract for two duties. The first was to train a neurosurgeon selected by TriHealth to take over his practice, and the second was to perform the duties of a neurosurgery hospitalist for Mayfield. (RE 169-36, PAGEID #11579)

On July 21, 2017, Cercek wrote to Collins asking whether there were "any additional details regarding what Dr. Shahbabian would be doing for [TriHealth]?" (RE 159-37, PAGEID #10465)  This was critical because Cercek wanted, "to be sure part of [Shahbabian's role] is to ensure that we keep his patients in the system with a smooth transition to other surgeons." (*Id.*)

On July 22, 2017, Collins wrote to Ringer indicating that TriHealth was still working on putting a transition package together for Shahbabian, including that of a neurosurgery hospitalist for Mayfield and office work. (RE 179-17, PAGEID #13117) Ringer responded that some Mayfield physicians had voiced their concern regarding Shahbabian's practice patterns and surgical indications, which were different than current neurosurgeons. (RE 179-17, PAGEID #13116) "If we pursue this, it would be with the caveat that he plans to do initial  assessment of inpatient consults and then discuss every case [with] the [Good Samaritan Hospital] attending of the day." (RE 179-17, PAGEID #13116)   Later that day, McPherson indicated he had concerns about Shahbabian.  (RE 179-18, PAGEID #13119)  McPherson

stated that he did not believe "with [Shahbabian's] appearance and manner, that he makes the best spokesman for us for our patients. <u>I think we have been handling the services fine, and with Zach [Tempel] and Lincoln [Jimenez]</u> in the picture, we should be able to handle it even better. I know it was my idea, but I think we should skip having Set as our hospitalist." (Emphasis added) (RE 179-18, PAGEID #13119)

Consequently, now that Tempel was in town to assume Shahbabian's surgical volume, the hospitalist option for Shahbabian was withdrawn. (RE 179, PAGEID #12995, Lines 14-17)

### X. <u>Donovan and Cercek Become Alarmed Because Mayfield is not Providing the Full Complement of Surgical Referrals Farrington Promised as Part of the 2017 Agreement</u>.

On Monday, August 7, 2017, Donovan and Cercek discussed the reduction of surgical volume at Good Samaritan during the month of July 2017. (RE 155-29, PAGEID #9765) Cercek explained that, "Neurosurgery [for July was] off by almost 40 cases. Dr. Shahbabian was 30 of those cases and Mayfield was off another 10. Dr. <u>Zachary Tempel (Mayfield) is trying his best to absorb Dr. Shahbabian's and just started three weeks ago</u>." (Emphasis added) (*Id*)

On September 15, 2017, Donovan became increasingly concerned about the decrease in Mayfield surgical volume. In anticipation of a Mayfield meeting in mid-September, she wrote to Cercek, "We need to understand where the Vol is! It is very disturbing. How can we progress further capital spend without affirmed new Vol."

(RE 152-71, PAGEID #8718)  Cercek replied, "I agree, [Volume] – specifically <u>Dr. Andaluz and ramping up Dr. Tempel who should be getting Shahbabian's cases</u>." (*Id.*)

### Y. <u>Due to the Involuntary Retirement of Shahbabian's Surgical Practice, TriHealth seeks a Clawback of the Compensation it Voluntarily Paid to Shahbabian From May 2017 through March 2018.</u>

On March 22, 2018, Cercek wrote to Clement and Donovan stating he had informed Shahbabian that TriHealth would be reducing his pay because he was not earning his current draw. (RE 157-18, PAGEID ##10065-10073)

In early 2018, Timothy Murphy, the former Chief Financial Officer for TriHealth Physician Partners and an employee of TriHealth, Inc. responsible for physician compensation was directed by Robert Cercek to undertake the clawback of compensation that Shahbabian had been paid during the years 2017 and 2018. (Murphy Dec., RE 201-1, PAGEID #15682 at ¶11)[21]  Murphy was told by Cercek that Cercek did not believe that Shahbabian would challenge the clawback decision by TriHealth <u>because he was old</u>. (Emphasis added) (*Id.*)  Cercek stated that if Shahbabian ever opposed the clawback process in front of a jury, a jury would not believe that Shahbabian could have performed the surgeries required to reach the

---

[21] The district court denied Shahbabian's motion to file the declaration after the close of discovery and the motions for summary judgment had been filed.  (Order, RE 207, PAGEID #16306)  The decision is part of this Appeal.

production criteria he needed to meet to achieve his contractual obligations. (*Id.*) No other TriHealth physician was required to pay back compensation under the clawback provisions of a contract. (*Id.* at ¶12)

### VIII.  LAW AND ARGUMENT

**A. The Applicable Legal Standards Require this Case be Presented to the Jury.**

"(S)ummary judgment is only appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Keweenaw Bay Indian City v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal citations omitted).  The burden is on the moving party to show that no genuine issues of material fact exist.  *Hosea Project Movers, LLC v. Waterfront Assocs.,* No. 1:15-cv-799, 2014 U.S. Dist. LEXIS 109556 *31 (S.D. Ohio, July 14, 2017).  If the moving party meets this initial burden, the non-moving party must present specific facts that demonstrate a genuine issue for trial. *Id.*  The non-movant need not prove a fact, but merely prove a genuine dispute over a fact.  A non-movant can satisfy this burden in myriad ways: with circumstantial evidence, through the submission of sworn declarations, via citations to particular parts of materials in the record, or by showing that the material cited by the movant does not establish the absence of a material fact.  *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001); *Johnson v. Swift Transp. Co. of Ariz., LLC*, No.

3:10-cv-352, 2013 U.S. Dist. LEXIS 29007 *4 (S.D. Ohio, Mar. 4, 2013); *Miller v. Alza Corp.*, 759 F.Supp.2d 929, 942 (S.D. Ohio 2010).

In short, the Court is tasked only with deciding whether the evidence shows sufficient factual disputes to warrant the presentation of the matter to a jury. *Lowe v. Hamilton Cty. Dep't of Job & Family Servs.,* No. 1:05-cv-117, 2012 U.S. Dist. LEXIS 74018 *11 (S.D. Ohio, May 29, 2012); see also *United States SEC v. Sierra Brokerage Servs.,* 712 F.3d 321, 327 (6th Cir. 2013) ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party.")

Further, a plaintiff's testimony alone is sufficient to create a jury question in a summary judgment proceeding. *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) (plaintiff's deposition testimony alone is sufficient to create a jury question)  See also *Moran v. Al Basit LLC*, 788 F.3d 201, 206 (6th Cir. 2015) (plaintiff's testimony alone may be sufficient to create an issue of material of fact thereby defeating a defendant's motion for summary judgment); *Oster v. Huntington Bancshare's Inc.*, No. 2-15cv2746, 2017 U.S. Dist. LEXIS 77651 at ¶46 (S.D. Ohio, May 19, 2017) (plaintiff's testimony alone is sufficient to defeat defendant's motion for summary judgment); *Swanson v. UAW Int'l Union*, No. 14-12581, 2015 U.S. Dist. LEXIS 117546 at ¶17 (E.D. Mich., Sept. 5, 2015) (to the extent plaintiff's

testimony conflicts with other facts, all reasonable inferences must be made in favor of the non-moving party).

## FIRST ISSUE PRESENTED FOR REVIEW

**Material Issues Of Fact Exist As To Whether TriHealth, Inc. Discriminated Against Shahbabian Because Of His Age In Violation Of The ADEA And State Law Pursuant To Counts Two, Four, Five And Seven Of His FAC**

A plaintiff can establish a claim for age discrimination under the ADEA and Ohio law through either direct or circumstantial evidence. "Direct evidence consists of facts that, 'if believed, require the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). Such evidence does not need any inference to be drawn "in order to conclude that …discrimination is afoot." *Id.*

Four factors are reviewed when evaluating statements allegedly showing an employer's age bias:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002) (citing *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 538-39 (6th Cir. 2002)).

49

In the absence of direct evidence, Shahbabian's ADEA and state law claims must be evaluated using the *McDonnell Douglas* burden-shifting framework.  See *Geiger v. Tower Auto.*, 5709 F.3d 614, 622 (6th Cir. 2009).  Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014).

> In order to establish a prima facie case under [the ADEA], [a plaintiff] must show that: (1) he was over 40 years old; (2) he suffered an adverse employment action; (3) he was qualified for the position he held; and (4) he was either replaced by a person outside the protected class or treated differently than similarly-situated individuals.

*Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. P'ship,* 508 F. App'x 404, 410-11 (6th Cir. 2012)  The plaintiff's burden to establish a prima facie case is light, one easily met, and not onerous.  *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)

In an indirect case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the action being challenged. *Pierson*, 749 F.3d at 536.  If the defendant satisfies this burden, then the plaintiff bears the ultimate burden of proving that the defendant's stated reason was a pretext for unlawful discrimination.  *Id*.  Under either method, "[t]he employee must ultimately show that 'age was the but-for cause of the employer's adverse action.'" *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177, 129 S. Ct. 2343, 174

L. Ed. 2d 119 (2009)).  In other words, Shahbabian must show that an issue of fact exists that age had a determinative influence in the outcome of TriHealth's decision-making process. *Sloat v. Hewett-Packard Enter. Co.*, 18 F.4th 209.

Alternatively, an issue of pretext may be inferred from weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in an employer's proffered reasons.  *Doe v. Directions for Youth & Families, Inc.,* No. 1:15-cv-2861, 2016 U.S. Dist. LEXIS 144798 at ¶¶33-34 (S.D. Ohio, Oct. 19, 2016) citing to *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997); *Beekman v. Office Depot, Inc.*, No. 1:05-cv-00638, 2007 U.S. Dist. LEXIS 49061 at ¶¶17-18 (S.D. Ohio, July 6, 2007)   At the summary judgment stage, the plaintiff need only rebut the employer's proffered reason to carry his burden; he need not disprove them.  *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012)

In this case, the district court determined that Shahbabian had failed as a matter of law to establish direct evidence of age discrimination due to Shahbabian's "recurring entanglement with the peer review process, negative case weight resulting from that process, and the voluntary relinquishment of his surgical privileges." (Order, RE 213, PAGEID 16781)   As part of its reasoning, it wrongly concluded that the ageist statements made by the decisionmakers were insufficient to create an issue of fact because the evidence was limited to the transcribed voice recordings of

Shahbabian. (*Id.* at PAGEID #16780)   The district court was wrong and issues of fact exist regarding direct evidence of age discrimination.

First, even if the ageist statements in the record were limited to transcribed recordings of Shahbabian – which they were not – those are sufficient to create an issue of material fact as to whether age was a determinative reason regarding the employment decisions taken by the Defendants.   See *Harris v. J.B. Robinson Jewelers, supra; Moran, supra; Oster, supra; Swanson, supra*.

However, the ageist direct evidence statements in the record are not limited to Shahbabian's own testimony in the recordings.  The ageist statements were made in reference to Shahbabian by decisionmakers throughout the decision-making process for a forced retirement.  The statements are not vague or ambiguous, but occurred over a period of time that was proximate to the employment acts taken against him. They included the following:

- March 12, 2015 conversation between Kerlakian and Shahbabian where Kerlakian told Shahbabian he should be examined because he was over 70. Shahbabian is told this request was initiated by Collins.

- March 19, 2015 email exchange by Kerlakian with his administrative assistant claiming Shahbabian's date of birth was 1890.

- April 2, 2015 conversation by Collins where he falsely tells Shahbabian that TriHealth is in the process of having mandatory medical evaluations for all medical staff over the age of 65.

- Kerlakian's statement during the April 14, 2015 peer review minutes that Dr. Tew was a surgeon from the same era as Shahbabian.

- Statement in the April 14, 2015 peer review minutes that the younger practicing surgeons are the ones stating that a microscope is the standard of care.

- Kerlakian and Ringer's suggestion to Shahbabian on April 21, 2015 that he should consider retirement.

- Donovan's April 19, 2016 statement that she was committed to a plan to replace Dr. Shahbabian as soon as possible as he moves towards retirement.

- Cercek's conversation in October of 2016 with Collins that Collins and Kerlakian intended to have a conversation with Shahbabian about his retirement.

- Collins statement to Cercek on October 12, 2016 that he and Kerlakian were going to talk to Shahbabian about his retirement.

- Collins' statement to Shahbabian on October 31, 2016, that he was an old "war horse".

- Collins' statement to Shahbabian on October 31, 2016, as to whether Shahbabian had thought about retirement.

- Collins' May 3, 2017 statement to Shahbabian that he was a legend and asked if he was 75 years old.

- The statements of members within the May 18th peer review committee meeting that Shahbabian should entertain retirement.

- Clement's discussion with Collins between May 18 and May 20, 2017, regarding creating a standard policy requiring regular fitness for duty evaluations once a certain age is reached.

- Collins' agreement with Clement between May 18 and May 20, 2017 that with regard to Shahbabian, a system wide process of evaluating staff for continued competency relating to age should be developed.

Mayfield's unlawful age animus in aiding and abetting TriHealth's forced retirement of Shahbabian from surgery and replacing him with a younger Mayfield physician, is proven by the following:

- The October 19, 2012 statement by Farrington that Mayfield could carry DePowell until Shahbabian's retirement.

- McPherson's October 31, 2012 statement to the Mayfield Board of Directors that Mayfield should do whatever it can as Shahbabian moves toward retirement.

- November 6, 2014, statement from Farrington to McPherson, Ringer and other Mayfield surgeons "TriHealth can believe that a 72? y/o surgeon performing 400 cases a year is having bad outcomes is good for business."

- Farrington's deposition testimony regarding a Mayfield strategy concocted on November 6, 2014 wherein he states that Mayfield's intention was to leverage a deal relating to physician cross coverage so that TriHealth could set a timeline for Shahbabian's retirement.

- Ringer and McPherson's agreement with this strategy.

- Arthur Arand's statement on November 9, 2014, requesting that Mayfield lay out a plan for TriHealth to expedite Shahbabian's retirement in 12-18 months.

- Ringer's statement to Mayfield Executive Committee in later November 2014 that he had participated in conversations with TriHealth regarding the potential of Dr. Shahbabian slowing down or retiring from practice.

- Farrington's statement to Tempel on September 27, 2016 that he loved the fact that Mayfield will have young guys that can develop strong relationships of the next 30 years.

In this case, the ageist remarks made by Collins, Cercek, Donovan, Kerlakian, Ringer, McPherson, and Farrington, all relate to Shahbabian's age. Some of those

statements reflect their collective hope that Shahbabian will retire. The 11-12 retirement statements about Shahbabian were primarily made outside of Shahbabian's presence and for the purpose of devising a plan to force him to retire because of his age. In essence, the retirement statements made by TriHealth executives, including those by Ringer, as the motivating force in imposing discipline during the peer review process, were a proxy for age discrimination, and, therefore, constitute sufficient evidence to show that age was a but for cause of the employment decisions made by TriHealth. *Sharp v. Aker Plant Servs. Group*, 726 F.3d 789 (6th Cir. 2013) When an employer such as TriHealth directs unsolicited and unwelcome retirement inquiries and suggests that an employee retire, this is sufficient to create an issue of fact of age discrimination. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) citing to *Braverman v. Penobscot Shoe Co.*, 859 F. Supp. 596, 601 (D. Me. 1994); *Gahman v. BST N. Am. Inc.*, No. 19-153-DLB-CJS, 2021 U.S. Dist. LEXIS 173, 150 at ¶23 (E.D. Ky., Sept. 19, 2021) (a supervisor's questioning about retirement can be sufficient to defeat summary judgment if "the employer initiated the questioning and then pointedly suggested retirement").

In *Sloat, supra*, the Sixth Circuit confirmed that at least 10 statements made by decisionmakers relating to retirement was one of the most powerful pieces of evidence in that plaintiff's case. 18 F.4[th] at 211.

> "Retirement is obviously a concept closely associated with being older; the term 'retirement age' is not used to describe persons in

the bloom of youth. That Hagler repeatedly badgered Sloat about retirement – in an undisputedly stressful and hard-driving work environment – would allow a jury to infer that the *reason* Hagler had prejudged Sloat's capabilities was that Hagler thought he was too old for the job." (*Id.*)

Alternatively, issues of fact exists relating to whether age was a determinative cause regarding the employment actions taken against Shahbabian under the *McDonald Douglas* paradigm. However, the district court, in refusing to recognize alternative methods in which to prove a prima facie case, limited its analysis as follows:

> Begin with whether Dr. Shahbabian has made a prima facie case of age discrimination. To do so, he must either present direct evidence of discrimination or establish (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination. *Blizzard,* 698 F.3d at 283. Dr. Shahbabian has not pointed to direct evidence that supports the fourth element.

(Order, RE 213, PAGEID #16782) The district court's analysis is wrong. The Sixth Circuit has long held that a prima facie case is established by showing that Shahbabian was replaced by a substantially younger person. See *Manzer v. Diamond Shamrock Chemicals*, 29 F.3d 1078, 1081 (6th Cir. 1994); *Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. P'ship, supra; Mickey v. Zeidler Tool & Dye Co.,* 516 F.3d 516, 521-522 (6th Cir. 2008). The record in this case is replete with evidence that Shahbabian was replaced by Zachary Tempel who was born in 1984 and thus a substantially younger replacement.

Moreover, the fourth prong of a prima facie case can also established through the production of evidence that support an inference of discrimination. (Order, RE 213, PAGEID #16782)   The numerous ageist remarks contained in the record require the conclusion that a prima facie case exists of age discrimination.

Finally, Shahbabian may also show that similarly situated younger individuals were treated differently or more favorably than him in establishing a prima facie case. *Fernandez v. City of Pataskala*, No. 2:05-cv-75, 2006 U.S. Dist. LEXIS 82136, ¶¶25-26 (S.D. Ohio Nov. 6, 2006)   In the course of his employment, the Good Samaritan peer review issued several determinations relating to Shahbabian's quality of care for his patients.  Eventually, Collins, along with Donovan, Clement, and Gracey, unilaterally demanded in May of 2017 that Shahbabian cease doing any further surgeries.  Other neurosurgeons had poor outcomes, but there was no demand that they relinquish their surgical privileges.  Those occasions where poor outcomes occurred include the very physicians who were advocating the cessation of Shahbabian's privileges.

### Andrew Ringer, M.D.

|  |  |
|---|---|
| Peer Review Date: | 02/18/2013 |
| QA Case Level: | 1 |
| Bates Stamp: | TriHealth 006809-6810 |

|  |  |
|---|---|
| Peer Review Date: | 02/24/2013 |
| QA Case Level: | 1 |
| Bates Stamp: | TriHealth 006804-6805 |

Peer Review Date:     06/19/2014
QA Case Level:     1
Bates Stamp:     TriHealth 006795; 006800-6803

Peer Review Date:     04/13/2015
QA Case Level:     2
Bates Stamp:     TriHealth 006788-6789

Peer Review Date:     04/16/2015
QA Case Level:     2
Bates Stamp:     TriHealth 006781-6782

Peer Review Date:     04/28/2015
QA Case Level:     2
Bates Stamp:     TriHealth 006774-6775

Peer Review Date:     04/29/2015
QA Case Level:     2
Bates Stamp:     TriHealth 006767-6768

Peer Review Date:     06/29/2015
QA Case Level:     2
Bates Stamp:     TriHealth 006754-6755

Peer Review     Date: 06/30/2015
QA Case Level:     2
Bates Stamp:     TriHealth 006760-6761

(RE 208-23, PAGIED #16436-16470)

### Christopher McPherson, M.D.

Peer Review Date:     09/26/2005
QA Case Level:     3
Bates Stamp:     TriHealth 006460-6462

Peer Review Date:     01/30/2012
QA Case Level:     3
Bates Stamp:     TriHealth 006450-6453

(RE 208-24, PAGEID #16471-16484)[22]  The record contains evidence that although Ringer and McPherson experienced poor outcomes by the assignment of Level 2 and 3 conduct, their privileges were not affected similarly to those of Shahbabian.

Once a prima facie case is established, TriHealth and/or Mayfield was required to articulate a legitimate non-discriminatory reason for their actions in reducing Shahbabian's surgical case load and clawing back the compensation that was paid to him in 2017 and 2018.  The district court determined that Shahbabian could not establish pretext because

> "the inference Dr. Shahbabian draws upon still fails to unseat the peer review findings and resulting concerns as the chief reasons leading up to the committee's conversation with him about suspending, at least temporarily, his surgeries.  The hard facts of his negative performances, his peers' resulting concern, and his subsequent suspension from surgery all combine to dissolve Dr. Shahbabian's inference-filled image of subterfuge and discrimination."  (Order, RE 213, PAGEID #16783)

Consequently, the district court concluded that the record was insufficient to overcome the negative case weights associated with the peer review process. (*Id.*)  The district court, for some unknown reason, simply ignored evidence in the record which establishes an issue of fact relating to pretext.

Pretext is simply an inquiry about causation; and causation in discrimination cases usually turns on whether an undisputed decisionmaker acted with a

---

[22] McPherson's year of birth is 1973. (RE 179, PAGEID #12934, Line 3)   Ringer's year of birth is 1967. (RE 171, PAGEID #11591, Line 3)

discriminatory motive.  *Sloat v. Hewett-Packard Enter. Co.*, 18 F.4th 210.  Proximate cause of TriHealth's discriminatory actions toward Shahbabian requires "only some direct relation between the conduct of the intermediate actor and the adverse employment decision".  *Id.* at 212.   An issue of fact exists in the record regarding causation.

First, if Shahbabian's performance was such that his surgical privileges were required to be suspended by TriHealth in order to ensure patient care, the focus review Good Samaritan performed on Shahbabian in 2013 would have demonstrated Shahbabian's lack of skill.  However, that January 2, 2014 focus review revealed that Shahbabian's surgical outcomes were impressive. (RE 171-27, PAGEID #12002-12003)

Second, if Shahbabian's performance was lacking, why then did Good Samaritan hire Shahbabian on a full-time basis pursuant to a five year employment contract in April of 2014.  Was it because he was an incompetent surgeon?  One would assume that hospitals don't hire incompetent surgeons.

Third, the three Shahbabian cases reviewed by the Good Samaritan peer review committee in the Spring of 2015 involved the recommendation for a negative finding by Ringer.  Shahbabian provided explanations for the poor outcomes which raises an issue of fact as to whether the poor outcomes were as a result of substandard conduct on his part.

Fourth, two of the 2015 surgical cases were reviewed by Dr. Tew, as an independent outside expert, in April of 2015. Tew did not find any substantive evidence that Shahbabian deviated from the standard of care for two of the patients presented by Ringer to the peer review committee. (RE 175-9, PAGEID #12657-12658)

Fifth, an internal review of duro tear comparisons between Shahbabian and Mayfield physicians from the time period 2010 – 2014 showed that, as a percentage comparison, the Mayfield physicians including Ringer had higher duro tear ratio than Shahbabian for the laminectomies they collectively performed during that time. (RE 175-8, PAGEID #12656)

Sixth, on January 7, 2016, TriHealth summarized its review of Shahbabian's surgical cases from September 1st through December and found that in 126 surgeries performed by Shahbabian during that time, there were no significant complications. (RE 208-11, PAGEID #16359-16400)

Seventh, on September 13, 2016, Collins wrote an email to Kevin Kappel stating that there were no quality of care issues associated with Shahbabian at that time. (RE 169, PAGEID #11287, Lines 8-19; RE 169, PAGEID #11313, Lines 18-22; RE 154-13, PAGEID #9521)

Eighth, in December of 2016, Ringer and Kerlakian submitted their professional evaluation to the Good Samaritan Credentialing Committee for the

reappointment of Shahbabian to the Medical Staff. They both determined that Shahbabian had exhibited satisfactory performance in a number of areas including clinical judgment, and technical and clinical skills. (RE 154-18, PAGEID #9552)

Ninth, Collins' email to Cercek on February 11, 2017, which was confirmed in Collins' 2019 deposition, confirmed that the only way to involuntarily remove Shahbabian from his surgical practice was to use a "sledge hammer" around quality performance or behavior. According to Dr. Collins, "[Shahbabian] has not stepped out of line in any of these areas so we have no foothold to push there." (RE 169-12, PAGEID #11448; RE 169, PAGEID #11334, Line 22 - #11335, Line 1)

Tenth, Shahbabian's explanations for the two peer review cases in the spring of 2017 indicate that he had performed the surgeries at the appropriate standard of care for each patient. (RE 164-9, PAGEID #10829; RE 181-1, PAGEID #13501, Lines 23-25; PAGEID #13508, Lines 17-22)

Eleventh, Kerlakian's letter written immediately after the May 18, 2017 peer review committee in which he admitted due process was not followed with Shahbabian, that Shahbabian had followed the changes requested by the hospital for the preceding three years, Shahbabian had complied with every requirement for the surgical cases he performed, that some of the members of the May 218 peer review committee had engaged in grandstanding without substance, that Mayfield had a vested interest in seeing Shahbabian retire so that its employed spine surgeons could

capture Shahbabian's business, and most importantly, <u>there was no clear imminent</u> <u>danger to Good Samaritan's patients</u>. (Emphasis added) (RE 175-22, PAGEID 12703)  These facts were ignored by the district court. They create an issue of fact as to whether or not the alleged poor outcomes in the peer review process orchestrated by Shahbabian's competitors truly motivated Good Samaritan and TriHealth in compelling Shahbabian to withdraw his surgical privileges, or whether it was his age.

The district court also determined that Shahbabian could not prove that age was a "but for" cause of the elimination of his surgical privileges because they were voluntarily relinquished by a letter dated June 7, 2017.  The evidence shows otherwise.

On the same day, May 18, 2017, that Kerlakian found that Shahbabian was not a danger to Good Samaritan patients, Collins told Shahbabian that he was a danger to society, Good Samaritan patients, and the hospital. (RE 181-3, PAGEID #13843-13844)  Collins insisted that Shahbabian involuntarily surrender his surgical privileges and that failing to do so would cause Good Samaritan to get rid of his medical license. (*Id.*)  On that day, Good Samaritan, through Jamie Easterling, deleted the scheduled surgeries for Shahbabian from the hospital computer system. (RE 181-3, PAGEID #13845)  Collins, not Shahbabian, instructed the Department of Surgery to refuse in the future to schedule any surgical cases for Shahbabian. (RE

159-7, PAGEID #10264)   Shahbabian was unaware in May of 2017 that Mayfield and TriHealth had agreed to transition his entire surgical practice to Tempel.   If Shahbabian had known of the preplanned transition, he would not have sent the June 7, 2017 letter withdrawing his surgical privileges.  (RE 186-1, PAGEID #14020 at ¶5)

Issues of fact exist as to whether the resignation of Shahbabian's clinical privileges were voluntary, or whether they were constructively taken from him.

**SECOND ISSUE PRESENTED FOR REVIEW**

> **Issues Of Material Fact Exist Regarding Shahbabian's Claims Against Mayfield For Aiding And Abetting And Conspiring To Discriminate Against Shahbabian In Counts Seven And Ten Of The FAC**

Ohio Revised Code §4112.02(J) makes it unlawful for any person to aid, abet and cite, compel, or coerce the doing of any act declared by Chapter 4112 to be an unlawful discriminatory practice.

A civil conspiracy under Ohio law consists of a "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."  *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 1995 Ohio 61, 650 N.E. 2d 863 (1995), quoting *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 512 N.E.2d 640 (1987) citing *Minarik v. Nagy* (1963), 8 Ohio App.3d 194, 193 N.E.2d 280, *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 1998 Ohio 294, N.E.2d 859 (1998).  "Liability attaches

for a civil conspiracy when a plaintiff can prove that two or more defendants agreed to injure another by unlawful action and committed an overt act in furtherance of the conspiracy." *Michigan Paytel Joint Venture v. City of Detroit,* 287 F.3d 527, 541 (6th Cir. 2002). The principal element of a conspiracy is an agreement among the parties. *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), rev'd in part on other grounds, 446 U.S. 754, 100 S. Ct. 1987, 64 L. Ed. 2d 670 (1980)

The facts in this case demonstrate that Mayfield and TriHealth conspired, and aided and abetted with each other, to discriminate against Shahbabian, force his retirement, and transition his practice to Mayfield. The court's granting of summary judgment as to counts seven and ten was error.

## THIRD ISSUE PRESENTED FOR REVIEW

**The District Court Erred In Denying Shahbabian's Motion For Leave To File The Murphy Declaration And Then Denying His Motion For Reconsideration.**

Subsequent to the filing of the motions for summary judgment by the parties, Shahbabian became aware of testimony possessed by Timothy Murphy, a former TriHealth executive which clearly demonstrated that the clawback of compensation by TriHealth in March of 2018 was motivated by Shahbabian's age in violation of federal and state law. (RE 201-1, PAGEID #15682 at ¶11) Shahbabian asked for leave to file his declaration in support of his opposition papers to Defendants'

motions for summary judgment.  (RE 201)  The court denied the motion. (Order, RE 207, PAGEID #16303-16306)

Shahbabian filed a Motion for Reconsideration identifying the reasons why the district court's refusal to accept and consider Timothy Murphy's declaration was an abuse of discretion. (RE 209, PAGEID #16485; RE 209-13, PAGEID #16742) The motion included a reply. (RE 211, PAGEID #16749-16760)  The court again denied Shahbabian's motion which is a clear abuse of discretion on July 22, 2021. (RE 212, PAGEID #16761-16763)  Because of the limitation of words in this brief to 17,000, Shahbabian adopts as if rewritten herein, the arguments he submitted to the district court in his motions for leave and reconsideration. (RE 201, PAGEID #15675-15682; RE 209, PAGEID #16485-16742) The facts developed at the district court level show the court abused its discretion in denying the filing of the Murphy declaration.   This evidence shows that the TriHealth's clawback decision was directly motivated by Shahbabian's age and therefore unlawful.

## FOURTH ISSUE PRESENTED FOR REVIEW

**Shahbabian's State Law Claims For Breach Of Contract (Count One), Common Law Fraud (Count Eight), Tortious Interference (Count Nine), And Common Law Civil Conspiracy (Count Ten) Are Not Barred By The Immunity Set Forth In Ohio Revised Code §2305.251(A) Because Issues Of Fact Exist Regarding The Defendants' Actual Malice**

The district court dismissed Shahbabian's claims in Counts One, Eight, Nine and Ten against the Defendants because it determined that the state law claims fell

within the peer review immunity contained in Ohio Revised Code §2305.251(A). (Order, RE 213, PAGEID #16774-16778)   The district court did not review the substantive nature of Shahbabian's claims.  Instead, it focused solely on the Revised Code 2305.251(A) immunity issue.  Regardless, the district court failed to consider the evidence in the record which creates an issue of material fact as to the actual malice of the Defendants in the peer review process so as to eliminate that statute as a defense to Shahbabian's state law claims.

Ohio Revised Code §2305.251(A) states in relevant part:

> [n]o health care entity shall be liable for damages to any person for any acts, omission, decisions, or other conduct within the scope of the function of the peer review committee by the health care entity.

The immunity set forth in §2305.251(A) may be defeated by a showing of actual malice.  *Muhlman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 1:20-cv-813, 2021 U.S. Dist. LEXIS 152162 at ¶12 (S.D. Ohio, April 26, 2021)  Actual malice requires proof the Defendants made statements in the peer review process with knowledge they were false or with reckless disregard for whether they were true or false. (*Id.* at ¶12-13)

The district court, as a matter of law, found that the committee members were solely concerned for patient safety.  (Order, RE 213, PAGEID #16775)   Thus, the peer review restrictions of Shahbabian's privileges were restricted by a good faith determination.  That conclusion is contradicted by the record.

The contradictory evidence in the record includes Kerlakian's opinion that as of May 18, 2017, Shahbabian was not a danger to patients at Good Samaritan. Further, the district court rationalized that the breach of contract, fraud, tortious interference, and common law conspiracy claims all emerged from the reduction of work due to the peer review proceedings. The district court ignored the facts which show Mayfield and TriHealth were using the peer review process to involuntarily transition Shahbabian's surgical practice to a Mayfield physician so that the surgeries Mayfield would otherwise have performed at University of Cincinnati could be redirected to TriHealth in violation of federal law. The Court also ignored that the principal proponent of using the peer review process to reduce Shahbabian's surgical practice was Ringer, who was intimately involved from May of 2016 through May of 2017 to transition Shahbabian's practice to Tempel. A reasonable jury could conclude that the peer review statute does not protect TriHealth or Mayfield from the foregoing causes of action because their intent was not to utilize the peer review process to ensure patient safety, but instead to steal Shahbabian's surgical practice and give it to Mayfield in return for redirection of additional surgeries from the University of Cincinnati.

## FIFTH ISSUE PRESENTED FOR REVIEW

### Shahbabian Established A Material Issue Of Fact Regarding His Claim For Disability Discrimination Under Federal and State Law With Respect To Counts Eleven And Twelve

The district court rejected Shahbabian's disability claims on the basis of its conclusion that TriHealth reduced Shahbabian's salary in 2018 consistent with other doctors who take medical leave. (RE 213, PAGEID #16790)  The district court also stated that Shahbabian incorporated his age discrimination arguments which were inapplicable to his disability claims.  (*Id.* at PAGEID #16791)   Regardless, the district court found, as a matter of law, that TriHealth's perception that his poor health was negligently impacting his job performance, is not "tantamount" to regarding that employee as disabled. *Id.*  The district court ignored evidence in the record which established an issue of material fact.

The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating against an employee because the employee is disabled, because the employee has a record of being disabled, or because the employer regards the employee of being disabled. 42 U.S.C. §§12102(1), 12112(a)  Ohio law follows federal law.  Under the "regarded as," Shahbabian made out a "regarded as" claim:

> if the [employee] establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. §12102(3)(A).  In order to establish the threshold condition of a "regarded as" ADA claim, an employee need only show that their employer believed they had a "physical or mental impairment," as that term is defined in federal regulations. The employer may then rebut this showing by pointing to objective evidence "that

the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor." *Id.* §1630.15(f). *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019) citing to *Mancini v. City of Providence*, 909 F.3d 32, 45-46 (1st Cir. 2018); *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll.*, 795 F.3d 698. 706 (7th Cir. 2015).

A material issue of fact exist as to whether or not Mayfield, through Ringer, and TriHealth regarded Shahbabian as disabled and took peer review actions against him because of their perceptions. Those facts include the following.

### Mayfield's Statements Regarding Disability

- November 9, 2014, Ringer's statement that Shahbabian had a kind of tired look about him and seemed to be worn out a little bit.

- November 9, 2014, Ringer's statement that the Mayfield spine work will expand as Shahbabian slows down ("imminently, I believe").

- Ringer's statement on June 15, 2017 that medical impairment makes the most sense and physical capacity has been questioned.

### TriHealth's References to Disability

- April 2, 2015 meeting between Collins, Kerlakian and Koselka where Collins states he is worried about Shahbabian's ability to perform surgeries.

- April 9, 2015 conversation where Robinson asked Shahbabian about his physical capabilities and suggesting that Shahbabian undergo a psychiatric examination by a physician chosen by TriHealth.

- Collins belief on October 31, 2016 that Shahbabian looked "rickety" because he was holding onto walls.

- Cercek's perception that Shahbabian was shuffling his feet when he walked.

- The statements in the May 18, 2017 peer review committee meeting by Dr. Smith that Shahbabian's competency should be evaluated because he shuffles when he walks.

Contrast these statements with the opinion of Kerlakian on May 18, 2017, that the physical impairment suffered by Shahbabian did not affect his ability to do surgeries. Issue of fact does exist as to the disability claims, so denying judgment was not merited.

**SIXTH ISSUE PRESENTED FOR REVIEW**

**Material Issues Of Fact Exist In The Record As To Shahbabian's Retaliation Claims Under Federal and State Law Set Forth in Counts Three and Six of the FAC**

Shahbabian seeks recovery for retaliation against TriHealth pursuant to the ADA, ADEA, and Ohio law set forth under Revised Code §§4112.02 and 4112.99. To make out a prima facie case of retaliation, Shahbabian must establish that: (1) he engaged in protected activity; (2) TriHealth knew that he engaged in the protected activity; (3) TriHealth subsequently took an adverse employment action against him; and (4) the adverse action was causally connected to the protected activity. *Spengler v. Williams Cylinders,* 615 F.3d 492-93 (6th Cir. 2010). The burden of proof at the prima facie stage of a retaliation action is minimal and "not onerous, but one easily met." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009); *DiCarlo v.*

*Potter*, 358 F.3d 408, 420 (6th Cir. 2004); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008)

If Shahbabian establishes his prima facie case of retaliation, the burden shifts to TriHealth to produce evidence of a legitimate, nondiscriminatory reason for its actions. See *Imwalle v. Reliance Medical Prod. Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). At this stage of the *McDonnell Douglas/Burdine* analysis, the defendant's burden is one of production, not persuasion, and no credibility assessment is to be made. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Chattman v. Toho Tenas America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). The burden of persuasion remains with Shahbabian at all times. *Weigel v. Baptist Hospital of East Tenn.*, 302 F.3d 367, 378 (6th Cir. 2002).

The protected activity element only requires that Shahbabian show he challenged an employment practice that he reasonably believed was unlawful. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)). While this challenge must be more than "a vague charge of discrimination[,]" "absolute formality, clarity, and precision" is not required. *Yazdian*, 793 F.3d at 645.

Beginning in 2015, Shahbabian challenged the necessity that he undergo a medical exam. Throughout 2016, he indicated that he did not intend to retire at the insistence of TriHealth executives. In May of 2017, Gracey was informed that

Shahbabian believed he was a victim of discrimination. Thereafter, TriHealth threatened to take his medical license and cancelled his surgeries. TriHealth continued its retaliation by initiating a clawback of his compensation in March of 2018. TriHealth's continuing violation of Shahbabian's rights to be free from discrimination and retaliation represents a continuing violation under federal law. *Sharp v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003)

**SEVENTH ISSUE PRESENTED FOR REVIEW**

**A Material Issue of Fact Exists As To Shahbabian's Claim Of Fraud Pursuant To Count Eight of the FAC**

Shahbabian's claim of fraud relates to Robinson's promises to Shahbabian that he would become the Director of the Department of Neurosurgery in 2014 after he signed his contract and that TriHealth would hire three neurosurgeons reporting to him to whom he could eventually transition his practice. Unbeknownst to Shahbabian, Robinson made a deal with TriHealth to allow Ringer to become the Director of the Department of Surgery and TriHealth could not hire any neurosurgeons without the permission of Mayfield. If Robinson had told Shahbabian that the statements relating to the directorship, and the hiring of three neurosurgeons was not going to occur, he would not have signed an employment contract, nor sold his assets to TriHealth. (RE 186-1, PAGEID #14019-14020)

Accordingly, issues of fact exist as to Shahbabian's claim of fraud.

73

**EIGHTH ISSUE PRESENTED FOR REVIEW**

**Material Issues Of Fact Exist As To Whether TriHealth G Is Entitled To The Clawback Payment Of $679,711.61 That It Claims Was Paid To Shahbabian During The Years 2017 and 2018**

The district court found that TriHealth G is entitled to the repayment of the gross amount of $679,711.61 for Shahbabian's alleged breach of contract. (RE 213, PAGEID #16801-16802)    The district court was incorrect.    It later added prejudgment interest to that amount.

First, according to Brad Hall, TriHealth's Rule 30(b)(6) representative, TriHealth does not ever clawback the gross amount of money that was paid pursuant to a physician contract.  It limits the clawback to the after-tax amount of the alleged deficit that was paid to a physician such as Shahbabian. (Hall Depo., RE 202, PAGEID #15758/Lines 19-21 and PAGEID #15759/Line 25; Brad Hall Affidavit, RE 211-2, PAGEID #16759 at ¶10)    Shahbabian is not responsible to repay the gross amount and TriHealth never submitted the net amount of the payback for the court's consideration.

Second, due to TriHealth's and TriHealth G's unlawful conduct, the breach of contract is barred by TriHealth's violation of the federal Anti-Kickback Statute and the overt acts it took to prevent the performance of the contract by Shahbabian by eliminating his surgical privileges. In regard to this argument, and due to the 17,000 word limitation for the brief, Shahbabian incorporates those arguments he made at

the district court level in his summary judgment opposition papers. (RE 186, PAGEID #13983-13991)

## IX.    **CONCLUSION**

For all of the foregoing reasons, Shahbabian requests the judgment of the district court be reversed and the case remanded for trial on Shahbabian's affirmative claims and on TriHealth G's counterclaims.

RESPECTFULLY SUBMITTED,

/s/  Mark J. Byrne
**MARK J. BYRNE (0029243)**
JACOBS, KLEINMAN, SEIBEL &
MCNALLY, LPA
Cincinnati Club Building
30 Garfield Place, Suite 905
Cincinnati, OH  45202
Tele:   (513) 381-6600
Fax:   (513) 381-4150
E-Mail:  mbyrne@jksmlaw.com
*Attorney for Plaintiff/Appellant*
*Set Shahbabian, M.D.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    (a)    this brief contains 17,171 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(A)(7)(B)(iii), and

    (b)    this brief uses a monospaced typeface and contains 1,767 lines of text, excluding the parts of the brief exempted by Fed. R. App. P.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    (a)    This brief has been prepared in a monospaced typeface using Times New Roman at 14 point.


*/s/  Mark J. Byrne*
**MARK J. BYRNE (0029243)**
*Attorney for Plaintiff/Appellant*


Dated:  September 20, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all CM/ECF participants and counsel of record as follows:

Deborah S. Adams, Esquire
Brice C. Smallwood, Esquire
Frost Brown Todd LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, OH 45202
dadams@fbtlaw.com
bsmallwood@fbtlaw.com
*Attorneys for TriHealth, Inc. and*
*TriHealth G, LLC*

Fred G. Pressley, Jr., Esquire
Zachary A. El-Sawaf, Esquire
Porter Wright Morris & Arthur LLP
41 South High Street, Suite 2800
Columbus, Ohio  43215
fpressley@porterwright.com
zelsawaf@porterwright.com
*Attorneys for Mayfield Clinic, Inc*

*/s/ Mark J. Byrne*
**MARK J. BYRNE (0029243)**
*Attorney for Plaintiff/Appellant*

**No. 21-3762**
**Consolidated with No. 22-3479**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

**SET SHAHBABIAN, M.D.**

**Plaintiff/Appellant**

**vs.**

**TRIHEALTH, INC.**
**TRIHEALTH G, LLC**
**MAYFIELD CLINIC, INC.**

**Defendants/Appellees**

---

**PLAINTIFF/APPELLANT'S DESIGNATION OF**
**APPENDIX CONTENTS**

---

Plaintiff/Appellant, pursuant to Sixth Circuit Rule 30(b), hereby designates the following filings in the district court's record as items to be included in the Appendix:

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| Complaint (Filed November 14, 2018) | Dist. Ct. 1 | | 1-32 |
| | | | |
| First Amended Complaint (Filed January 8, 2019) | Dist. Ct. 21 | | 102 |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
|  |  |  |  |
| Reply in Response to Motion to Quash Third Party Subpoena to Navigant (Filed October 24, 2019) | Dist. Ct. 86 |  | 704 |
|  |  |  |  |
| TriHealth/TriHealth G Motion for Summary Judgment (Filed February 28, 2020) | Dist. Ct. 137 |  | 3828-3864 |
|  |  |  |  |
| Mayfield Motion for Summary Judgment (Filed February 28, 2020) | Dist. Ct. 138 |  | 4333-4370 |
|  |  |  |  |
| Stephen Gracey Deposition (Filed March 6, 2020) | Dist. Ct. 151 | 17-25 | 7209 |
|  |  | 1 | 7210 |
|  |  | 8-9 | 7210 |
|  |  | 23-25 | 7223 |
|  |  | 6-11 | 7225 |
|  |  | 11-18 | 7339 |
|  | 151-11 |  | 7633-7644 |
|  | 151-37 |  | 7705-7706 |
|  |  |  |  |
| Gail Donovan Deposition (Filed March 6, 2020 | Dist. Ct. 152 | 20-24 | 7790 |
|  |  | 12-25 | 7769 |
|  |  | 1-5 | 7770 |
|  |  | 12-20 | 7772 |
|  |  | 13-18 | 7775 |
|  |  | 11-25 | 7816 |
|  |  | 1-25 | 7817 |
|  |  | 1-16 | 7818 |
|  | Dist. Ct. 152-4 |  | 7974-7975 |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| | Dist. Ct. 152-38 | | 8372-8374 |
| | Dist. Ct. 152-39 | | 8378 |
| | Dist. Ct. 152-45 | | 8412 |
| | Dist. Ct. 152-58 | | 8513 |
| | Dist. Ct. 152-68 | | 8667 |
| | Dist. Ct. 152-71 | | 8718 |
| | | | |
| Mark Farrington Deposition (Filed March 7, 2020) | Dist. Ct. 153 | | 8747 |
| | | 4-15 | 8815 |
| | | 19-20 | 8820 |
| | | | 8831 |
| | | 7-14 | 8846 |
| | | 13-25 | 8848 |
| | | 1-12 | 8849 |
| | | 1-7 | 8866 |
| | | 19-24 | 8871 |
| | | 21-24 | 8889 |
| | Dist. Ct. 153-2 | | 8985 |
| | Dist. Ct. 153-2 | | 8985-8986 |
| | Dist. Ct. 153-5 | | 8992 |
| | Dist. Ct. 153-11 | | 9013 |
| | Dist. Ct. 153-13 | ¶2.1(i)(A) ¶2.1(i)(B) ¶2.1(C) | 9025 |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| | | ¶9.2.3 | 9039 |
| | | | 9059 |
| | | | 9071 |
| | Dist. Ct. 153-16 | | 9077 |
| | | | 9080 |
| | Dist. Ct. 153-20 | | 9089 |
| | Dist. Ct. 153-21 | | 9096 |
| | Dist. Ct. 153-22 | | 9099 |
| | Dist. Ct. 153-23 | | 9103 |
| | Dist. Ct. 153-24 | | 9107 |
| | Dist. Ct. 153-25 | | 9112-9114 |
| | Dist. Ct. 153-29 | | 9119 |
| | Dist. Ct. 153-52 | | 9291-9292 |
| | | | |
| Thomas Tami Deposition (Filed March 6, 2020) | Dist. Ct. 154 | 18-21 | 9419 |
| | Dist. Ct. 154-10 | | 9517 |
| | Dist. Ct. 154-11 | | 9518 |
| | Dist. Ct. 154-13 | | 9521 |
| | | | 9522 |
| | Dist. Ct. 154-15 | | 9525 |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| | Dist. Ct. 154-18 | | 9552 |
| | | | 9556 |
| | | | |
| Zachary Tempel Deposition (Filed March 6, 2020) | Dist. Ct. 155 | 9 | 9563 |
| | | 4-7 | 9603 |
| | | 14-25 | 9607 |
| | | 10-13 | 9610 |
| | Dist. Ct. 155-13 | | 9711 |
| | Dist. Ct. 155-29 | | 9765 |
| | Dist. Ct. 155-32 | | 9773 |
| | | | |
| Mark Clement Deposition (Filed March 8, 2020) | Dist. Ct. 157 | 21-25 | 9782 |
| | Dist. Ct. 157-18 | | 10065-10073 |
| | Dist. Ct. 157-20 | | 10085-10086 |
| | | | |
| Robert Cercek Deposition (Filed March 8, 2020) | Dist. Ct. 159 | 5-7 | 10120 |
| | | 6-23 | 10163 |
| | | 9-11 | 10161 |
| | Dist. Ct. 159-7 | | 10262-10264 |
| | Dist. Ct. 159-29 | | 10446 |
| | Dist. Ct. 159-34 | | 10459 |
| | Dist. Ct. 159-34 | | 10465 |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| | | | |
| Deposition of Jay Koch (Filed March 13, 2020) | Dist. Ct. 162-15 | | 10635-10636 |
| | | | |
| (Sealed) Deposition of Set Shahbabian (Filed March 13, 2020) | Dist. Ct. 164-6 | | 10740 |
| | | | 10742 |
| | | | 10744 |
| | | | 10747 |
| | | | 10750-10757 |
| | | | 10760 |
| | | | 10761-10765 |
| | | | 10767 |
| | | | 10771 |
| | | | 10773 |
| | Dist. Ct. 164-7 | | 10800 |
| | Dist. Ct. 164-8 | | 10807-10814 |
| | Dist. Ct. 164-9 | | 10825 |
| | | | 10826-10827 |
| | | | 10829-10830 |
| | | | 10831 |
| | | | |
| Gerald Oliphant Deposition (Filed March 13, 2020) | Dist. Ct. 165 | 7-17 | 10944 |
| | Dist. Ct. 165-7 | | 11096 |
| | | | |
| Robert Collins Deposition (Filed March 18, 2020) | Dist. Ct. 169 | 7-11 | 11245 |
| | | 8-19 | 11287 |
| | | 18-22 | 11313 |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| | | 7-13 | 11314 |
| | | 5-8 | 11315 |
| | | 22-25 | 11334 |
| | | 1 | 11335 |
| | | 17-20 | 11340 |
| | | 15-25 | 11341 |
| | | 1-3 | 11342 |
| | | 8-16 | 11345 |
| | | | 11349 |
| | | 21-25 | 11352 |
| | | 1-4 | 11353 |
| | | 9-25 | 11358 |
| | | 1-6 | 11359 |
| | | 2-14 | 11387 |
| | Dist. Ct. 169-12 | | 11448 |
| | Dist. Ct. 169-13 | | 11558 |
| | Dist. Ct. 169-24 | | 11491 |
| | Dist. Ct. 169-24 | | 11532 |
| | Dist. Ct. 169-26 | | 11560 |
| | Dist. Ct. 169-36 | | 11579 |
| | Dist. Ct. 169-37 | | 11581 |
| | | | |
| Andrew Ringer Deposition (Filed March 18, 2020) | Dist. Ct. 171 | 3 | 11591 |
| | | | 11594-11595 |
| | | 8-17 | 11705 |
| | | | 11721 |
| | | 15-19 | 11736 |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| | | 5-24 | 11756 |
| | | 12-17 | 11757 |
| | | 14-18 | 11785 |
| | | 23-24 | 11820 |
| | | | |
| | Dist. Ct. 171-27 | | 12002-12003 |
| | Dist. Ct. 171-34 | | 12010 |
| | Dist. Ct. 171-62 | | 12068 |
| | Dist. Ct. 171-66 | | 12098 |
| | | | |
| George Kerlakian Deposition (Filed March 18, 2020) | Dist. Ct. 175 | | 12500 |
| | | 1-6 | 12526 |
| | | | 12565 |
| | | 23-25 | 12566 |
| | | 19-23 | 12503 |
| | | 10-14 | 12504 |
| | | 24-25 | 12505 |
| | | 1 | 12506 |
| | | 19-25 | 12507 |
| | | 1-3 | 12508 |
| | | 11-15 | 12508 |
| | | 5-16 | 12614 |
| | Dist. Ct. 175-7 | | 12654 |
| | Dist. Ct. 175-8 | | 12655-12656 |
| | Dist. Ct. 175-9 | | 12657-12658 |
| | Dist. Ct. 175-22 | | 12703 |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| | Dist. Ct. 175-26 | | 12711 |
| | Dist. Ct. 175-28 | | 12715 |
| | Dist. Ct. 175-29 | | 12717-12718 |
| | Dist. Ct. 175-30 | | 12720 |
| | | | |
| John Robinson Deposition (Filed March 18, 2021 | Dist. Ct. 177 | | 12796 |
| | | | |
| Christopher McPherson Deposition (Filed March 18, 2020) | Dist. Ct. 179 | 3 | 12934 |
| | | | 12935 |
| | | | 12940 |
| | | 8-22 | 12974 |
| | | 20-25 | 12988 |
| | | 1-16 | 12989 |
| | | 14-17 | 12995 |
| | | | 13020 |
| | Dist. Ct. 179-15 | | 13063-13113 |
| | | | 13066-13067 |
| | Dist. Ct. 179-16 | | 13115 |
| | Dist. Ct. 179-17 | | 13116-13117 |
| | Dist. Ct. 179-18 | | 13119 |
| | | | 13120 |
| | | | |
| Set Shahbabian Deposition (Filed March 19, 2020) | Dist. Ct. 181-1 | 23-25 | 13501 |
| | | 17-22 | 13508 |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| | Dist. Ct. 181-3 | | 13793-13975 |
| | | | 13798 |
| | | | 13801-13805 |
| | | | 13811 |
| | | | 13829 |
| | | | 13843-13845 |
| | | | |
| Shahbabian Response to Motions for Summary Judgment (Filed April 1, 2020) | Dist. Ct. 186 | | 13912-14017 |
| | | | |
| Shahbabian Declaration | Dist. Ct. 186-1 | | 14019-4020 |
| Shahbabian Declaration | | ¶3 | 14020 |
| | | ¶5 | 14020 |
| | | | |
| Mark J. Byrne Declaration (MJB) | Dist. Ct. 186-3 | | 14025-14068 |
| | Dist. Ct. 186-5 | | 14108-14154 |
| | Dist. Ct. 186-6 | | 14155-14201 |
| | | | |
| Motion for Leave to File Declaration of Timothy Murphy (February 8, 2020) | Dist. Ct. 201 | | 15675-15682 |
| | | | |
| Timothy Murphy Declaration | 201-1 | ¶11 | 15682 |
| | | | |
| Brad Hall Deposition (Filed December 15, 2020) | Dist. Ct. 202 | 19-21 | 15758 |
| | | 25 | 15759 |
| | | | |

| DESCRIPTION OF ENTRY | Record Entry # | Transcript Page/Line/ Exhibit or Para./Page | PAGEID# |
|---|---|---|---|
| Order Denying Motion for Leave to File Declaration of Timothy Murphy (Filed March 24, 2021) | Dist. Ct. 207 | | 16303-16306 |
| | | | |
| Sealed Documents (Filed March 29, 2021) | Dist. Ct. 208-11 | | 16359 |
| | | | 16400 |
| Motion for Reconsideration to file Timothy Murphy Declaration (Filed April 17, 2021) | Dist. Ct. 209 | | 16485 |
| | Dist. Ct. 209-13 | | 16742 |
| | | | |
| Reply in Support of Motion for Reconsideration (Filed May 24, 2021) | Dist. Ct. 211 | | 16749-16760 |
| | | | |
| Brad Hall Affidavit | Dist. Ct. 211-2 | ¶10 | 16759 |
| | | | |
| Order Denying Motion for Reconsideration (Filed July 22, 2021) | Dist. Ct. 212 | | 16761-16763 |
| | | | |
| Order Granting MSJ (Filed July 22, 2021) | Dist. Ct. 213 | | 16764-16803 |
| | | | |
| Notice of Appeal (Filed August 23, 2021) | Dist. Ct. 214 | | 16804 |
| | | | |
| Order Awarding Calculated Prejudgment Interest | Dist. Ct. 216 | | 16808-16809 |
| Notice of Appeal | Dist. Ct. 217 | | 16810-16812 |

RESPECTFULLY SUBMITTED,

*/S/  Mark J. Byrne*
**MARK J. BYRNE (0029243)**
JACOBS, KLEINMAN, SEIBEL &
MCNALLY, LPA
Cincinnati Club Building
30 Garfield Place, Suite 905
Cincinnati, OH  45202
Tele:   (513) 381-6600
Fax:    (513) 381-4150
E-Mail:  mbyrne@jksmlaw.com
*Attorney for Plaintiff/Appellant*
*Set Shahbabian, M.D.*