**Case No. 21-3762**
**Consolidated with Case No. 22-3479**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SET SHAHBABIAN, M.D.,
*Plaintiff-Appellant,*
*v.*
TRIHEALTH, INC., *et alia*,
*Defendant-Appellee.*

On Appeal from the United States District Court
For The Southern District of Ohio, Western Division
Civil Action No. 1:18-cv-00790-MWM

---

## BRIEF OF APPELLEES TRIHEALTH, INC. AND TRIHEALTH G, LLC

---

Deborah S. Adams (0005607)
FROST BROWN TODD LLC
Great American Tower
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
Phone: (513) 651-6800
Email: dadams@fbtlaw.com

*Counsel for Defendants/Appellees TriHealth,*
*Inc. and TriHealth G, LLC*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, Defendants/Appellants TriHealth G, LLC and TriHealth Inc. make the following disclosures:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

**No.**

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

**Yes.  TriHealth, Inc. carries employment practices liability through AIG, a publicly traded company.**

*/s/ Deborah S. Adams*
Deborah S. Adams

*Counsel for Defendants-Appellees TriHealth, Inc. and TriHealth G, LLC*

# TABLE OF CONTENTS

STATEMENT IN OPPOSITION TO ORAL ARGUMENT ........................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE..............................................................................2

INTRODUCTION................................................................................................2

   A. TriHealth and Mayfield Relationship ...................................................3

   B. TriHealth and Shahbabian Relationship ...............................................7

      1. Shahbabian's Quality of Care Issues as a Staff Surgeon .............................7

         a. December 2009 Quality of Care Issue ..................................10

         b. Focus Review 2011 ................................................................10

         c. November 2011 Quality of Care Issue..................................11

         d. July 2012 Quality of Care Issue ...........................................11

         e. November 2012 Quality of Care Issue..................................12

         f. January 2013 Quality of Care Issue .....................................12

         g. February 7, 2013 Quality of Care Issue ...............................12

         h. April 11, 2013 Coaching of Shahbabian ...............................13

      2. Shahbabian Sells His Practice to TriHealth and Becomes a TriHealth Employee ................................................................13

      3. Shahbabian's Quality of Care Issues as an Employed Physician ...............16

         a. October 2014 Quality of Care Issue......................................16

         b. November 26, 2014 Quality of Care Issue............................17

         c. January 2015 Quality of Care Issue .....................................18

         d. June 1, 2015 Corrective Action Plan and Amended Employment Agreement ................................................19

         e. September 11, 2015 Quality of Care Issue............................21

         f. October 2015 Quality of Care Issue......................................21

         g. October 31, 2016 Meeting With Collins and Kerlakian .......................22

         h. January 23, 2017 Quality of Care Issue ...............................23

         i. March 17, 2017 Quality of Care Issue ..................................24

         j. May 4, 2017 Quality of Care Issue ......................................25

         k. May 18, 2017 Quality of Care Issue ....................................25

l.   Shahbabian Voluntarily Relinquishes Surgical Privileges.....................25

4.  Negotiations With Shahbabian Concerning His Role After His
     Surrender of Surgical Privileges................................................................27

SUMMARY OF THE ARGUMENT ...........................................................................30

A. Age Discrimination (including aiding and abetting)............................30

1.  Shahbabian Produced No Direct Evidence ...................................30

2.  Shahbabian's Circumstantial Evidence Failed to Create an Inference of
     Age Discrimination...........................................................................30

B. Rejection of Murphy's Declaration ......................................................31

C. All State Law Claims Are Barred .........................................................31

D. Disability Discrimination......................................................................32

E. Retaliation ..............................................................................................32

F. Recovery of Wage Overpayment – Counterclaim of TriHealth.........33

ARGUMENT ..............................................................................................................33

A. Standard of Review...............................................................................33

B. First Issue:  No Material Issue Of Fact Exists To Suggest That TriHealth
    Discriminated Against Shahbabian Because Of His Age. ....................33

1.  There Is No Direct Evidence Of Age Discrimination ...................34

2.  There Is No Triable Inference of Age Discrimination Based on
     Circumstantial Evidence..................................................................45

a.  The District Court Did Not Refuse to Recognize "Alternative Ways"
     to Make a Prima Facie Showing .............................................45

b.  The District Court Did Not Require "Direct Evidence" As Part of a
     Circumstantial Case...................................................................48

c.  Ringer and McPherson Were Not Similarly Situated to Shahbabian ....49

3.  The District Court Was Correct That The Record Revealed No Evidence
     Of Pretext To Cover Up Age Discrimination.................................51

C. Second Issue:  There Is No Genuine Dispute That TriHealth Did Not Aid
    And Abet Age Discrimination. ..............................................................60

D. Third Issue:  There Was No Abuse Of Discretion In The District Court's
    Denial Of Shahbabian's Motion To Submit The Declaration Of A Third-
    Party Witness. ........................................................................................61

E. Fourth Issue:  All Of Shahabian's State Law Claims Are Barred By
    O.R.C. §2305.251(A) And By His Failure To Exhaust Internal Remedies ......64

1.  O.R.C. 2305.251 Bars Shahbabian's State Law Claims ...............................64

2.  Failure To Exhaust Internal Remedies Is An Additional And Independent Bar To Shahbabian's Claims ....................................................66

F.  Fifth Issue:  There Was No Material Issue That Trihealth Did Not Discriminate Against Shahbabian On The Basis Of Disability. ........................67

G.  Sixth Issue:  No Material Issue Of Fact Exists That TriHealth Did Not Unlawfully Retaliate. .........................................................................................71

H.  Seventh Issue:  No Material Fact Exists:  There Was No Fraud. ......................74

I.  Eighth Issue:  There Is No Genuine Issue Of Fact That TriHealth Is Entitled To Recover The Amount Of Money Overpaid To Shahbabian...........76

CONCLUSION ....................................................................................................78

CERTIFICATE OF COMPLIANCE .........................................................................79

CERTIFICATE OF SERVICE ..................................................................................79

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .................80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerel, S.R.L. v. PCC Airfoils, LLC.*,
  448 F.3d 899 (6th Cir. 2006) ...............................................................74

*Alberty v. Columbus Twp.*,
  730 F. Appx. 352 (6th Cir. 2018) ...............................................36, 59

*Arendale v. City of Memphis*,
  519 F.3d 587 (6th Cir. 2008) ...............................................................55

*Babb v. Maryville Anesthesiologists*,
  942 F.3d 308 (6th Cir. 2019) ...............................................................59

*Betkevur v. Aultman Hosp. Assn*,
  78 F.3d 1079 (6th Cir. 1996) .................................................46, 47, 63

*Blizzard v. Marion Tech. Coll.*,
  698 F.3d 275 (6th Cir. 2012) ............................. 39, 45, 51, 52, 55, 73

*Boston v. Blue Cross and Blue Shield*,
  431 Fed. Appx. 763 (10th Cir. 2011)...................................................72

*Brahmamdam v. TriHealth Inc.*,
  No. 1:19-cv-00152-SJD, 2022 WL 1539535 (S.D. Ohio May 16,
  2022) ...............................................................................................53, 56

*Brahmbhatt v. General Products Corp.*,
  No. 1:12-cv-919, 2014 WL 2711839 (S.D. Ohio June 16, 2014) ...............36, 58

*Brooks v. Arlington Hosp. Assn.*,
  850 F.2d 191 (4th Cir. 1988) ...............................................................66

*Brubaker v. Western & Southern Financial Group, Inc.*,
  2015 WL 47443046 (S.D. Ohio Aug. 10, 2015) ................................59

*Bush v. Dictaphone Corp.*,
  161 F.3d 363 (6th Cir. 1998) ...............................................................38

*Carter v. City of Miami*,
  870 F.2d 582 (11th Cir., 1989) .......................................................35

*Caskey v. Cty. of Ontario*,
  800 F.Supp.2d 468 (W.D. N.Y. 2011)..............................................72

*Chen v. Dow Chemical Co.*,
  580 F.3d 394 (6th Cir. 2009) ..........................................................53

*City of Columbus Civil Service Commission v. McGlone*,
  82 Ohio St. 3d 569 (Ohio 1998) .....................................................70

*Crow v. Penrose-St. Francis Healthcare System*,
  169 P.3d 158 (Colorado 2007)........................................................66

*Daugherty v. Sajar Plastics, Inc.*,
  544 F.3d 696 (6th Cir. 2008) ..........................................................69

*Diebel v. L&H Res. LLC*,
  492 F. App'x 523 (6th Cir. 2012) ....................................................39

*Doucet v. Univ. of Cincinnati*,
  No. 06-4118, 2007 WL 2445993 (6th Cir. August 28, 2007) ...........56

*Ferrari v. Ford Motor Company*,
  826 F.3d 885, Headnote 10 (6th Cir. 2016).................................70, 71

*Flagg v. City of Detroit*,
  715 F.3d 165 (6th Cir. 2013) ..........................................................33

*Frick v. Univ. Hosp. of Cleveland*,
  727 N.E.2d 600, 133 Ohio App.3d 224 (Ohio App. 1999) ..............66

*George v. Ford Motor Co.*,
  No. 03 Civ. 7643, 2007 WL 2398806 (S.D.N.Y. Aug. 17, 2007)....61

*Goodsite v. Norfolk Southern Ry. Co.*,
  573 Fed. Appx. 572 (6th Cir. 2014)................................................73

*Grady v. Affiliated Cent., Inc.*,
  130 F.3d 553 (2d Cir. 1997) ...........................................................35

*Gray v. The Kroger Company*,
  804 F. Supp. 2d 623 (6th Cir. 2011)...............................................40

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009)...............................................................33, 52, 59

*Gruener v. Ohio Cas. Ins. Co.*,
   510 F.3d 661 (6th Cir. 2008) ............................................................68

*Hazen Paper v. Biggins*,
   507 U.S. 604, 113 S. Ct. 1701 L.E.2d 338 (1993)............................43

*Holder v. City of Raleigh*,
   867 F.2d 823 (4th Cir. 1989) ............................................................58

*Hubbard v. Select Portfolio Servicing, Inc.*,
   No. 16-cv-11455, 2017 WL 3725475 (E.D. Mich. Aug. 30, 2017) .............64, 74

*Irwin v. Airco Carlisle*,
   837 F.2d 724 (6th Cir. 1987) ............................................................53

*James v. Metro Govt. of Nashville*,
   243 Fed. App'x 74 (6th Cir. 2007) ...................................................52

*Jinks v. Shenseki*,
   Case No. 2:08-cv-60, 2009 WL 3747172 (E.D. Tenn. Nov. 4, 2009)...............58

*Laws v. HealthSouth Northern Kentucky Rehabilitation*,
   508 Fed. App'x 404 (6th Cir. 2012) .................................................51

*Leadbetter v. Gilley*,
   385 F.3d 683 (6th Cir. 2004) ...........................................................50

*Lee v. Metro. Gov't of Nashville & Davidson Cty.*,
   432 F. App's 435, 443-44 (6th Cir. 2011) ........................................61

*Lewis v. Humboldt Acquisition Corp., Inc.*,
   681 F.3d 312 (6th Cir. 2012) ...........................................................67

*Longino v. City of Cincinnati*,
   No. 1:12-cv-424, 2013 WL 2424253 (S.D. Ohio June 4, 2013) ........................36

*Lynch v. Giglia M.D., et al.*,
   Case No. 1:17cv770-MRB (J. Barrett) ..............................................64

*Marie v. Am. Red Cross*,
   771 F.3d 344 (6th Cir. 2014) ...........................................................33

*McDonnell-Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ..................................................................45, 49

*Mehlman v. Cincinnati Children's Hosp. Med. Ctr.*,
  No. 1:20-cv-813, 2021 WL 4430631 (S.D. Ohio Apr. 26, 2021),
  adopted, No. 1:20-cv-813, 2021 WL 3560571 (S.D. Ohio Aug. 11,
  2021) ........................................................................................65

*Metz v. Titanium Metals Corp.*,
  475 Fed. Appx. 33 (6th Cir. 2012) ............................................39, 43

*Miles v. South Central Human Resources Agency, Inc.*,
  946 F.3d 883 (6th Cir. 2020) ...................................................51, 52

*Mitchell v. Toledo Hosp.*,
  964, F.2d 577 (6th Cir. 1992) ..................................................35, 53

*Myers v. Cuyahoga Cnty. Oh.*,
  182 F. App'x 510 (6th Cir. 2006) ..................................................39

*Nemazee v. Mt. Sinai Med. Ctr*,
  56 Ohio St. 3d 109, 564 N.E.2d 477 (Ohio 1990) ........................65, 66

*Pelcha v. MW Bancorp, Inc.,*,
  988 F.3d 318 (6th Cir. 2021) ........................................................39

*Pena v. City of Flushing*,
  651 Fed. Appx. 415 (6th Cir. 2016) .............................................69, 70

*Peters v. Lincoln Elec. Co.*,
  285 F.3d 456 (6th Cir. 2002) ........................................................35

*Pittman v. Experian Info. Solutions*,
  901 F.3d 619 (6th Cir. 2018) ........................................................61

*Policastro v. NW Airlines*,
  297 F.3d 535 (6th Cir. 2002) ........................................................35

*Qasem v. Kozarek*,
  716 F.2d 1172 (7th Cir. 1983) ......................................................66

*Ranowsky v. Nat'l Railroad Passenger Corp.*,
  244 F.Supp.3d 138 (D.C. Dist. 2017) ..............................................72

*Reid v. Sears, Roebuck & Co.*,
   790 F.2d 453 (6th Cir. 1986) ................................................................74

*Ridenour v. Lawson Co*.,
   791 F.2d 52 (6th Cir. 1986) ..................................................................53

*Sampson v. Sisters of Mercy of Willard*,
   Ohio, No. 3:12-cv-00824, 2015 WL 39535053 (N.D. Ohio June 29,
   2015) ......................................................................................................60

*Schwendeman v. Marietta City Schools*,
   436 F.Supp 3d 1045 (S.D. Ohio 2020) ..................................................51

*Scott v. Potter*,
   182 Fed. App'x 521 (6th Cir. 2006) ..........................................35, 39, 40

*Semertzides v. Bethesda North Hospital*,
   1st Dist. Hamilton No. C-180659, 2020 Ohio App. LEXIS 150 (Jan.
   22, 2020) ................................................................................................64

*Shulman v. Washington Hosp. Ctr.*,
   348 F.2d 70 (D.C. Cir. 1965) .................................................................66

*Slater v. Potter*,
   28 Fed. Appx. 512 (6th Cir. 2002) .........................................................60

*Sloan v. Repa Corp. Inc.*,
   310 F. Supp. 3d 891 (S.D. Ohio 2018) ......................................70, 71, 72

*Sloat v. Hewlett-Packard Enter. Co.*,
   18 F. 4th 204 (6th Cir. 2021) .................................................................40

*Speck v. City of Memphis*,
   370 F.App'x 622 (6th Cir. 2010) ............................................................73

*Stipkala v. American Red Cross*,
   215 F.3d 1327 (6th Cir. 2000) ...............................................................38

*Stuckey v. Online Resources Corp.*,
   909 F. Supp. 2d 912 (S.D. Ohio Nov. 9, 2012) .....................................75

*Sullivan v. River Valley Sch. Dist.*,
   197 F.3d 804 (6th Cir. 1999) .................................................................69

*Talwar v. Catholic Healthcare Partners*,
   258 Fed. Appx. 800 (6th Cir. 2007)......................................................64

*Tennessee Prot. & Advoc., Inc. v. Wells*,
   371 F.3d 342 (6th Cir. 2004) ............................................................61

*Tingle v. Arbors at Hilliard*,
   692 F.3d 523 (6th Cir. 2013) ............................................................51

*Toosen v. Roadway Express*,
   47 Fed. Appx. 370 (6th Cir. 2002)......................................................37

*Transworld Airlines, Inc. v. Thurston*,
   469 U.S. 111 (1985)......................................................................49

*Tucker v. Union of Needletrades, Indus. & Textile Employees*,
   407 F.3d 784 (6th Cir. 2005) ............................................................67

*Vaughn v. City of Lebanon*,
   18 Fed. Appx. 252 (6th Cir. 2001)................................................64, 74

*U.S. ex rel. Villafane v. Solinger*,
   543 F.Supp.2d 678 (W.D. Ky. 2008)....................................................77

*Wall v. Ohio Permanente Med. Group, Inc.*,
   119 Ohio App. 3d 654 N.E.2d 1233 (Ohio Ct. App. 1997)............................64

*Washington v. Cambridge East*,
   Case No. 12-cv-11911, 2012 WL 5363785 (E.D. Mich. Oct. 30,
   2012) ....................................................................................58

*Weinrauch v. Sherwin Williams Co.*,
   2019 WL 3007031 (N.D. Ohio July 10, 2019)....................................60

*Wheat v. Columbus Bd. Of Educ.*,
   644 Fed. Appx. 427 (6th Cir. 2016)....................................................59

*Wilson v. Chipotle Mexican Grill, Inc.*,
   Case No. 1:12-cv-87-HJW, 2013 WL 6008623 (S.D. Ohio Nov. 13,
   2013) ....................................................................................55

*Woolf v. City of Streetsboro*,
   N.D. Ohio No. 5:09-cv-1570, 2010 U.S. Dist. LEXIS 110446 (Oct.
   18, 2010) ................................................................................60

*Worthy v. Mich. Bell Telephone Co.*,
   472 F. App'x 342 (6th Cir. 2012) .......................................................39

*Woythal v. Tex-Tenn Corp.*,
   112 F.3d 243 (6th Cir. 1997) ...............................................39, 43, 49

**Statutes**

5 U.S.C. § 8425(a) .................................................................................44

29 U.S.C § 623(j) ...................................................................................44

49 U.S.C. § 44729 ..................................................................................44

O.R.C. 2305.25......................................................................................60

O.R.C. 2305.25(A) .................................................................................31

O.R.C. 2305.251...............................................................................63, 64

O.R.C. 2305.251(A)..................................................................1, 2, 63, 64

O.R.C. 4112.02.......................................................................................64

O.R.C. 4112.02(J) ..................................................................................60

**Other Authorities**

Sixth Circuit Rule 26.1.............................................................................1

Sixth Circuit Rule 30(b)..........................................................................80

Federal Rule of Appellate Procedure 26.1 ..............................................1

## STATEMENT IN OPPOSITION TO ORAL ARGUMENT

Oral argument is unnecessary to decide this straightforward, extensively briefed appeal. Appellee TriHealth respectfully requests that Appellees be free from the unnecessary inconvenience and expense of oral argument.

## STATEMENT OF THE ISSUES

I.   Did the district court properly grant summary judgment in TriHealth's favor on Shahbabian's claims of age discrimination in the absence of any direct or circumstantial evidence in the record?

II.  Did the district court properly grant summary judgment in TriHealth's favor on Shahbabian's claims of aiding and abetting in age discrimination where the underlying age claim had no basis?

III. Did the district court abuse its discretion in refusing to consider the proffered Declaration of Timothy Murphy where Shahbabian was aware of Murphy's alleged knowledge early on but failed to submit the proffered Declaration until after summary judgment motions were filed and the Declaration was not probative of age discrimination?

IV.  Did the district court properly grant TriHealth's motion for summary judgment in TriHealth's favor on all of Shahbabian's state-law claims because they are barred by the immunity protections extended by O.R.C. §2305.251(A) where Shahbabian admitted his operating errors occurred, conceded that he had no factual basis to question the legitimacy of the peer review process and failed to appeal any of the peer review findings?

V.   Did the district court properly grant TriHealth's motion for summary judgment in TriHealth's favor on Shahbabian's claims of disability discrimination where Shahbabian conceded he had committed multiple operating errors, deliberately and dishonestly failed to cooperate in TriHealth's efforts to determine fitness for duty and produced no evidence that the peer review process was driven by any factor other than concern for patients' well-being?

VI.  Did the district court properly grant TriHealth's motion for summary judgment in TriHealth's favor on Shahbabian's claim of retaliation where no protected activity occurred before the alleged adverse action?

VII.   Did the district court properly grant TriHealth's motion for summary judgment in TriHealth's favor on Shahbabian's claim of fraud which was untimely raised, barred by O.R.C. §2305.251(A) and supported by no record evidence?

VIII.  Did the district court correctly rule on TriHealth's counterclaim that Shahbabian owed TriHealth $679,711.61 in overpaid wages plus interest per the undisputed terms of his employment agreement and where Shahbabian submitted a proposed order to the district court agreeing to the amount at issue?

## STATEMENT OF THE CASE

## INTRODUCTION

Shahbabian's appeal is based on self-serving arguments rather than record facts. The undisputed record facts required the result below. They establish that Shahbabian, a neurosurgeon, operated for decades as an independent physician, exercising staff privileges primarily at Good Samaritan Hospital, a TriHealth facility. When, despite an aggressive surgery load, his income underwent a significant decline, he began looking for a reliable exit ramp to retirement. In 2014, at age 70, he sold his entire practice to TriHealth, continuing to operate at Good Sam as an employed physician. His stated purpose for this arrangement was his transition to retirement.

The record is undisputed that Shahbabian committed multiple errors in surgery, resulting in actual harm to patients. These errors were reviewed pursuant to an objective quality-control peer review process. The quality review committees issued multiple negative findings against Shahbabian. Shahbabian conceded the legitimacy of the peer review process, did not object to the findings and did not exercise his right to appeal the negative findings.

2

Shahbabian was also experiencing a deterioration in his health.  Shahbabian misrepresented to TriHealth that he had submitted to fitness evaluations and been deemed "perfect."  In fact, he had undergone no such evaluation.  He did voluntarily agree to a plan under which he would log fewer operating room hours and avoid or seek help with complex procedures.  These measures saw a temporary improvement which soon gave way to additional surgical errors that led to further negative findings by the quality review committees.  In May 2017, faced with the choice of a voluntary versus involuntary pause in surgical procedures pending an independent review of his cases, Shahbabian chose a third option, a permanent surrender of his operating privileges.  Despite its right to terminate Shahbabian's employment upon six months' notice, TriHealth retained him and Shahbabian continued his clinical practice until the expiration of his employment contract in May 2019.   A normal compensation reconciliation determined that he had been overpaid in the amount of $579,711.61.  Shahbabian has refused to pay what the district court correctly found he owed.

### A.    TriHealth and Mayfield Relationship

TriHealth was formed in 1995 when Good Samaritan Hospital ("GSH") and Bethesda Hospital joined. It serves the community's healthcare needs through employed physicians as well as independent physicians who exercise staff privileges at its hospitals. (Oliphant Depo., RE 165, PageID 10946-10947).

Mayfield Clinic, Inc. is an independent neurosurgery group whose neurosurgeons exercise surgical privileges at most of Cincinnati's area hospitals,

including TriHealth. (Ringer Depo., RE 171, PageID 11623, 11659). Mayfield has long provided neurosurgery services to the TriHealth system. Its ties with GSH were particularly strong. Its founder, Dr. Frank Mayfield, operated there and trained many surgeons there, including Shahbabian. (Shahbabian Depo., RE 181, PageID 13166-13167; Kerlakian Depo., RE 175, PageID 12518-12519). Dr. Andrew Ringer, neurosurgeon and Mayfield principal, has operated at GSH since 2004 and served as its Medical Director of Neurosurgery since 2009. (Ringer Depo., RE 171, PageID 11595).

On June 2, 2014, TriHealth and Mayfield entered into a written Co-Management Agreement under which TriHealth engaged Mayfield to provide additional neuroscience services including staffing an on-call panel of neurosurgeons at GSH and Bethesda to assure 24-7, 365 day a year coverage to ER patients or in-patients without a current physician-patient relationship; medico-administrative services, including filling two Medical Director roles and assistance in planning physician recruitment for future services and succession needs; help with quality initiatives and targets; and active participation in quality assurance and peer review programs. (Farrington Depo., RE 153-13, Page ID 9022-9071; Donovan Depo., RE 152, PageID 7752-7753, 7840-7841; Ringer Depo., RE 171, PageID 11672-11676, 11690-11692; Ringer Depo., RE 171-20, PageID 11932-11981; Ringer Depo., RE 171-22, PageID 11983-11986). Mayfield had similar co-management arrangements with other health systems and TriHealth had similar co-management agreements with other specialty groups.

(Oliphant Depo., RE 165, PageID 10947, 10964; McPherson Depo., RE 179, PageID 13002).

Mayfield and TriHealth entered into a second and expanded Co-Management Agreement, effective May 10, 2017, which built upon and in large part duplicated the 2014 Co-Management Agreement. (McPherson Depo., RE 179-15, PageID 13063-13113; Ringer Depo., RE 171-67, PageID 12099-12149). The 2017 Co-Management Agreement created the role of Medical Director and System Department Chief (anticipated to be Ringer), site chiefs at GSH and Bethesda North and a Balanced Score Card to measure quality-control improvements. (McPherson Depo., RE 179-15 PageID 13095).

Mayfield also had a long-standing Co-Management Agreement with the University of Cincinnati Medical Center ("UCMC") to run its department of neurosurgery, an agreement in place since the mid-1980's. (Farrington Depo., RE 153, PageID 8821). In 2016, Mayfield learned that UCMC was ending that Co-Management Agreement effective mid-2017. (Id., PageID 8901-8902; Ringer Depo., RE 171, PageID 11786). The divorce meant that Mayfield's neurosurgeons must operate elsewhere since privileges at UCMC require an academic affiliation, previously enjoyed by Mayfield surgeons only through the UCMC Co-Management Agreement. Mayfield also would cease to run UCMC's residency program. (Farrington Depo., RE 153, PageID 8783, 8833-8834; Ringer Depo., RE 171, PageID 11798; McPherson Depo., RE 179, PageID 12989; Oliphant Depo., RE 165, PageID 10970; Kerlakian

Depo., RE 175, PageID 12547-12549, 12554).  Mayfield informed TriHealth, the Christ Hospital, and Mercy Hospital that Mayfield anticipated bringing additional patient volume to their systems and inquired whether the receiving hospitals would have adequate space and equipment to treat its patients, given the size and sophistication of its practice.  (Farrington Depo., RE 153, PageID 8787-8788).  Some cases *had* to go to GSH because it had one of the few neuro ICUs outside of UCMC. (Id.).

In 2016, GSH did not have sufficient bed capacity or adequate equipment to accommodate a significant volume increase.  (Donovan Depo., RE 152, PageID 7769-7770).  To prepare, TriHealth needed a better understanding of what may be needed in terms of neurosurgical beds, post-surgical beds, specialized equipment, instrumentation, and operating room block time.  Although Mayfield expected to bring more patients to GSH and elsewhere, there was never any guarantee it would do so. (Farrington Depo., RE 153, PageID 8895, 8912; Cercek Depo., RE 159, PageID 10135-10142; Donovan Depo., RE 152, PageID 7918).

The 2017 Co-Management Agreement was independent of the Mayfield/UCMC dissolution.  (Farrington Depo., RE 153, PageID 8785).  It was driven by TriHealth's own pre-existing business mission to grow each of its five specialty service lines, including neuroscience.  (Donovan Depo., RE 152, PageID 7796).  TriHealth had hired Mark Clement as President in March 2015.  He became President and CEO in January 2016.  (Clement Depo., RE 157, PageID 9782, 9787).  Clement hired Gail Donovan as

6

Chief Operating Officer in December 2015.  (Clement Depo., RE 157, PageID 9788-9789; Donovan Depo., RE 152, PageID 7719-7720).  Clement charged Donovan with shaping TriHealth's various hospitals, ambulatory facilities and physician practices into one integrated delivery system focused on five specialty service lines, including neuroscience, women's health, cancer, cardiovascular and musculoskeletal.  (Clement Depo., RE 157, PageID 9790-9791; Donovan Depo., RE 152, PageID 7727-7728).  TriHealth engaged an independent consulting firm, The Chartis Group, to assist in developing a strategic plan for each of the five service lines.  (Donovan Depo., RE 152, PageID 7727).  In connection with this initiative, TriHealth engaged in projection analyses with respect to the service lines and independent groups with whom it worked to try to estimate potential future demand for services in the various areas so as to properly accommodate that demand.  (Clement Depo., RE 157, PageID 9816-9817; Cercek Depo., RE 159, PageID 10139).

**B.    TriHealth and Shahbabian Relationship**

1.    <u>Shahbabian's Quality of Care Issues as a Staff Surgeon</u>

Shahbabian is a retired neurosurgeon who set up an independent solo practice in 1985 as Set Shahbabian M.D. Inc. (Shahbabian Depo., RE 181, PageID 13148). His office practice, along with his MRI facility, was located on Cincinnati's west side. Although he held privileges at several local hospitals, he primarily exercised surgical privileges and operated on patients at GSH as a non-employee staff physician.  (Id., PageID 13190-13192).  Shahbabian maintained a heavy neurosurgical load and

consistently demonstrated a keen interest in its increase. He often complained that he felt that the neurosurgery residents or emergency department doctors at GSH were referring patients to other surgeons rather than to him. (Id., 13164-13165, 13243-13244, 13247-13248, 13250-13251; Shahbabian Depo., RE 181-3, PageID 13763).

Shahbabian exhibited some indifference to required paperwork and operating room civility. He received frequent warnings that his staff privileges would be terminated if he failed to complete medical records. (Shahbabian Depo., RE 181, PageID 13230-13235; Shahbabian Depo., RE 181-3, PageID 13741-13744). The GSH nursing staff repeatedly complained about his yelling and cursing. (Shahbabian Depo., RE 181, PageID 13234-13238, 13240, 13246, 13270-13271; Shahbabian Depo., RE 181-3, PageID 13745, 13757-13762, 13785-13786). In 2006, to avoid review by GSH's Medical Executive Committee ("MEC"), he agreed to attend a stress management program. (Shahbabian Depo., RE 181, PageID 13243-13245; Shahbabian Depo., RE 181-3, PageID 13752-13756).

GSH's Quality Review process applies to all physicians with GSH staff privileges, both employed and staff. The process begins with a nurse Clinical Quality Specialist ("CQS") who reviews patient records according to pre-established criteria for flagging any quality of care concern with respect to a given patient, such as unexpected complications or excessive blood loss. (Shahbabian Depo., RE 181, PageID 13214; Kerlakian Depo., RE 175, PageID 12576-12577). The nurse reviewer is employed within the GSH Clinical Quality department and is independent of the

8

Department of Surgery.  (Shahbabian Depo., RE 181, PageID 13214; Koselka Depo., RE 173, PageID 12257-12259; Ringer Depo., RE 171, PageID 11715-11716; Kerlakian Depo., RE 175, PageID 12573-12577).   After CQS review, the chart is reviewed by the applicable Section Chief (e.g., Ringer for Neurosurgery) and Department Chair (in this case, George Kerlakian, M.D., a bariatric surgeon).  The case may be closed or the physician may receive a Letter of Inquiry ("LOI") with specific quality-related questions. (Kerlakian Depo., RE 175, PageID 12575).  The physician's responses become part of the file should the review process continue to the Quality Assurance Committee ("QAC") and the Patient Care Committee ("PCC"), the next steps in the Quality Review process. (Ringer Depo., RE 171, PageID 11721-11722; Kerlakian Depo., RE 175, PageID 12570).  Each Department, such as Surgery, has its own QAC, comprised of its various Division Chiefs.  The PCC is comprised of the Heads of the various QACs and oversees all of them.  (Ringer Depo., RE 171, PageID 11721-11722; Koselka Depo., RE 173, PageID 12202-12205, 12231-12233, 12256-12261). The physician being reviewed may attend and participate in QAC and PCC discussions. (Shahbabian Depo., RE 181-1, PageID 13386). The Quality Review process may result in a case closure or the assignment of a Case Weight (also sometimes called Case Level) of 0, 1, 2 or 3.[1] Under the Medical Staff Bylaws, a

---

[1] Case Weight 1: Improvement opportunity. Case Weight 2: At risk behavior. Case Weight 3: Reckless behavior or recurrent at-risk behavior. (Ringer Depo., RE 171, PageID 11727-11728; Patient Care Committee Medical Staff Peer Review Guidelines, RE 208-1 SEALED, PageID 16310-16315).

physician may appeal a negative Case Weight. (Shahbabian Depo., RE 181, PageID 13261; RE 208-1 SEALED, PageID 16309-16315).

The Quality Review Process at GSH also includes Focused Reviews, instituted when a physician's outcomes in a certain area, e.g., blood loss or post-surgery readmission, deviate from the norm. (Ringer Depo., RE 171, PageID 11716). The Focus Review, too, is initiated by a CQS according to pre-established criteria. (Id.; Kerlakian Depo., RE 175, PageID 12551).

### a.     December 2009 Quality of Care Issue

Shahbabian's patient was scheduled for surgery on disc C5-C6. Shahbabian performed surgery on the patient's C6-C7 before checking the MRI. He blamed his office staff for "documentation confusion." A Case Weight 1 was assigned. (Shahbabian Depo., RE 181-3, PageID 13765; Shahbabian Depo., RE 164-2 SEALED, PageID 10715-10718; Shahbabian Depo., RE 181, PageID 13253-13263).

### b.     Focus Review 2011

Shahbabian was placed on Focus Review because his rates of blood loss and blood transfusions during spine fusion surgery were significantly higher than those for the Division's other neurosurgeons. Shahbabian admitted that he "lost more blood than he should have." (Id., PageID 13257-13262, 13313; Shahbabian Depo., RE 181-3, PageID 13766-13775). Until 2016, Shahbabian declined to use a cell saver, which reduces blood loss. (Shahbabian Depo., RE 181, PageID 13257, 13313). From 2011 through 2015, Shahbabian's outcomes led to his being under Focus Review for a total

of 17 months.    (Shahbabian Depo., RE 181-3, PageID 13766-13774, 13789; Shahbabian Depo., RE 181-4, PageID 13869-13871; Shahbabian Depo., RE 181, PageID 13263-13265, 13274; Shahbabian Depo., RE 181-1, PageID 13407).

### c.    November 2011 Quality of Care Issue

Shahbabian operated on a patient who suffered excessive bleeding.  Following surgery, the patient was paralyzed.  Shahbabian had ignored the Medical Reconciliation Form reflecting the patient was on Lovenox, a Coumadin alternative.  The patient died on December 10, 2011.  (Shahbabian Depo., RE 164-3 SEALED, PageID 10719-10727; Shahbabian Depo., RE 181, PAGEID 13264-13265).  Ringer recommended a Case Weight 2.  Kerlakian, Shahbabian's friend and fellow Armenian, recommended a Case Weight 3. (Shahbabian Depo., RE 164-3 SEALED, PageID 10719-10727; Shahbabian Depo., RE 181, PageID 13265).  The Surgery QAC and the PCC upheld the Case Weight 3 recommendation.  (Shahbabian Depo., RE 181, PageID 13264-13266; Shahbabian Depo., RE 181-3, PageID 13781-13783).  Shahbabian did not dispute or appeal the Case Weight 3 finding, although he had the right of appeal as each notice informed him.  (Shahbabian Depo., RE 181, PageID 13261,13265; Shahbabian Depo., RE 164-3 SEALED, PageID 10719-10727).

### d.    July 2012 Quality of Care Issue

There was a complication with Shahbabian's patient about which Ringer decided a Letter of Inquiry ("LOI") was not necessary.  However, an Education Letter did issue because Shahbabian had dismissed the obligation to report the complication to UCMC

given the assistance of a UCMC resident on the case. (Shahbabian Depo., RE 181-3, PageID 13781-13783; Shahbabian Depo., RE 181, PageID 13266-13267).

### e.    November 2012 Quality of Care Issue

A LOI addressed Shahbabian's patient's excessive blood loss during surgery. Shahbabian conceded that his rate of blood loss was a recurring problem. (Shahbabian Depo., RE 164-4 SEALED, PageID 10728-10733). A Case Weight 2 issued. Shahbabian did not appeal and on January 22, 2013, Shahbabian told CQS Lisa Parks, R.N., that he had no argument with the finding. (Shahbabian Depo., RE 181, PageID 13267-13270).

### f.    January 2013 Quality of Care Issue

Shahbabian administered doxycycline to a penicillin-allergic patient although it was not an approved antibiotic. He admitted that he "was not aware of the standard of care" which required the prescribing of other drugs. A Case Weight 1 issued. (Shahbabian Depo., RE 164-5 SEALED, PageID 10734-10736; Shahbabian Depo., RE 181, PageID 13273-13274).

### g.    February 7, 2013 Quality of Care Issue

Shahbabian's OR records omitted documentation of the pre- and post-op antibiotics prescribed. Shahbabian had no explanation for the violation. A Case Weight 1 issued. (Shahbabian Depo., RE 164-6 SEALED, PageID 10737-10739; Shahbabian Depo., RE 181, PageID 13274-13275).

h.    April 11, 2013 Coaching of Shahbabian

Kerlakian and Dr. Robert Collins, VP of Medical Affairs, met with Shahbabian
about two incident reports concerning his disruptive behavior in the operating room.
Shahbabian engaged in "yelling, cursing and name calling" and caused the loss of cell
saver blood.  (Shahbabian Depo., RE 181, PageID 13270-13271; Shahbabian Depo.,
RE 181-3, PageID 13785-13786).   Shahbabian did not dispute his misconduct.
(Shahbabian Depo., RE 181, PageID 13233-13235, 13271).  Although Kerlakian and
Collins were concerned that his high-production pace could be affecting him
negatively, Shahbabian denied that any personal or health issue was a contributing
factor.  (Id., PageID 13270-13271; Shahbabian Depo., RE 181-3, PageID 13785-
13786).

2.    Shahbabian Sells His Practice to TriHealth and Becomes a
TriHealth Employee

The pressures of a solo practice and personal issues were increasingly weighing
on Shahbabian.  (Kerlakian Depo., RE 175, PageID 12537).   His patients were
expressing concern about what would happen to them when he retired.  (Shahbabian
Depo., RE 181-1, PageID 13384). He often operated on four hours' sleep. (Id., 13355).
In January 2014, he fainted in the operating room. (Shahbabian Depo., RE 164-1
SEALED, PageID 10676-10677; Ringer Depo., RE 171, PageID 11815-11816).
Despite his work pace, his compensation had been declining.  (Shahbabian Depo., RE
181, PageID 13175, 13186-13188).  He was losing money on his MRIs because of

13

steep competition and lower reimbursement rates. He had 18 employees and high overhead. (Id., PageID 13187-13188, 13297). For several years, he had not been getting the referrals he had previously received from other physicians in the community. (Id., PageID 13165-13166).  He wanted to spend more time with his wife who was seriously ill.  (Id., PageID 13328; Shahbabian Depo., RE 164-1 SEALED, PageID 10692-10694).

Shahbabian had been trying to persuade residents to join him in independent practice, by renting office space from him and sharing expenses. He believed the alignment with a junior doctor would facilitate the transition of his practice upon retirement. (Shahbabian Depo., RE 181, PageID 13167-13173, 13328-13330).  In 2013 he considered three residents as potential candidates to align with him over the next three to four years.  (Id., PageID 13167-13169).  He had serious discussions with resident Dr. John DePowell.  Shahbabian was aware that DePowell was also exploring opportunities with GSH and Mayfield.  (Id., PageID 13169-13173).  Each resident rejected the expense and risks of a solo practice. (Id., PageID 13167-13170, 13328-13330).  The "young guys, they afraid of being solo," "that's why everybody wants to join a big group."  (Id., PageID 13168).

Having found no one willing to align with him in independent practice, in March 2013, at age 70, Shahbabian began negotiations with TriHealth to sell his office and MRI facility and become a TriHealth-employed physician. (Id., PageID 13173).  He was represented by David Kamp, the "best lawyer Shahbabian knows."  Marcia

Swehla, TriHealth's COO at the time, negotiated on behalf of TriHealth. (Id., PageID 13188-13189). Shahbabian loves Swehla and has no question that she is honest.  (Id., PageID 13173-13174).  He told Swehla more than once that he wanted to have less work in a couple of years.  (Shahbabian Depo., RE 181-1, PageID 13342).

Under the Asset Purchase Agreement ("APA"), executed on April 30, 2014, TriHealth purchased all tangible and intangible assets of Set Shahbabian M.D. Inc. and assumed all its obligations, including personnel, back office administration and vendor contracts. (Shahbabian Depo., RE 181, PageID 13178-13182; Shahbabian Depo., RE 181-2, PageID 13523-13545, 13566-13567). The APA contained an "integration" clause confirming the Agreement was the entire agreement rendering all prior understandings or negotiations null and void.  Shahbabian also entered into a five-year Employment Agreement with TriHealth, which provided that his employment would begin on May 1, 2014 and end on April 30, 2019.  There was no obligation or expectation of renewal at the Agreement's end. (Shahbabian Depo., RE 181-2, PageID 13648-13666; Shahbabian Depo., RE 181, PageID 13188-13189).  After April 30, 2017, either party could terminate the Employment Agreement without cause upon six months' notice. (Id., PageID 13193-13194). The Employment Agreement also contained an integration clause. (Shahbabian Depo., RE 181-2, PageID 13648-13666).[2]

---

[2] Clement and Donovan, with hire dates of March 2015 and December 2015 respectively, had no involvement in the negotiation of Shahbabian's 2014 employment contract, the Asset Purchase Agreement or the 2014 Co-Management Agreement.

Under the Employment Agreement, Shahbabian was paid $968,000 annually with baseline production established at 24,207 Work Relative Value Units ("wRVUs"). wRVUs are designed to measure the value of the various work tasks performed by physicians, including surgeries. (Ringer Depo., RE 171, PageID 11641). It is common to allow newly hired physicians an "onboarding" period during which the physician's salary level is protected even if the wRVU production standard is not met. (Oliphant Depo., RE 165, PageID 10988-10990).   Shahbabian's Employment Agreement provided a three-year period of income protection through April 30, 2017. After that, if Shahbabian failed to meet his wRVU production requirement, the amount of deficiency was to be paid back to TriHealth.  As Shahbabian explained:  "three years. After that, whatever you kill you.  Eat whatever you kill." (Shahbabian Depo., RE 181, PageID 13193; Shahbabian Depo., RE 181-2, PageID 13648-1366).   Despite his freedom from the pressures of business ownership, Shahbabian's quality of care issues continued.  In late 2014 and early 2015, three of Shahbabian's surgeries were flagged for review.

3.   <u>Shahbabian's Quality of Care Issues as an Employed Physician</u>

a.   <u>October 2014 Quality of Care Issue</u>

Shahbabian operated on a 54-year-old man.   Because the "bleeding was becoming uncontrollable," the procedure was abbreviated.  (Shahbabian Depo., RE 164-6 SEALED, PageID 10750-10766).  Shahbabian admitted the complication was "horrible."  (Shahbabian Depo., RE 181, PageID 13283-13284).  Post-surgery, the

patient experienced new symptoms and was unable to walk. He was readmitted and Ringer completed the procedure at the family's request. (Shahbabian Depo., RE 164-6 SEALED, PageID 10761). Unlike Shahbabian, Ringer used a microscope. No further complications occurred. (Id., 10755-10757; Shahbabian Depo., RE 181, PageID 13284). Shahbabian said Ringer used the microscope because "some people, they want to see." (Id.). On March 19, 2015, the QAC recommended a Level 3 finding, which the PCC adopted on April 14, 2015. Shahbabian did not appeal. The PCC recommended a formal improvement plan with monitoring. (Shahbabian Depo., RE 164-6 SEALED, PageID 10750-10766; Collins Depo., RE 169, PageID 11266-11267; Koselka Depo., RE 173, PageID 12186-12189).

b.    November 26, 2014 Quality of Care Issue

Shahbabian performed a laminectomy on a 50-year-old female whom he discharged with headaches and leakage. (Shahbabian Depo., RE 164-6 SEALED, PageID 10741-10743; Shahbabian Depo., RE 181, PageID 13280-13283). She was readmitted and operated on again. She was discharged and readmitted a third time with a surgical site infection. Shahbabian had ordered an unapproved pre-op antibiotic. On March 19, 2015, the Surgery QAC recommended a Case Weight 3. It believed that the leakage should have been detected and repaired sooner and differently and that Shahbabian's treatment put the patient at risk for meningitis. On April 14, 2015, the PCC reviewed the case and upheld the Level 3 finding. (Shahbabian Depo., RE 164-6 SEALED, PageID 10743). Shahbabian again had the right to appeal but did not.

(Shahbabian Depo., RE 181, PageID 13261, 13282, 13291; Shahbabian Depo., RE 181-1, PageID 13387).

c.    <u>January 2015 Quality of Care Issue</u>

In operating on a 72-year-old woman, Shahbabian left inside her part of a catheter that he could not retrieve.  (Shahbabian Depo., RE 164-6 SEALED, PageID 10767-10792; Shahbabian Depo., RE 181, PageID 13286-13291).  He again failed to use a microscope.  Post-surgery, she had impaired functional balance and coordination.  (Shahbabian Depo., RE 164-6 SEALED, PageID 10772-10773).  On March 19, 2015, she returned to the OR for the catheter's removal where an assisting surgeon used a microscope.  This case was flagged for review and proceeded to the QAC.  This is the only QAC meeting that Shahbabian attended.  He blamed the residents for pulling out a drain while he was out of the operating room.  He had no explanation for his being in the doctors' lounge drinking coffee during this "extremely unusual" case.  (Shahbabian Depo., RE 181, PageID 13288-13291).  Following the second surgery, Shahbabian requested that Ringer do the follow up consult.  (Shahbabian Depo., RE 164-6 SEALED, PageID 10776-10777).  The QAC issued a Level 3 finding for recurrent at-risk behavior, a finding adopted by the PCC on May 12, 2015 along with the implementation of a formal improvement plan with monitoring.  (Shahbabian Depo., RE 164-6 SEALED, PageID 10792).  Shahbabian had no dispute with this finding and did not appeal it.  (Shahbabian Depo., RE 181, PageID 13291).

       d.      June 1, 2015 Corrective Action Plan and Amended Employment Agreement

In April 2015, Shahbabian had several discussions with Kerlakian, Collins and others about quality of care concerns. In response to the suggestion that a fitness for duty evaluation may be in order, Shahbabian stated that he had already been evaluated by a family doctor, a neuropsychiatrist and a neurologist and that everything was "perfect." (Id., PageID 13293, 13299, 13303, 13321-13327; Shahbabian Depo., RE 181-1, PageID 13348-13352; Shahbabian Depo., RE 164-1 SEALED, PageID 10683-10686; Shahbabian Depo., RE 181-3, PageID 13793-13845; Shahbabian Depo., RE 181-3, PageID 13803; Shahbabian Depo., RE 164-14 SEALED, PageID 10892-10904).  TriHealth did not require further evaluation. (Shahbabian Depo., RE 181, PageID 13299-13301).  Shahbabian had been untruthful.  No doctor had performed any fitness for duty evaluation.  There is no evidence of any 2015 visit to Dr. Hughes, a neurologist and Shahbabian's friend and tenant of 35 years.  (Id., PageID 13322-13327).  He saw no neuropsychiatrist.  His primary care doctor, Dr. Thaddeus Bort, had recommended that he see a psychologist, Jim Diehl, Ph.D., for stress issues.  Mr. Diehl was clear that he was not performing a fitness for duty evaluation of Shahbabian. (Shahbabian Depo., RE 164-1 SEALED, PageID 10683-10686 and Shahbabian Depo., RE 181-1, PageID 13353; Shahbabian Depo., RE 164-14 SEALED, PageID 10892-10904).

On April 20, 2015, Kerlakian and Dr. Margaret LeMasters, an OB/GYN surgeon and PCC Chair, confirmed to Shahbabian that he would be receiving a formal plan of correction.  (Shahbabian Depo., RE 164-6 SEALED, PageID 10746; Shahbabian Depo., RE 181, PageID 13287).  Shahbabian did not appeal. Instead, in June 2015, Shahbabian, still represented by Kamp, voluntarily agreed to the plan under which he would block less time in the GSH operating rooms, limit the complexity of his surgical procedures and consult with Ringer on intra-cranial (brain) cases.  (Shahbabian Depo., RE 181, PageID 13196-13199; Shahbabian Depo., RE 181-2, PageID 13667-13670; Ringer Depo., RE 171, PageID 11750-11754; Kerlakian Depo., RE 175, PageID 12580-12581).  On April 28, 2015, Shahbabian thanked LeMasters for her compassion and understanding and accepted the formalized correction plan "based on the precedent of similar situations in the past."  (Shahbabian Depo., RE 181-1, PageID 13358-13359; Shahbabian Depo., RE 181-4, PageID 13855-13856).  At the same time, he entered into an Amended Employment Agreement with a decreased wRVU production standard of 11,700. (Shahbabian Depo., RE 181, PageID 13196-13199; Shahbabian Depo., RE 181-2, PageID 13667-13678).  His salary and income protection period remained unchanged.  (Shahbabian Depo., RE 181, PageID 13197; Oliphant Depo., RE 165, PageID 10990-10992).[3]

---

[3] Given their hire dates, Donovan and Clement had no involvement in the peer review process or the June 15 corrective action plan and contract amendment.

TriHealth monitored Shahbabian's performance pursuant to the plan of correction. Although the CQS flagged several incidents for review and one LOI issued, Kerlakian and Ringer agreed the cases should be closed without further review. (Shahbabian Depo., RE 181-1, PageID 13365; Shahbabian Depo., RE 164-7 SEALED, PageID 10802-10804). A Focus Review in late 2015 determined that Shahbabian had been complying with the limits imposed by the plan of correction. (Shahbabian Depo., RE 181-1, PageID 13365; Shahbabian Depo., RE 164-7 SEALED, PageID 10799-10801). Shahbabian told Kerlakian in September 2015 that he was "fine" and "more than happy" not doing complex spine surgeries and that someone else could do them. (Shahbabian Depo., RE 181-1, PageID 13362-13365).

### e.    September 11, 2015 Quality of Care Issue

Shahbabian performed a surgery that he documented as a "redo." (Shahbabian Depo., RE 164-7 SEALED, PageID 10793-10798; Shahbabian Depo., RE 181-4, PageID 13857; Shahbabian Depo., RE 181-1, PageID 13362-13365). "Redos" were non-compliant with the June 2015 Corrective Action Plan. Shahbabian's explanation was that this was actually a discectomy and not a "redo." Ringer and Kerlakian agreed that the matter would not be escalated. (Shahbabian Depo., RE 164-7 SEALED, PageID 10793-10798; Shahbabian Depo., RE 181-1, PageID 13362-13365).

### f.    October 2015 Quality of Care Issue

The QCS flagged three of Shahbabian's procedures for review which had occurred on October 5, October 12 and December 10, 2015 respectively. In each case,

Ringer decided not to escalate and Kerlakian agreed. (Shahbabian Depo., RE 181-1, PageID 13365; Shahbabian Depo., RE 164-7 SEALED, PageID 10802-10804). In the third procedure, Shahbabian asked for (and received) Ringer's assistance in locating lesions which Shahbabian was unable to find. This happened more than once. (Ringer Depo., RE 171, PageID 11812-11818; Shahbabian Depo., RE 164-7 SEALED, PageID 10804).[4]

### g.    October 31, 2016 Meeting With Collins and Kerlakian

During this time period, despite his misrepresentation to TriHealth that everything was "perfect," Shahbabian was being treated by Dr. Bort for worsening hypertension, fatigue and anxiety. (Shahbabian Depo., RE 181-1, PageID 13455-13460; Shahbabian Depo., RE 164-1 SEALED, PageID 10688-10693). Primary osteoarthritis in both knees caused his knees to buckle suddenly. (Shahbabian Depo., RE 181-1, PageID 13347-13348; Shahbabian Depo., RE 164-1 SEALED, PageID 10682-10683). He had difficulty walking and appeared worn out. (Ringer Depo., RE 171, PageID 11705-11706; Cercek Depo., RE 159, PageID 10161-10162; Collins Depo., RE 169, PageID 11314, 11333).

---

[4] In April 2016, a patient complained about quality of care and a lack of honesty on Shahbabian's part. In November 2016, a nurse complained that Shahbabian had begun a second operation without having issued post-op orders. (Shahbabian Depo., RE 164-7 SEALED, PageID 10804; Shahbabian Depo., RE 181-4, PageID 13858; Shahbabian Depo., RE 181-1, PageID 13367-13368). The incidents were not escalated.

On October 31, 2016, Collins and Kerlakian met with Shahbabian about his future plans.    (Shahbabian Depo., RE 181-3, PageID 13829).    Shahbabian surreptitiously tape recorded the meeting. (Shahbabian Depo., RE 181, PageID 13293-13294).  Shahbabian told Collins and Kerlakian that he had more than enough surgical cases, he was slowing down and after May 2017, when his income protection ended, he would slow down much more, enjoy things and spend more time with his wife. He said changes could be made to the contract then, or there could be a new contract and/or "Mayfield" can take over at that point. (Shahbabian Depo., RE 181-1, PageID 13374-13383; Shahbabian Depo., RE 181-3, PageID 13829-13840). He explained that he was perfectly happy with building a "little team" for transition. They specifically asked whether he wanted to start a process where his surgical load was decreased. He said that he did.  (Shahbabian Depo., RE 181-1, PageID 13381-13382; Shahbabian Depo., RE 181-3, PageID 13833).  He told them that he still had the capacity to do mostly office work and refer patients.  (Id.). He recognized that any decrease in surgery would mean a decrease in income and, if he produced less than the wRVU standard after the end of the income-protection period, any deficiency would have to be repaid.  He said that was "fine." (Shahbabian Depo., RE 181-1, PageID 13383; Shahbabian Depo., RE 181-3, PageID 13836-13838).

<h3>h.    January 23, 2017 Quality of Care Issue</h3>

Shahbabian performed elective surgery on a 59-year-old man.  (Shahbabian Depo., RE 164-8 SEALED, PageID 10807-10814; Shahbabian Depo., RE 181-1,

PageID 13386-13397). A LOI issued inquiring whether extensive surgery was indicated without consultation with others per the Corrective Action Plan. The cervical MRI showed no cord contusion contrary to Shahbabian's office notes. Shahbabian had "glanced" at the MRI report, trusting his "experience" over MRI findings. (RE 181-1, PageID 13390). On May 9, 2017, Shahbabian responded to the LOI saying that the patient was "happy, did very well," was discharged and was "still improving" (Shahbabian Depo., RE 164-8 SEALED, PageID 10812). His own office notes say that the patient was in "nothing but severe pain," had "severe spasms," had a "hard time eating food" and was showing symptoms that Shahbabian found "concerning." (Shahbabian Depo., RE 164-8 SEALED, PageID 10815-10824; Shahbabian Depo., RE 181-1, PageID 13390-13394). At the QAC meeting on May 18, 2017, it was determined that LeMasters would consult with Collins. The QAC subsequently issued a Level 2 rating. (Shahbabian Depo., RE 164-8 SEALED, PageID 10807-10814). Shahbabian did not attend the Committee meeting, did not appeal and had no objection to the finding. (Shahbabian Depo., RE 181-1, PageID 13395).

i.    March 17, 2017 Quality of Care Issue

Shahbabian operated on a 44-year-old woman with a herniated disk. (Shahbabian Depo., RE 164-9 SEALED, PageID 10825-10831; Shahbabian Depo., RE 181-1, PageID 13395-13403). He readmitted her on March 20 because of progressive weakness, worsening pain and a rapid onset of kyphosis. At Shahbabian's request, Chris McPherson, M.D., a Mayfield neurosurgeon, operated on her again. (Shahbabian

24

Depo., RE 164-9 SEALED, PageID 10829).  In McPherson's opinion, the first surgery

had been unnecessarily extensive.  This case, along with the one above, was presented

at the May 18, 2017 QAC meeting.  A Case Weight 2 was subsequently assigned.  (Id.,

PageID 10825-10831;  Shahbabian Depo.,  RE  181-1,  PageID  13395-13397).

Shahbabian had no objection because "that's what their opinion [was]."  (Id., PageID

13397).

j.      <u>May 4, 2017 Quality of Care Issue</u>

On this date, Shahbabian sent a patient to post-op without orders.  This incident

was known but not presented at the May 18, 2017 QAC meeting.  Shahbabian admitted

that "obviously it happened" and that Ringer's decision to issue an Educational Letter

was legitimate.  (Id., PageID 13397-13398;  Shahbabian Depo., RE 164-9 SEALED,

PageID 10832-10839).

k.      <u>May 18, 2017 Quality of Care Issue</u>

Shahbabian submitted operating room records with inconsistencies he was

unable to explain, and his office notes reflected that "something is not right."

(Shahbabian Depo., RE 164-10 SEALED, PageID 10840-10843; Shahbabian Depo.,

RE 164-11 SEALED, PageID 10844-10850; Shahbabian Depo., RE 181-1, PageID

13407-13415).

l.      <u>Shahbabian Voluntarily Relinquishes Surgical Privileges</u>

At its May 18, 2017 regularly scheduled meeting, the QAC reviewed the Surgery

Department's pending quality of care issues which included Shahbabian's patient

25

events of January and March 2017. Ringer presented the two neurosurgery cases to the QAC. (Ringer Depo., RE 171, PageID 11812). Division Chiefs attending included Dr. Robert Burger (Orthopedics), Dr. Alexander Saba (General Surgery), Dr. Michael Smith (Cardiology), Dr. Helen Koselka (Internal Medicine and Executive Medical Director), Dr. Eric Kuhn (Urology) and Ringer. Kerlakian attended as well. (Id., PageID 11807-11808; Koselka Depo., RE 173, PageID 12266). The QAC had deep concern about Shahbabian's ability to operate safely, despite the precautions adopted in his corrective action plan. (Ringer Depo., RE 171, PageID 11813-11817, 11820-11821; Koselka Depo., RE 173, PageID 12261-12264). Following the QAC meeting, Koselka, LeMasters and Collins met with Shahbabian and offered him a choice. He could voluntarily suspend surgical activity pending review of his performance by the PCC and Medical Executive Committee or GSH could issue an involuntary summary suspension of surgical privileges pending review by the Committees. In either case, Shahbabian could resume operating assuming positive review results. (Koselka Depo., RE 173, PageID 12280-12290). After consultation with his attorney Shahbabian chose a third path by deciding to go no further with the peer review process. (Shahbabian Depo., RE 181-4, PageID 13863-13866, 13868; Koselka Depo., RE 173, PageID 12261-12264). Kamp told Steve Gracey, TriHealth's General Counsel, that it was time for Shahbabian to stop doing surgeries. (Gracey Depo., RE 151, PageID 7342-7343; Gracey Depo., RE 151-35, PageID 7700-7701; Shahbabian Depo., RE 181-4, PageID 13867; Shahbabian Depo., RE 181-1, PageID 13401, 13404-13407). On June 8, 2017,

TriHealth received Shahbabian's written notice that he had decided to voluntarily relinquish his surgical privileges at GSH. (Shahbabian Depo., RE 181-1, PageID 13416; Shahbabian Depo., RE 181-4, PageID 13874).

> ### 4. Negotiations With Shahbabian Concerning His Role After His Surrender of Surgical Privileges

Kamp and Gracey began to negotiate the terms of an amended employment contract between Shahbabian and TriHealth. (Gracey Depo., RE 151, PageID 7344-7345; Koch Depo., RE 162, PageID 10560-10564; Shahbabian Depo., RE 181-4, PageID 13867-13868). TriHealth proposed he work as a neurosurgical hospitalist, a physician who rounds on a hospital's inpatient population. Shahbabian believed the offer to be "insulting" and would not consider it. (Shahbabian Depo., RE 181-1, PageID 13424; Shahbabian Depo., RE 181-3, PageID 13848; Koch Depo., RE 162, PageID 10570). This refusal mooted the Mayfield surgeons' reluctance to entrust their patients to his care since his treatment philosophies were often at odds with modern practices. (Ringer Depo., RE 171, PageID 11824-11825). In September 2017, TriHealth offered him $437,500 a year to perform various other non-surgical duties. (Gracey Declaration, RE 137-10, PageID 4265; Gracey Depo., RE 151-38, PageID 7707-7708; Gracey Depo., RE 151-39, PageID 7709; Gracey Depo., RE 151-40 PageID 7710). Shahbabian declined and negotiations dragged on. (Gracey Depo., RE 151, PageID 7344-7350).

Shahbabian's health issues worsened. On May 2, 2017, Shahbabian reported high blood pressure and recurrent lightheadedness to Bort. (Shahbabian Depo., RE 181-1, PageID 13462-13464; Shahbabian Depo., RE 164-1 SEALED, PageID 10695-10697; Shahbabian Depo., RE 164-15 SEALED, PageID 10911-10912). On August 7, 2017, he reported malaise, fatigue and gait abnormality. (Id., 10913). In January 2018, he had a heart attack and underwent open heart surgery. Against his doctors' orders, he began seeing patients in his office four days later. (Shahbabian Depo., RE 181-1, PageID 13465-13466; Shahbabian Depo., RE 164-1 SEALED, PageID 10698-10699; Shahbabian Depo., RE 164-15 SEALED, PageID 10914-10916). By April 2018, he was still suffering shortness of breath and intermittent lightheadedness. Knee, joint and muscle pain prevented exercise. (Shahbabian Depo., RE 181-1, PageID 13468; Shahbabian Depo., RE 164-1 SEALED, PageID 10701; Shahbabian Depo., RE 164-15 SEALED, PageID 10917-10920). Although warned that his hypertension was not controlled, Shahbabian declined to take his medications. (Shahbabian Depo., RE 181-1, PageID 13469-13472; Shahbabian Depo., RE 164-1 SEALED, PageID 10702-10705). The spring of 2018 found Shahbabian using knee braces and a cane to get around, and later in the year, a scooter. (Id., 13470). He had multiple knee surgeries in 2018 and 2019 with serious complications including ruptures in both knees. (Id., 13474-13475; Shahbabian Depo., RE 164-1 SEALED, PageID 10707-10708; Shahbabian Depo., RE 164-15 SEALED, PageID 10929-10930). By May 2019, Bort was observing an overall decline including progressive confusion, inability to walk,

loss of vision and a big risk of falling. Bort ordered a home evaluation and care coordination. (Shahbabian Depo., RE 181-1, PageID 13478-13480; Shahbabian Depo., RE 164-1 SEALED, PageID 10711-10746; Shahbabian Depo., RE 164-15 SEALED, PageID 10937-10938). By the time of his deposition, Shahbabian required full-time in-home care. (Shahbabian Depo., RE 181, PageID 13142).

While TriHealth and Shahbabian were engaged in the ongoing negotiation of an amended employment contract, his 2014 Employment Agreement, amended in June 2015, remained in place. Because he was not meeting the 11,700 wRVU production standard, Shahbabian was generating a growing deficiency which would have to be repaid under the terms of the contract. (Gracey Depo., RE 151, PageID 7347-7349; Gracey Depo., RE 151-39, PageID 7709). On March 16, 2018, his salary was adjusted downward to reflect his actual wRVU production and prevent the deficiency from growing even larger.[5] (Koch Depo., RE 162, PageID 10571-10573, 10575-10578; Cercek Depo., RE 159, PageID 10224-10225; Cercek Depo., RE 159-38, PageID 10466).

Shahbabian's employment ended April 30, 2019 on the expiration of his five-year employment contract. Per the contract, a final reconciliation was done.

---

[5] Employed physicians receive biweekly draws against their annual salaries. "True ups" or "reconciliations" occur at the end of each individual compensation year (which is not a calendar year but runs from the date of employment). (Hall Depo., RE 202, PageID 15727-15728; Koch Depo., RE 162, PageID 10541). Shahbabian's individual "fiscal year" or "compensation year" ran from April 30 to May 1.

Shahbabian had been overpaid in the amount of $679,711.61. As required, he was served with a Reconciliation Notice. (Shahbabian Depo., RE 181-4, PageID 13877). Shahbabian made no attempt at repayment.

## SUMMARY OF THE ARGUMENT

The district court's Order should be affirmed. (Order, RE 213, PageID 16764-16803). Shahbabian's appeal is without basis.

### A.   Age Discrimination (including aiding and abetting)

#### 1.   Shahbabian Produced No Direct Evidence

The district court was correct that Shahbabian failed to offer direct evidence of age discrimination. The alleged statements offered as direct evidence were made by Shahbabian himself, not made by decisionmakers, not made by those identified as ageists, not related to the decision-making process and/or not proximate in time to the decision at issue, i.e., Shahbabian's surrender of surgical privileges, which was a voluntary decision made by Shahbabian himself.

#### 2.   Shahbabian's Circumstantial Evidence Failed to Create an Inference of Age Discrimination.

The district court, in finding that Shahbabian also failed to establish a triable inference of age discrimination through circumstantial evidence, did not ignore the ability of a plaintiff to establish a prima facie showing through evidence that plaintiff was replaced by a younger employee. It correctly found that Shahbabian's evidence did not suffice and, in any event, was undone by his inability to offer evidence of

pretext sufficient to create an inference that age animus was the "but for" reason Shahbabian voluntarily surrendered surgical privileges in May/June 2017. Because Shahbabian's age claim fails, his aiding and abetting in age discrimination necessarily fails as well.

### B.    Rejection of Murphy's Declaration

The district court did not abuse its discretion in rejecting the Declaration of third party witness Timothy Murphy proffered by Shahbabian a year after discovery's close and nine months after dispositive motions were filed where Shahbabian knew of Murphy's role early on and the Declaration was not probative of age discrimination.

### C.    All State Law Claims Are Barred

Shahbabian's argument, that the district court wrongly determined that his state-law claims were barred by the immunity provided to a hospital's peer review process under O.R.C. § 2305.25(A), fails. First, Shahbabian argues on appeal that TriHealth lost its immunity protection because it acted with malice. He did not make that claim below and so the argument is barred on appeal. Second, the record contains no evidence of malice on the part of any person involved in the peer review process. Third, Shahbabian voluntarily surrendered his surgical privileges. Fourth, in eschewing TriHealth's internal administrative process, Shahbabian forfeited any right to seek judicial relief. Finally, Shahbabian's state law claims fail on the substantive merits even if they were otherwise viable.

31

### D.    Disability Discrimination

In his First Amended Complaint, Shahbabian did not allege that he was perceived as disabled and did not assert that surgical privileges were lost due to disability discrimination.  Accordingly, he is barred from doing so on appeal.  The district court's finding that disability discrimination was not the "but for" cause of Shahbabian's salary reduction during his leave of absence (or following his relinquishing of surgical privileges) was properly based on the undisputed record evidence that salary reduction occurred for all similarly situated employees.

An employer is permitted to determine why an employee's performance is suffering and related inquiries do not constitute unlawful disability discrimination.  Shahbabian's subterfuge in avoiding any fitness for duty review bars his claim of disability discrimination.

### E.    Retaliation

The district court correctly held that the activities identified by Shahbabian were not protected as a matter of law and that he did not show a "but for" causal connection between the alleged activities and the relinquishment of surgical privileges or the clawback of overpaid wages.  This claim is also barred because the adverse actions complained of occurred *before* Shahbabian's actual protected activities of filing an EEOC charge and a lawsuit.

### F.   Recovery of Wage Overpayment – Counterclaim of TriHealth

Shahbabian offers no reason for his assigning error to the district court's correct finding that the employment contract was a legally enforceable contract. Shahbabian raises for the first time on appeal that TriHealth's recovery of the money Shahbabian owes should be limited to the after-tax amount. The argument comes too late and lacks record support.

### ARGUMENT

### A.   Standard of Review

The standard of review on Shahbabian's appeal of summary judgment is de novo. *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013). The standard of review on his appeal of the decision excluding from evidence the proffered Declaration of Timothy Murphy is an abuse of discretion. *Marie v. Am. Red Cross*, 771 F.3d 344, 366 (6th Cir. 2014).

### B.   First Issue:   No Material Issue Of Fact Exists To Suggest That TriHealth Discriminated Against Shahbabian Because Of His Age.

To demonstrate unlawful treatment under the ADEA, a plaintiff must present evidence that the employer's action would not have occurred "but for" the plaintiff's age. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009). Merely showing that a plaintiff's age was a motivating factor is not enough. *Id.,* 177-78. In this case, Shahbabian has presented no evidence sufficient to allow a reasonable trier of fact to

conclude that his operating errors would have been ignored had he been under 40 years of age.

      1.     <u>There Is No Direct Evidence Of Age Discrimination</u>

Shahbabian testified away his age claim. He identified no ageist other than Collins and no ageist act by Collins, three years his junior. (Shahbabian Depo., RE 181-1, PageID 13490-13491; Collins Depo., RE 169, PageID 11242).

Q:    … Who, specifically are you saying, at TriHealth, discriminated against you because of age?

A:    Several places in document, many places, where age became a factor. And specifically, a lot of attention was paid by, to Collins.

Q:    Who else are you accusing of age discrimination besides Dr. Collins?

A:    In document. There's a bunch of indication that my age, about getting tired. I don't know. I don't have anything specific.

Q:    What specifically are you saying that Dr. Collins did that constituted age discrimination?

A:    In the chart, a lot of notes. A lot of reference to the age.

Q:    I'm asking you, in your memory … you've told me your memory is very good.

A:    Excellent.

Q:    Excellent. So relying on your excellent memory, I want you to tell me every act that you accuse Dr. Collins of taking that constitutes age discrimination in your mind?

A:    It's not that excellent. It's not that excellent.

Q:    Okay.

A:    I cannot recall specifically.

Q:   Well, tell me what you can remember that you're accusing Dr. Collins of and calling it age discrimination?

A.   I have to look at all documents.  I cannot tell specifically, but it is.

Q:   Okay.  Other than Dr. Collins, are you accusing any TriHealth representative of age discrimination?

A:   Other than general, no.

(Shahbabian Depo., RE 181-1, PageID 13490-13491, objections omitted).  Shahbabian had disliked Collins for decades beginning when they were young peers operating at Deaconess.  (Shahbabian Depo., RE 181, PageID 13306-13307).  Shahbabian just "felt" that Collins was "after him."  (Id., PageID 13271, 13306-13309).  An unsupported feeling of bias is not direct (or circumstantial) evidence of unlawful discrimination.  *Mitchell v. Toledo Hosp*., 964, F.2d 577, 584-585 (6th Cir. 1992); *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997).  Moreover, Collins was merely the messenger of the QAC, not a decisionmaker.  He did not attend the May 18, 2017 QAC meeting and normally did not attend QAC meetings.  (Collins Depo., RE 169, PageID 11341).  In an apparent mitigation effort, Shahbabian offers 23 comments (eight by Mayfield), which he labels "direct evidence" of age discrimination.  (Appellant's Brief, Doc. 36 at 63-65).

The district court was correct that the statements offered by Shahbabian as direct evidence do not meet the test applied by this Court:  i.e., whether the statements (1) were made by a decision-maker or by an agent within the scope of his employment; (2) were related to the decision-making process; (3) were more than merely vague,

ambiguous or isolated remarks; and (4) were made proximate in time to the act of termination or contested adverse action. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-478 (6ᵗʰ Cir. 2002) (citing *Policastro v. NW Airlines*, 297 F.3d 535, 538-539) (6th Cir. 2002). "Direct evidence is evidence that proves the existence of a fact without requiring any inference." *Scott v. Potter*, 182 Fed. App'x 521, 526 (6ᵗʰ Cir. 2006)(cites omitted). "Only the most blatant remarks whose intent could be nothing other than to discriminate on the basis of age, satisfy the criteria." Id., citing *Carter v. City of Miami*, 870 F.2d 582 (11ᵗʰ Cir., 1989). See also, *Alberty v. Columbus Twp.*, 730 F. Appx. 352, 356-357 (6ᵗʰ Cir. 2018).

Of the 15 TriHealth comments, six were made by Shahbabian himself. He merely offers his own quotes from a journal he kept. (Shahbabian Depo., RE 181-3, PageID 13794, 13796, 13810, 13821, 13835). Shahbabian cannot parlay his own out of court assertions into "direct evidence" of others' alleged animus. *Brahmbhatt v. General Products Corp.*, No. 1:12-cv-919, 2014 WL 2711839 at \*11 (S.D. Ohio June 16, 2014) (Plaintiff cannot evade summary judgment and establish direct evidence through his own testimony alone); *Longino v. City of Cincinnati*, No. 1:12-cv-424, 2013 WL 2424253 at \*12 (S.D. Ohio June 4, 2013) ("Plaintiff has not supported his allegations with admissible evidence and the record evidence flatly contradicts many of plaintiff's assertions").[6] Even Shahbabian's own statements reflect nothing more

---

[6] Shahbabian cites cases for the proposition that his own statements are sufficient to preclude summary judgment. (Appellant's Brief, Doc. 36 at 60, 63). The cases are

than succession-planning inquiries prompted by his own announced transition plans and ongoing quality concerns.

None of the alleged "direct evidence" statements matters. Those involved in the peer review process are either not identified as sources of any alleged ageist remarks and/or are admitted by Shahbabian to harbor no age bias. Shahbabian does not accuse Ringer, Kerlakian or any member of the QAC or PCC of age bias. Shahbabian could not even identify a single PCC member. (Shahbabian Depo., RE 181, PageID 13265-13266, 13281). The record is replete with examples where Kerlakian and Ringer chose not to escalate an issue flagged by the QCS although fully empowered to do so. Shahbabian admits that Ringer acted reasonably, was helpful to him and was in no way a "conspirator." (Shahbabian Depo., RE 181, PageID 13255, 13263-13264; Shahbabian Depo., RE 181-1, PageID 13444-13445). He admits Kerlakian was his friend and ally whom he supported for Department Chair. (Shahbabian Depo., RE 181, PageID 13248-13250; Kerlakian Depo., RE 175, PageID 12537). The joke by Kerlakian's assistant that Shahbabian was born in 1890 is an irrelevant stray remark. (Ringer Depo., RE 171-34, PageID 11731-11732, 12010). The assistant played no role in any decision affecting Shahbabian. *Toosen v. Roadway Express*, 47 Fed. Appx. 370, 375 (6th Cir. 2002) (remarks of individuals without any decisionmaking authority over

---

inapplicable in that they involve "he said, she said" fact patterns, i.e., directly opposing proffered facts. That is not true here. Shahbabian agrees that the surgical missteps occurred and the reviewing Committees truly believed they merited the negative case weights. There is no material factual dispute in this case.

the plaintiff not probative of discriminatory intent."). Donovan, Clement, Cercek and Farrington (Mayfield's CEO) are not physicians and played no role in the peer review process.

Moreover, the statements offered are not indicative of age bias or stereotypical thinking. Kerlakian's alleged statement that Dr. Tew was from Shahbabian's era is a simple statement of fact.[7] Shahbabian and Tew had known each other for 48 years. (Shahbabian Depo., RE 181, PageID 13286). Tew had retired around 2009 or 2010. (Id., PageID 13285-13286). Similarly, Collins' reference to himself and Shahbabian "as old war horses" was merely a reference to a shared history that went back 40 years. Collins had stopped operating on patients approximately 10 years before and retired from employment in January 2018. (Collins Depo., RE 169, PageID 11243, 11248-11249). It was also a neutral statement of fact, as Shahbabian admitted, that younger surgeons were more likely to use a microscope because "they wanted to see," presumably an advantage in surgery. (Shahbabian Depo., RE 181, PageID 13313). *Stipkala v. American Red Cross*, 215 F.3d 1327 at *4 (6th Cir. 2000) (remarks that technology had outgrown plaintiff's capabilities were neutral remarks not indicative of age bias).

---

[7] Plaintiff's "era" may help explain why he called his female staff "girls" and "bombshell" and Defendants' lawyer "honey." (Shahbabian Depo., RE 181-1, PageID 13357, 13387, 13402, 13429).

Most of the statements offered as direct evidence did not occur proximate in time to Shahbabian's May/June 2017 decision to relinquish surgical procedures and were not related to that decision-making process. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 287 (6th Cir. 2012)(statements by non-decisionmakers or by decisionmakers unrelated to the decisional process do not satisfy the burden of demonstrating animus, citing *Bush v. Dictaphone Corp*., 161 F.3d 363, 369 (6th Cir. 1998).  Eleven of the "direct evidence" statements offered by Shahbabian were made on or before October 16, 2016, many as early as 2015, too far removed in time and substance to be deemed direct evidence of any age bias in Shahbabian's May/June 2017 decision.  See *Diebel v. L&H Res. LLC*, 492 F. App'x 523, 528, 533 (6th Cir. 2012) (discriminatory comments made seven months prior to plaintiff's termination failed to show pretext); *Worthy v. Mich. Bell Telephone Co.*, 472 F. App'x 342, 347 (6th Cir. 2012) (two and a half years insufficient); *Myers v. Cuyahoga Cnty. Oh.*, 182 F. App'x 510, 520 (6th Cir. 2006) (three-four years insufficient); *Scott v. Potter*, 182 Fed. App'x 521, 526 (6th Cir. 2006)(EEOC charges in 1999-2000 too far removed in time from December 2001 discharge).

In any event, statements relating to retirement are not direct (or circumstantial) evidence of age discrimination.  *Pelcha v. MW Bancorp, Inc.,* 988 F.3d 318 (6th Cir. 2021)(comments by discharging supervisor that another employee in her eighties had a limited shelf life and had reached her expiration date, that he would reduce that employee's hours until she quit and that he would like to hire younger tellers not direct

evidence of age discrimination against Plaintiff where they were not made in relation to plaintiff's termination and were made more than six months before plaintiff's termination); *Metz v. Titanium Metals Corp.*, 475 Fed. Appx. 33 (6th Cir. 2012)(human resources manager's e-mail referring to retained employee bringing "new eyes and tools" and "new ideas" and mentioning plaintiff's plan for retirement within six to nine months not direct evidence), citing *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997)(comments on an employee's planned retirement, without more, do not show discrimination); *Gray v. The Kroger Company*, 804 F. Supp. 2d 623 (6th Cir. 2011)(question to 62-year-old Plaintiff whether she would retire upon obtaining eligibility for full retirement benefits not direct evidence); *Scott v. Potter* 182 Fed. Appx. at 526 (supervisor's remark "why don't you retire and make everybody happy" was not direct evidence of age discrimination).

This is not a case, like *Sloat*, relied on by Shahbabian, where the employer "directs unsolicited and unwelcome retirement inquiries and suggests that an employee retire" or where the "employer initiated the questioning and then pointedly suggested retirement." *Sloat v. Hewlett-Packard Enter. Co.*, 18 F. 4th 204 (6th Cir. 2021). (Appellant's Brief, Doc. 36 at 66). Even *Sloat* does not stand for the proposition, as Shahbabian implies, that retirement should be a proxy for age. (Id.). The *Sloat* court simply acknowledged that a jury could infer a connection between retirement and age based on the particular facts of *Sloat* which included the following:

- Prior to the assignment of a new boss (Hagler), Sloat's performance had been deemed to exceed expectations, and be bonus and promotion worthy.

- Hagler dismissed Sloat's prior strong performance as irrelevant.

- Hagler sarcastically called Sloat "Uncle Ron" and "young man," and criticized his "old skills."

- On at least ten occasions, Hagler asked when Sloat would retire and "why are you still here?"

- Hagler removed Sloat's responsibilities without providing a reason, attempted to transfer him and recommended Sloat be fired in a "one-person" reduction in force.

- Hagler had provided the decisionmaker misleading information to effect Sloat's discharge.

These facts are easily distinguishable from those at issue in Shahbabian's appeal.

In this case, Shahbabian admits that the events leading to his negative case weights occurred and offers no evidence to suggest that the Quality Committees' concerns about his competence were not genuine or due to age bias. In this case, transitioning to retirement was Shahbabian's idea. It was the very purpose of his Asset Purchase and Employment Agreements. He told Swehla in 2014 he wanted to have less work and spend more time with his wife. In October 2016, he told Collins and Kerlakian that he had more than enough surgical cases, that he was slowing down and after May 2017, he would slow down much more, enjoy things and spend more time with his wife. He volunteered that his employment agreement could be modified and Mayfield could "take over at that point." He said he was perfectly happy with building

a "little team" to transition and, when specifically asked whether he wanted to start a process to decrease his surgical load, he said that he did.

There is no evidence that TriHealth (or Mayfield) was pressuring Shahbabian to retire. Everyone knew that Shahbabian was "moving toward retirement." (Farrington Depo., RE 153, PageID 8865). No one knew exactly when that would occur. TriHealth (and Mayfield) had a legitimate interest in the timing of Shahbabian's announced slow down and retirement given the very real impact his retirement would have on both entities and their ability to serve the community's neuroscience needs. (McPherson Depo., RE 179, PageID 12970-12972). Inquiries about an anticipated timetable for the transition to retirement were reasonable and necessary attempts to plan for the future. (Farrington Depo., RE 153, PageID 8854).

The winding down and/or transition of a physician's practice involves many moving parts, including recruiting needs, notice to patients, continuity of patient care, replacing a given expertise and so on. Recruiting and embedding a new physician into a service area cannot happen overnight. (Collins Depo., RE 169, PageID 11299). An effective transition is accomplished most ideally over a two-year period. (Ringer Depo., RE 171, PageID 11657-11658, 11701, 11746, 11776, 11781-11782, 11790; Donovan Depo., RE 152, PageID 7861; 7894-7895, 7911; Farrington Depo., RE 153, PageID 8831; Robinson Depo., RE 177, PageID 12834-12836; TriHealth's Motion for Summary Judgment, RE 137-13, PageID 4297). The need to plan ahead for Shahbabian's retirement was particularly acute given the longevity and size of his

42

practice.    As of January 2011, he had been performing the largest number of neurosurgical procedures at GSH.  (Kerlakian Depo., RE 175 at PageID 12524-12526; Kerlakian Depo., RE 175-26, PageID 12710).  Upon Shahbabian's retirement, there would be a large service gap on the west side.  Mayfield surgeons had long been the primary providers of TriHealth's neuroscience services.   Dr. Chris McPherson, a Mayfield surgeon who served the west side, was already at capacity.  (Farrington Depo., RE 153, PageID 8843).  Mercy West needed coverage.  (Ringer Depo., RE 171, PageID 11658-11661).   Mayfield, on behalf of TriHealth and other hospitals it supported, had to consider whether current staffing levels could meet community needs or whether it should recruit additional neurosurgeons and, if so, how many.  (Ringer Depo., RE 171, PageID 11621-11622, 11746, 11761).  There is no evidence to suggest that Mayfield and TriHealth's interest in clarifying Shahbabian's timetable for retirement was motivated by unlawful age bias rather than legitimate succession planning.  *Woythal*, 112 F.3d at 247; *Metz*, 475 F. App'x at 35.

There is no disparate treatment under the ADEA when the factor motivating the employer is some factor other than age, even where the motivating factor and age are empirically correlated.  *Hazen Paper v. Biggins*, 507 U.S. 604, 611, 113 S. Ct. 1701, 123 L.E.2d 338 (1993) (terminating a 62-year-old close to the time of his pension vesting does not automatically give rise to an inference of age discrimination).

The alleged statements at the May 18, 2017 QAC meeting did not relate to age but to competence. Competence (like retirement) is analytically distinct from age bias.

When asked for any evidence that TriHealth's request for a fitness for duty evaluation was for some prohibited reason, Shahbabian admitted he had no facts, just "suspicion." (Shahbabian Depo., RE 181-1, PageID 13352-13353).

Even the consideration of a policy requiring fitness for duty evaluations at a certain age shows no unlawful age animus. (Response in Opposition, RE 186, PageID 13996). The effects of aging on persons with safety-sensitive roles is a serious topic faced by many institutions today. Healthcare is no exception. (Tami Depo., RE 154, PageID 9468; Collins Depo., RE 169, PageID 11373-11374). The Court may take judicial notice that federal air traffic controllers must retire at age 56 and airline pilots at 65. (Tami Depo., RE 154, PageID 9467-9470). 29 U.S.C § 623(j); 5 U.S.C. § 8425(a); 49 U.S.C. § 44729. Brain and spine surgery are at least as dangerous as flying. Discussions of this difficult societal issue cannot serve as a reasonable basis to infer age bias against Shahbabian on the facts of this case. That is especially true since TriHealth adopted no such policy and Shahbabian's voluntary decision to relinquish operating privileges was not the result of any such policy. (Kerlakian Depo., RE 175, PageID 12560-12562; Koselka Depo., RE 173, PageID 12304-12305).

Finally, it is significant that after May 2017, TriHealth had the contractual right to terminate Shahbabian's employment upon six months' notice. It did not do so. TriHealth wanted him to continue his employment in some valued capacity, as many physicians do. (TriHealth's Motion for Summary Judgment, RE 137-13, PageID 4297; McPherson Depo., RE 179, PageID 12971, 12992-12993; Koch Depo., RE 162,

PageID 10561-10562).  In fact, he did not retire.  He continued to do clinical work until the expiration of his contract in May 2019.

> ### 2.    There Is No Triable Inference of Age Discrimination Based on Circumstantial Evidence

Shahbabian argues that the district court erred 1) by refusing to recognize alternative ways to establish a prima facie case including a plaintiff's replacement by someone younger; 2) by holding that "direct evidence" is required as part of the circumstantial framework under *McDonnell-Douglas*; and 3) by ignoring evidence that Ringer and McPherson were similarly situated to him but treated more favorably. (Doc. 22 at 66-67).  Each argument is unsupported.

> ### a.    The District Court Did Not Refuse to Recognize "Alternative Ways" to Make a Prima Facie Showing

Shahbabian argues that he made a prima facie showing of age discrimination by producing evidence that Zachary Tempel, M.D., age 33, a Mayfield neurosurgeon, "replaced" him and that the district court erred by limiting the fourth prong of the prima facie showing to "circumstances that support an inference of discrimination." (Appellant's Brief, Doc. 36 at 67).

There was no error.  The district court's framing of the fourth prong as "circumstances that support an inference of discrimination" is sufficiently broad to encompass Shahbabian's alleged replacement by Tempel.  *Blizzard*, 698 F.3d 275, 283 (6th Cir. 2012)(circumstances supporting an inference of discrimination include replacement by a younger employee for purposes of the fourth prong of a prima facie

showing).  Moreover, the district court did consider Shahbabian's claim that Mayfield and TriHealth had conspired to effect Shahbabian's replacement by Tempel.  It correctly found Shahbabian's offered evidence lacking.

The record evidence does not establish that Tempel was hired as Shahbabian's specific replacement.  Tempel, who began practicing with Mayfield in July 2017, was hired to supplement west-side coverage generally.  In 2016, the recruitment year for 2017 new hires, the west side's neuroscience needs exceeded Shahbabian's and McPherson's capacity.  (Donovan Depo., RE 152, PageID 7778-7779, 7804-7805, 7824-7825, 7843-7845, 7850, 7894-7895; Farrington Depo., RE 153, PageID 8843, 8903-8904; Cercek Depo., RE 159, PageID 10126, 10167-10170; Robinson Depo., RE 177, PageID 12834-12836, 12857, 12861, 12874; Oliphant Depo., RE 165, PageID 10952-10953; Ringer Depo., RE 171, PageID 11658-11661, 11781-11782).  There was a need for Tempel regardless of Shahbabian's status.  (Ringer Depo., RE 171, PageID 11658-11661; Farrington Depo., RE 153, PageID 8903-8905; McPherson Depo., RE 179, PageID 12937, 12963-12964).  That need would become acute upon Shahbabian's anticipated retirement.  Tempel's recruitment was part of necessary planning to meet anticipated future needs, not part of an age- (or other) based conspiracy.  (Donovan Depo., RE 152, PageID 7736-7737; Cercek Depo., RE 159, PageID 10126, 10130-10131).

Relying on Donovan Depo., RE 152-45, PageID 8412, a chart prepared by Chartis relating to future plans for the Neurosciences Service Line, Shahbabian claims

that "Dr. Tempel was identified as the anticipated replacement for Shahbabian who would assume 80-90% of Dr. Shahbabian's fiscal 2012, 2013 and 2014 surgical volume." (Appellant's Brief, Doc. 36 at 39-40). That document is a business-planning document prepared by Chartis with Chartis's assumptions. *Betkevur v. Aultman Hosp. Assn*, 78 F.3d 1079, 1085-1086 (6th Cir. 1996)(comment in outside consultant's report about an American born/American trained candidate not adopted by or relied upon by decisionmakers not evidence of national origin discrimination). Shahbabian neglects to mention that those assumptions regarding Tempel's assuming 80-90% of Shahbabian's volume was for fiscal year 2021, two years *after* the expiration of Shahbabian's contract. (Id., Cercek Depo., RE 159, PageID 10144-10145).

TriHealth did nothing to "replace" Shahbabian with Tempel and did little to assist in developing a referral network for Tempel. (Tempel Depo., RE 155, PageID 9645-9646; Donovan Depo., RE 152, PageID 7778-7779, 7806, 7915; Collins Depo., RE 169, PageID 11307-11310, 11320; Robinson Depo., RE 177, PageID 12857-12858, 12874; Tami Depo., RE 154, PageID 9429, 9438, 9446-9447). No one told Tempel he was to be Shahbabian's replacement, and, in fact, Tempel did not succeed to Shahbabian's practice. (Tempel Depo., RE 155, PageID 9582-9584, 9589, 9594, 9597, 9604, 9611; Donovan Depo., RE 152, PageID 7915; Farrington Depo., RE 153, PageID 8856, 8871, 8903-8904; Ringer Depo., RE 171, PageID 11604-11605, 11658-11661). Tempel picked up some west-side patients but not a lot. (Farrington Depo., RE 153, PageID 8871-8872). Mayfield had other coverage needs given the deaths of two of its

surgeons, one in 2014 and one in 2015. (Id., PageID 8879, 8903-8904). Tempel assumed the referral base of the deceased Dr. Kuntz and was charged with establishing a practice at Mercy West although he did more cases at Jewish and Bethesda North. (Tempel Depo., RE 155, PageID 9581-9583, 9613-9616).

In May 2019, consistent with its normal practice upon the expiration of a physician's employment contract, TriHealth asked Shahbabian to identify the doctors to whom he wanted his patients directed. Shahbabian chose Dr. Borden and Dr. Stambough. TriHealth sent letters to Shahbabian's patients specifically advising them that their continued care would be managed by Borden and Stambough. (Johns Declaration, RE 137-13, PageID 4297). There is no evidence that TriHealth previously had reassigned Shahbabian's patients to McPherson or Tempel (or anyone else).

> b.   The District Court Did Not Require "Direct Evidence" As Part of a Circumstantial Case

Shahbabian argues that the district court held that direct evidence is required as part of the *McDonnell Douglas* prima facie showing. In so doing, Shahbabian misquotes the court as stating that Shahbabian had "not pointed to *direct* evidence that supports the fourth element." (Appellant's Brief, Doc. 36 at 67). In fact, the Court said, in relevant part:

> Begin with whether Dr. Shahbabian has made a prima facie case of age discrimination. To do so, he must either present direct evidence of discrimination *or* establish (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination. *Blizzard*, 698 F.3d at 283.

48

> Dr. Shahbabian has not pointed to *evidence* that supports the fourth element.

(Order, RE 213, PageID 16782, emphasis added).  The trial court did not require Shahbabian to produce "direct evidence" in support of the fourth prong of the prima facie showing.  Nowhere does the Court collapse the direct and circumstantial evidence modes of proof into one.  Indeed, it is Shahbabian who improperly attempts that collapse by offering the alleged ageist remarks denominated as direct evidence as evidence to support a circumstantial inference of age discrimination.  The *McDonnell-Douglas* burden shifting framework of the circumstantial case does not apply if there is direct evidence.  *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Transworld Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *Woythal v. Tex-Tenn Corporation*, 112 F.3d 243, 246 (6th Cir. 1997).

> c.    <u>Ringer and McPherson Were Not Similarly Situated to Shahbabian</u>

Finally, Shahbabian alleges that the Court ignored evidence that Ringer and McPherson were similarly situated to him but treated more favorably.  (Appellant's Brief, Doc. 36 at 68-69).  His assertion that they had "poor outcomes" similar to his is demonstrably untrue.  Neither Ringer or McPherson ever had a "poor outcome."  The negative case weights assigned to Ringer and McPherson are wholly distinguishable in nature and frequency.

Ringer's February 18, 2013 incident involved a patient for whom compression boots were ordered on day three rather than day two.  (Declaration of Mark Byrne, RE

186-2, PageID 14023-14024 at ¶14; Patient Monitoring Notes, RE 208-23 SEALED, PageID 16436-16470 at 16438).  The February 24, 2013 and June 19, 2014 incidents involved a failure to note on patients' charts that they did not qualify for rehab.  (Id., PageID 16440-16446).  The remaining six incidents from 2015 were identified by the nurse quality reviewer at the same time and involved three occasions where there was some temporal overlap between two surgeries being performed by Ringer.  Ringer was instructed that one surgery must be completely finished before the next surgery could begin.  (Id., 16449-16458).

McPherson has had only two incidents in the last fifteen years.  In 2005, he and an Emergency Medicine physician were advised that patients in the Emergency Department must be seen more quickly.  (Declaration of Mark Byrne, RE 186-2, PageID 14023-14024 at ¶15 and Patient Monitoring Notes, RE 208-24 SEALED, PageID 16472-16474).  In 2012, a resident's error during surgery resulted in a discectomy being conducted on the wrong level.  The mistake was discovered and corrected during the surgery.  The patient suffered no adverse effects.  (Id., 16475-16478).

In contrast, as a result of Shahbabian's treatment, a patient was rendered quadriplegic and died, another patient developed significant complications and had to be admitted to the hospital three times, another was left severely disabled and another underwent unnecessary surgery.  There is no reasonable comparison.  As a matter of law, Ringer and McPherson are not similarly situated to Shahbabian for purposes of

establishing a prima facie showing (or pretext).  *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004) ("the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [employee] who he alleges [was] treated more favorably"); *Blizzard*, 698 F.3d 275, 287 (6th Cir. 2012)(plaintiff not similarly situated to alleged comparator where comparator entered vendor data using four lines of text versus three with no economic loss while plaintiff's mistakes caused double payments to vendors); *Laws v. HealthSouth Northern Kentucky Rehabilitation*, 508 Fed. App'x 404, 411 (6th Cir. 2012)(plaintiff not similarly situated to younger employees where her charting error was the only one that resulted in pain medication being discontinued without a doctor's order causing patient to suffer unnecessary pain).  Indeed, given the relatively minor nature of Ringer's and McPherson's infractions, a reasonable person could conclude they were treated less favorably than Shahbabian.

### 3.    The District Court Was Correct That The Record Revealed No Evidence Of Pretext To Cover Up Age Discrimination

To prove pretext, a plaintiff must show one of the following:  that TriHealth's quality concerns had no basis in fact, did not actually motivate its conduct or were insufficient to warrant the challenged conduct, i.e., that others similarly situated were treated more favorably.  *Schwendeman v. Marietta City Schools*, 436 F.Supp 3d 1045, 1061 (S.D. Ohio 2020), citing *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2013); *Miles v. South Central Human Resources Agency, Inc.*, 946 F.3d 883, 888 (6th

Cir. 2020). The district court correctly found that Shahbabian, like the plaintiff in *Miles*, failed to articulate some "cognizable explanation" of how his evidence establishes pretext.[8]

First, as a foundational matter, there was no "adverse conduct" by TriHealth against Shahbabian leading TriHealth to lie about its motive. The district court recognized that the undisputed record evidence establishes that Shahbabian's relinquishment of surgical privileges was a voluntary choice made by Shahbabian not an adverse decision by TriHealth. Shahbabian, an experienced and savvy surgeon, represented by skilled and experienced counsel, was free to choose the alternative of having his cases submitted to independent review and the possibility of retaining his surgical privileges. The mere review of cases is not an adverse action. *Blizzard*, 698 F.3d at 290 (negative employee evaluation does not rise to the level of materially adverse action, citing *James v. Metro Govt. of Nashville*, 243 Fed. App'x 74, 79 (6th Cir. 2007)). To forego that option was entirely his choice.

---

[8] Shahbabian concedes that in establishing pretext, a plaintiff must ultimately show that age was the "but for" cause of the *employer's* adverse action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 129 S. Ct. 2343, 174 L.Ed.2d 119 (2009). (Appellant's Brief, Doc. 36 at 61). However, perhaps seeking a perceived lesser burden, he eschews *Gross's* articulation of a plaintiff's burden of "but for" cause in favor of *Sloat's* articulation of whether age animus was a "determinative" cause. (Appellant's Brief, Doc. 36 at 67). However framed, there is simply no evidence that age discrimination was the "but for" or "determinative" cause of the negative case weights or the clawback of overpaid wages.

There can be no doubt whatsoever that the events leading to the negative case weights actually occurred. Shahbabian does not contest the facts that underlay the alleged adverse action; he simply dismisses their importance. A plaintiff's disagreement with his employer's viewpoint is not evidence of pretext. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009). Also, the Sixth Circuit has repeatedly distinguished between plaintiffs who contest the facts underlying an adverse action with actual evidence and those who merely deny the employer's proffered reasons without producing actual evidence to substantiate the denial. *Mitchell v. Toledo Hospital*, 964 F.2d at 585, citing *Irwin v. Airco Carlisle*, 837 F.2d 724, 726 (6th Cir. 1987); *Ridenour v. Lawson Co.*, 791 F.2d 52 (6th Cir. 1986); see also *Brahmamdam v. TriHealth Inc.*, No. 1:19-cv-00152-SJD, 2022 WL1539535 (S.D. Ohio May 16, 2022).

Shahbabian offered no evidence that quality concerns did not motivate participants in the peer review process. Indeed, he repeatedly confirmed that he had no objection to the Committees' findings and did not appeal them because "that was their opinion."

Finally, as already demonstrated above, Shahbabian offered no evidence that others similarly situated were treated better in relation to the quality review process.

Undeterred by the lack of evidence, Shahbabian offers 11 arguments that the district court erred in not finding a triable inference of pretext. (Appellant's Brief, Doc. 36 at 70-74). All fail. In reasons 1, 6, 7, 9 and 11, Shahbabian points to brief periods

of time in which he had no poor outcomes or significant complications.  For example, he notes that the results of a 2013 focus review were positive.  This ignores that the very purpose of a focus review is subpar performance in the first place, that Shahbabian's performance issues were not limited to the results of a single focus review and that 2013 performance is of limited relevance to multiple bad outcomes four years later.  Similarly, that Shahbabian had no significant complications for a three-month period at the end of 2015 after the implementation of a performance improvement plan specifically designed to avoid complications by limiting operating hours and complex procedures, suggests the legitimacy of the plan, not pretext.  It also shows that when he performed without harm to anyone, the peer review process acknowledged it, suggesting honest decision making, not pretext.

In reasons 2 and 8, Shahbabian points to acts that benefitted him, including his hire at age 70 and his credentialling reappointment in 2016.  To hire a 70-year-old argues against age bias.  That lack of bias in 2014 did not require TriHealth to ignore his operating room mistakes thereafter.  No one, regardless of age, is entitled to an eternal presumption of competence.  Like his hire, the renewal of his appointment is an undisputed positive action reflecting a lack of animus.  Perhaps Shahbabian's point is that his hire and credentialling renewal undermine the credibility of the subsequent negative Case Weights.  That unsupported speculation cannot establish pretext given that the legitimacy of the quality-review process is beyond any reasonable dispute.  And

if the "conspiracy" to "steal" his practice was afoot in 2016, one would expect a denial of reappointment.

In reasons 3, 4 and 10, Shahbabian alleges pretext because he and Dr. Tew believed that he did not deviate from the standard of care on certain cases. Tew's opinion on the 2015 incidents is irrelevant to the 2017 quality of care issues which triggered Shahbabian's decision to relinquish operating privileges. *Blizzard*, 698 F.3d at 285 (co-worker's opinion of plaintiff's performance irrelevant where coworker had infrequent interaction ending a year before plaintiff's performance problems began). That Kerlakian viewed Tew's 2015 opinion as unreliable is a difference of medical opinion, not evidence of pretext. There was no written report by Tew and no record evidence to establish the nature, extent or quality of Tew's review. Shahbabian wanted Tew, a social friend whom he had known for 48 years, as the reviewer so that he would "be on his side." (Shahbabian Depo., RE 181, PageID 13285). Shahbabian's own opinion that he had observed the standard of care is meaningless and Tew's opinion was nothing more than an echo of Shahbabian's own – an opinion Shahbabian did not pay for "because he did not have to." (Id., 13286). A plaintiff's disagreement with his employer's decision is insufficient to establish a genuine dispute of material fact. *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008); *Wilson v. Chipotle Mexican Grill, Inc*., Case No. 1:12-cv-87-HJW, 2013 WL 6008623, fn 4 (S.D. Ohio Nov. 13, 2013) ("Plaintiff's subjective opinion of her own job performance is not relevant to the analysis and creates no genuine dispute of material fact.").

In his effort to manufacture some hint of pretext, Shahbabian misstates that it was Ringer who "initiated" peer review cases and Ringer who "recommended" a negative finding in three cases. (Appellant's Brief, Doc. 36 at 30, 32, 60). Shahbabian also falsely claims that Ringer recommended the Corrective Action Plan. The peer review process begins with the QCS and the Corrective Action Plan was a collective decision of PCC members. As the Director of Neurosurgery, Ringer could close out or escalate a flagged concern (subject to Kerlakian's approval) and usually presented the facts of the cases. However, negative case weights and the Corrective Action Plan were the result of consensus decisions by the reviewing committee, decisions which Shahbabian did not dispute or appeal. (Koselka Depo., RE 173, PageID 12266-12269; Collins Depo., RE 169, PageID 11266-11267; Ringer Depo., RE 171, PageID 12005, 11820-11821).

In any event, Shahbabian does not accuse Ringer (or McPherson) of age bias. Even if he were to do so, it would not suggest pretext. Although Ringer was part of the peer review process, the ultimate decisions were collective decisions made by multiple individuals and there is no indication the groups were influenced by any factors beyond the facts initially flagged by the QCS. *Brahmamdam*, 2022 WL1539535 at *10, citing *Doucet v. Univ. of Cincinnati*, No. 06-4118, 2007 WL 2445993, at *6 (6th Cir. August 28, 2007) (although two individuals involved in the decision to not reappoint plaintiff had allegedly uttered discriminatory comments, plaintiff presented no evidence from which a jury could conclude those individuals

"sufficiently influenced the [reappointment] process so as to prompt the decision not to reappoint" the plaintiff").

Shahbabian's fifth argument in support of pretext, that some Mayfield physicians' duro tears between 2010-2014 outnumbered Shahbabian's, is also irrelevant to pretext. All duro tears are reviewed. (Ringer Depo., RE 171, PageID 12573). Shahbabian was not asked to temporarily pause operating procedures in 2017 because of duro tears. In addition, performance in one area in 2010-2014 is of limited relevance to overall poor outcomes in 2017.

Finally, in reason 11, Shahbabian points to a May 18, 2017 letter in which Kerlakian "admitted due process was not followed with Shahbabian." (Appellant's Brief, Doc. 36 at 37-38, 62-63). This, too, argues against age bias, not for pretext. Kerlakian was protective of and well-disposed to Shahbabian and wrote as a "surgeon advocate." (Kerlakian Depo., RE 175, PageID 12505-12506). Nonetheless, Kerlakian had repeatedly recommended Case Weight 3s against him. Even in May 2017, Kerlakian acknowledged that Shahbabian had been a performance concern for some time and was "potentially dangerous." (Id., PageID 12507, 12615). He recognized that Shahbabian required some sort of intervention despite the increased oversight implemented in 2015 and he recommended cognitive and psychomotor testing. (Kerlakian Depo., RE 175, PageID 12513-12514; Kerlakian Depo., RE 175-22, PageID 12703). Shahbabian omits that Kerlakian's e-mail about due process was written before Kerlakian was aware of what actually happened after the QAC meeting of May

2017. Kerlakian did not know when he wrote the letter that Shahbabian had been given the choice to voluntarily pause operating procedures pending review of his cases or to let the normal peer review process proceed under the bylaws and that Shahbabian – with his lawyer's advice – had instead chosen to resign operating privileges. (Kerlakian Depo., RE 175, PageID 12580-12581, 12602-12610; Kerlakian Depo., RE 175-22, PageID 12703). Shahbabian's decision was subsequently confirmed by him and his counsel, in writing, on June 8, 2017, after adequate time to consider all options. In any event, a deviation from "due process," without more is not evidence of age discrimination. That Kerlakian viewed the QAC meeting as infused with some amount of grandstanding or even economic rivalry says nothing about *age* bias, nor did Kerlakian suggest that it did. (Kerlakian Depo., RE 175, PageID 12512-12513). The holding of *Holder v. City of Raleigh*, 867 F.2d 823, 825-826 (4th Cir. 1989) that nepotism, even if proved, is not evidence of unlawful discrimination applies equally here. Title VII was not designed to cure unfairness. *Washington v. Cambridge East*, Case No. 12-cv-11911, 2012 WL 5363785, at *3 (E.D. Mich. Oct. 30, 2012) ("unfair treatment in and of itself is not prohibited by federal law"); *Jinks v. Shenseki*, Case No. 2:08-cv-60, 2009 WL 3747172, at *7 (E.D. Tenn. Nov. 4, 2009) ("Title VII does not provide a cosmetic remedy against unfairness in the workplace"). It is not enough that a proffered reason for an alleged adverse action be false. It must be false and manufactured for the purpose of covering up unlawful discrimination. *Brahmbhatt v. General Products Corporation*, 2014 WL 2711839 *14 (S.D. Ohio 2014).

Kerlakian's view that Shahbabian was not an "imminent" danger to patients was not a "finding," but merely the personal opinion of a sympathetic ally. That others disagreed is not evidence of age bias on their parts. Hospitals are not required to ignore performance issues until a surgeon presents a threat of imminent harm. Customer service and medical ethics allow hospitals to set a higher and safer standard. *Babb v. Maryville Anesthesiologists*, 942 F.3d 308, 317 (6th Cir. 2019)(a defendant's standard of care may be higher than that set by state tort claims; an employer may set its own standard for employees to follow).

Shahbabian also tells this Court that the peer review process was a pretext designed to allow his Mayfield competitors to steal his practice as part of an illegal kickback scheme. (Appellant's Brief, Doc. 36 at 16, 26-30). Shahbabian cannot have it both ways. If TriHealth's motivation was to steal his practice for economic gain, then the "but for" cause of the "sham" peer review process outcome was not age (or disability or retaliation) bias. Thieves are not interested in the age of their victims. *Alberty v. Columbus Township*, 730 Fed. Appx. 352 (6th Cir. 2018)(the ADEA does not permit a "mixed motives" claim; a plaintiff alleging a violation of the ADEA must prove that age was the "but for" cause of the employer's adverse action) citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175, 177, 129 S. Ct. 2343, 174 L.Ed.2d 119 (2009).[9]

---

[9] Ohio's employment discrimination statutes are interpreted in accordance with the federal statutes. *Wheat v. Columbus Bd. Of Educ.*, 644 Fed. Appx. 427, 429 (6th Cir.

**C.    Second Issue:  There Is No Genuine Dispute That TriHealth Did Not Aid And Abet Age Discrimination.**

In his First Amended Complaint, Shahbabian sued both Mayfield and TriHealth for "aiding and abetting" under O.R.C. §4112.02(J).  It is unclear whether he appeals on that claim as to both Defendants below or only Mayfield.[10]  In any event, in his brief, Shahbabian merely recites the elements of this claim but provides no record evidence or argument in support.  It is therefore waived.  *Slater v. Potter*, 28 Fed. Appx. 512, 513 (6th Cir. 2002)(issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived).  The district court correctly found that if the underlying age claim fails, so too does any aiding and abetting claim.  *Woolf v. City of Streetsboro*, N.D. Ohio No. 5:09-cv-1570, 2010 U.S. Dist. LEXIS 110446 (Oct. 18, 2010) *48; *Weinrauch v. Sherwin Williams Co.*, 2019 WL 3007031, at *14 (N.D. Ohio July 10, 2019).  In addition, an entity may not aid and abet itself.  *Sampson v. Sisters of Mercy of Willard*, Ohio, No. 3:12-cv-00824, 2015 WL 39535053, at * (N.D. Ohio June 29, 2015).  Finally, the 4112.02(J) claim, as all the state law claims, is barred by O.R.C. 2305.25.[11]

---

2016); *Brubaker v. Western & Southern Financial Group, Inc*., 2015 WL 47443046, at *3 (S.D. Ohio Aug. 10, 2015).  Shahbabian's state-law discrimination claims therefore would also fail on their merits if they were not barred by Ohio's statutory immunity.

[10] While his Second Issue Presented For Review includes only Mayfield (Appellant's Brief, Doc. 36 at 6), he still argues that Mayfield and TriHealth conspired with and aided and abetted Mayfield.  (Doc. 36 at 76).

[11] Any claim of conspiracy or aiding and abetting fails for lack of evidence.  Shahbabian's sworn testimony established that Ringer and Kerlakian acted without ill-intent.  (Shahbabian Depo., RE 181, PageID 13250, 13255, 13263-13265; Kerlakian

**D.    Third Issue:  There Was No Abuse Of Discretion In The District Court's Denial Of Shahbabian's Motion To Submit The Declaration Of A Third-Party Witness.**

Shahbabian does not even attempt to explain why the district court's rejection of the untimely Murphy Declaration was a clear abuse of discretion, i.e., that the Court committed a manifest injustice, an error that is "direct, obvious, and observable." *Tennessee Prot. & Advoc., Inc. v. Wells*, 371 F.3d 342, 348 (6th Cir. 2004).  Nor could he.  The district court took careful note of Shahbabian's motions below and correctly analyzed the factors relating to reopening discovery after the close of all pretrial deadlines.  *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App's 435, 443-44 (6th Cir. 2011).  Shahbabian's request to reopen discovery came one year after the close of discovery and nine months after dispositive motions were filed.  Shahbabian's dilatoriness merited the district court's denial of his motions.  See *Pittman v. Experian Info. Solutions*, 901 F.3d 619, 642-643 (6th Cir. 2018); *George v. Ford Motor Co.*, No. 03 Civ. 7643, 2007 WL 2398806 (S.D.N.Y. Aug. 17, 2007).

Shahbabian's representation to the district court that he became aware of Murphy's testimony "subsequent to the filing of the motions for summary judgment by the parties" was demonstrably untrue as the district court noted.  Shahbabian knew of

---

Depo., RE 175, PageID 12539-12540; Koselka Depo., RE 173, PageID 12182-12183). He denied Ringer was a part of any conspiracy.  (Shahbabian Depo., RE 181-1, PageID 13444-13451).  His belief that McPherson and a Dr. Tobler are guilty of conspiracy is based on nothing but irrelevant "suspicions."  (Id., 13437-13438, 13441-13445). Tobler, who operates at Christ Hospital, had no role in the GSH peer review process. (Ringer Depo., RE 171, PageID 11622).

Murphy's role as early as March 2019. In his first set of interrogatories to TriHealth, Shahbabian's counsel identified Murphy as a person with knowledge, whose electronic mailbox should be searched and relevant documents produced. (Pl. First Request for Documents, RE 204-1, PageID 16204). Shahbabian's counsel questioned multiple witnesses about Murphy's role in the reduction of Shahbabian's compensation and the need to reconcile his growing deficit. (Farrington Depo., RE 153, PageID 8790-8791; Koch Depo., RE 162 PageID 10567, 10571-10581; Koch Depo., RE 162-5, PageID 10607-10608; Koch Depo., RE 162-18, PageID 10642-10643; Koch Depo., RE 162-21, PageID 10649-10653; Hall Depo., RE 202, PageID 15686-15687, 15698, 15744; Collins Depo., RE 169, PageID 11380-11381). Although Shahbabian deposed at least 18 individuals, including three former employees of TriHealth, he chose to ignore Murphy who worked at TriHealth from May 2017 through February 2019. He did not notify the court of a possible declaration from Murphy until November 2020. (Order, RE 212, PageID 16762).

As importantly, Murphy's proffered testimony was not probative of age discrimination. Under the explicit terms of his employment contract, Shahbabian owed TriHealth $679,711.61. Contract terms are to be enforced without regard to whether one party is an alleged ageist. That is especially true given Shahbabian's admission that he was unaware of any physician treated more favorably in this regard, let alone any similarly situated physician. (Shahbabian Depo., RE 181-1, PageID 13383). The conclusory allegation that some unidentified doctors were treated better avails nothing

in the absence of any evidence about their identity, contract details, compensation history, status or even their ages. Each compensation reconciliation is subject to the variations dependent on the pre-contract negotiations.

There is ample evidence that TriHealth enforced clawback provisions against other physicians. (Hall Depo., RE 202, PageID 15746-15753, 15757-15760, 15772-15773). TriHealth recouped deficits as small as $1,196.00. (Id. 15747-15748, 15762-15763). On January 4, 2017, TriHealth sent a physician a Notice of Reconciliation. (Response in Opposition, RE 204-2, PageID 16210). Following a delay culminating in TriHealth's threat to sue him, the doctor wrote a check to TriHealth for $22,496.77 in "Refund for Overpayment." (Id., PageID 16212). TriHealth had previously filed suit against another physician to recover a deficit of $18,651.68. (Id., PageID 16216-16221). There is no basis to argue that TriHealth's motive in trying to recoup $679,711.61 from Shahbabian was age bias given its history of pursuing far smaller deficit amounts. *Betkevur v. Aultman Hosp. Assn.*, 78 F.3d 1079, 1087 (6th Cir. 1996)(a plaintiff may not rely on the hope that the trier of fact will disbelieve an employee's denial of some alleged disputed fact; he must present affirmative evidence to defeat a properly supported motion for summary judgment).

E.    **Fourth Issue:  All Of Shahbabian's State Law Claims Are Barred By O.R.C. §2305.251(A) And By His Failure To Exhaust Internal Remedies**

1.    O.R.C. 2305.251 Bars Shahbabian's State Law Claims

Shahbabian implicitly concedes that the district court correctly dismissed his state-law tort claims based on the immunity bestowed on TriHealth's peer review process by O.R.C. 2305.251.[12]  *Semertzides v. Bethesda North Hospital*, 1st Dist. Hamilton No. C-180659, 2020 Ohio App. LEXIS 150 (Jan. 22, 2020)(dismissing claims of surgeon alleging peer review committee used quality review process to eliminate his economic competition).  Shahbabian argued to the district court that his claims were beyond the statute's scope.  He now abandons that argument and asserts that TriHealth lost the statute's protection because it acted with "actual malice." Shahbabian did not raise that argument below and so may not do it here.  *Vaughn v. City of Lebanon,* 18 Fed. Appx. 252, 272 (6th Cir. 2001); *Hubbard v. Select Portfolio Servicing, Inc.,* No. 16-cv-11455, 2017 WL 3725475, at *3 (E.D. Mich. Aug. 30, 2017). Had he claimed malice below, the argument would still fail on appeal.

To overcome the peer review immunity privilege, "the party seeking relief must present clear and convincing evidence that defendants acted with actual malice." *Talwar v. Catholic Healthcare Partners*, 258 Fed. Appx. 800, 808-09 (6th Cir. 2007)

---

[12] That immunity extends not only to the tort claims, but to the state law discrimination claims brought under O.R.C. 4112.02.  *Lynch v. Giglia M.D., et al*., Case No. 1:17cv770-MRB (J. Barrett), Sealed Doc. 110, PageID 2893 at 2910.

(dismissing state law claims due to O.R.C. 2305.251(A) immunity)(quoting *Wall v. Ohio Permanente Med. Group, Inc.*, 119 Ohio App. 3d 654, 666, 695 N.E.2d 1233 (Ohio Ct. App. 1997)).  Actual malice requires proof that defendants made statements in connection with the peer review process with knowledge they were false or with reckless disregard for whether they were true or false.  *Wall* at 119 Ohio App. 3d 666; *Mehlman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 1:20-cv-813, 2021 WL 4430631, at *4 (S.D. Ohio Apr. 26, 2021), adopted, No. 1:20-cv-813, 2021 WL 3560571 (S.D. Ohio Aug. 11, 2021).

In any event, there is no evidence in the record that participants in the peer review process made statements with knowledge they were false or with reckless disregard whether they were true or false.  Shahbabian never asserted, while employed or later, that anyone lied or spoke with reckless disregard about the surgical events at issue.  He repeatedly conceded that he did not appeal their findings and indeed had no objection to them.  With respect to the two Level 2 Case Weights in 2017, he admitted he had no objections.  (Shahbabian Depo., RE 181-1, PageID 13395-13397):

> Q:    Just look at the document.  It says a level 2 was assigned.
>         I'm asking if you had any objection to that.
>
> A:    No, no, I have no objection.  That's what their opinion is.

(Id., 13397; Shahbabian Depo., RE 164-8 SEALED, PageID 10807-10824; Shahbabian Depo., RE 164-9 SEALED, PageID 10825-10831).

65

2.   <u>Failure To Exhaust Internal Remedies Is An Additional And Independent Bar To Shahbabian's Claims</u>

The Ohio Supreme Court in *Nemazee v. Mt. Sinai Med. Ctr,* 56 Ohio St. 3d 109, 114, 564 N.E.2d 477, 482 (Ohio 1990) held that "[a] physician in a private hospital whose employment and/or hospital privileges have been terminated must exhaust all internal administrative remedies provided by a hospital's charter, bylaws, rules, regulations and employment contract prior to seeking judicial review." This is so even where the physician believes, rightly or wrongly, that exhausting administrative remedies will be futile. *Id.,* 482-83. The Court explained that "Ohio courts have long held that we should defer to the judgment of hospital administrators in matters relating to staff privileges," and noted that "federal courts which have addressed this issue have also held that a physician in a private hospital whose hospital privileges have been terminated is required to exhaust the hospital's internal administrative remedies before seeking judicial relief." *Id.,* 482 (citing *Brooks v. Arlington Hosp. Assn.*, 850 F.2d 191 (4th Cir. 1988); *Qasem v. Kozarek*, 716 F.2d 1172 (7th Cir. 1983); *Shulman v. Washington Hosp. Ctr.*, 348 F.2d 70 (D.C. Cir. 1965); *see also Crow v. Penrose-St. Francis Healthcare System*, 169 P.3d 158 (Colorado 2007) (physicians must exhaust internal administrative remedies before going to court). There is no dispute Shahbabian eschewed TriHealth's internal administrative remedies at every step of the process. That choice bars his state law claims.

Shahbabian cites three cases in arguing that this Court should ignore *Nemazee*. None involves physicians and hospitals. While courts have resisted efforts to expand *Nemazee* and apply it to a variety of unrelated contexts, *Nemazee* remains good law in the current context. *See Frick v. Univ. Hosp. of Cleveland*, 727 N.E.2d 600, 133 Ohio App.3d 224 (Ohio App. 1999) (dismissing hospital employee's discrimination claims where employee failed to pursue internal administrative remedies to challenge termination).

It is unclear what Shahbabian means in asserting that the "district court, as a matter of *law*, found that the committee members were solely concerned for patient safety." (Appellant's Brief, Doc. 36 at 78). The district court correctly relied on the unrebutted record *facts* establishing the committee members' concerns were real.

### F.    Fifth Issue:  There Was No Material Issue That Trihealth Did Not Discriminate Against Shahbabian On The Basis Of Disability.

Shahbabian's First Amended Complaint alleged that in 2017 and 2018 he was "actually disabled" and "handicapped" and that TriHealth engaged in disability discrimination by reducing his salary because he could not generate his wRVUs.  (RE 21, PageID 130-132 at ¶133, 137, 141).  At his deposition, he testified that his only disability was his bad knees.  (Shahbabian Depo., RE 181, PageID 13146-13147).  In opposition to the summary judgment motion below, he asserted that he was "regarded as" disabled.  As noted, a plaintiff may not raise a claim for the first time at that stage of the proceedings. *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407

F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.")

In any event, the district court correctly found that disability discrimination was not the "but for" cause of Shahbabian's salary reduction. (Opinion and Order, RE 213, PageID 16789-16791); *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (the ADA, like the ADEA, prohibits discrimination that is a "but for" cause of the employer's adverse decision). The Court correctly followed the unrebutted evidence that salary reduction occurred for all those similarly situated, i.e., those failing to meet the established RVU production level due to FMLA leave and so incurring a deficit. (Koch Depo., RE 162, PageID 10575-10579, Koch Depo., RE 162-19, PageID 10644). Shahbabian essentially argues that he was somehow entitled to preferential treatment. He offers no basis why this should be so.

In his First Amended Complaint, Shahbabian offers the salary reduction imposed due to his FMLA leave as the only discriminatory act based on disability. (Amended Complaint RE 21, PageID 130-131). As the district court noted, in opposing summary judgment, Shahbabian added the argument that the peer review actions were also driven by Defendants' perception of him as disabled. (Response in Opposition, RE 186, PageID 14010-14012). The district court correctly found that this untimely addition availed Shahbabian nothing. There is no dispute the poor surgical outcomes occurred

and were honestly reviewed.  The statements of concern about his health, relied on by Shahbabian, do not change that.

First, the comments had no nexus to the salary reductions of which he complains. No Mayfield or TriHealth physician involved in his peer review process administered the FMLA or compensation policies.

Second, the regarded-as-disabled prong of the ADA protects employees who are perfectly able to perform a job, but are rejected because of the myths, fears and stereotypes associated with disabilities. *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008).  The observations by Ringer, Collins and Dr. Michael Smith (QAC member and Shahbabian's heart surgeon) that Shahbabian looked rickety, shuffled and walked by holding on to walls for support, were not "perceptions" borne of stereotypical thinking; it was what they actually observed.  Shahbabian did shuffle his feet.  He did have to hold on to walls to walk.  His knees did buckle suddenly.  He did faint in the operating room.  He was being treated for hypertension, fatigue and anxiousness.  He did operate on four hours' sleep.  He did tell others he was slowing down.  The operating errors did occur.

The law does not require employers to ignore reality.  It does require hospitals to guard against patient harm.  (Koselka Depo., RE 173, PageID 12263; Collins Depo., RE 169, PageID 11333; Ringer Depo., RE 171, PageID 11814-11818).  TriHealth made proper inquiries related to competence.  Such inquiries  are legitimate.  *Pena v. City of Flushing*, 651 Fed.  Appx. 415, 420 (6th Cir. 2016) ("[A]n employer's perception that

69

health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled. This is because an employer needs to be able to determine the cause of the employee's aberrant behavior. Accordingly, a request that an employee obtain a medical exam may signal that an employee's job performance is suffering, but that cannot itself prove perception of a disability…"). *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999) (health problems that impact an employee's job performance justify an inquiry into the nature and impact of those health problems). *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696 (6th Cir. 2008)(maintenance technician who suffered from back pain was not regarded as disabled merely because employer concluded his pain medication and its side effects presented risk of impairment and injury while operating dangerous injury); *Ferrari v. Ford Motor Company*, 826 F.3d 885, Headnote 10 (6th Cir. 2016)(employee's opioid use was a legitimate, non-discriminatory reason for temporarily bypassing an employee for an apprenticeship position); *City of Columbus Civil Service Commission v. McGlone*, 82 Ohio St. 3d 569 (Ohio 1998)(city did not regard firefighter with 20/100 vision as disabled where city considered his nearsightedness as a mere failure to fulfill single physical requirement for a single job); *Pena v. City of Flushing*, 651 Fed. Appx 415 (6th Cir. 2016)(city's request for employee to undergo a fitness for duty exam before returning from a medical leave due to an unknown psychological condition did not establish that city regarded him as disabled even where his doctors had cleared him for duty where manager was concerned about employee's demeanor and employee

seemed to be a "different person"); *Sloan v. Repa Corp. Inc.*, 310 F. Supp. 3d 891 (S.D. Ohio 2018)(plaintiff, with back and neck pain, properly terminated where employer had reason to believe he could not perform his job and plaintiff blocked attempts to determine extent of condition and whether use of morphine was necessary).

In 2015, Shahbabian shut down any attempt to determine his fitness for duty by misrepresenting that he had secured independent medical reviews. In 2017, he shut the inquiry down by voluntarily relinquishing surgical privileges. TriHealth was left to review his work performance without the benefit of any medical examination or fitness review. Shahbabian cannot shift the consequences of his decisions to TriHealth. *Sloan v. Repacorp, Inc.*, 310 F.Supp.3d 891, 900 (S.D. Ohio 2018) (purpose of ADA is to facilitate employer-employee communication about health issues that impact job performance; plaintiffs cannot refuse to participate in those conversations and then sue for disability discrimination).

Finally, as in *Ferrari v. Ford Motor*, no permanent harm was visited upon Shahbabian as a result of the peer review process. At issue was a request to temporarily pause operating pending an independent case review. The decision to relinquish surgical privileges permanently was Shahbabian's own.

### G. Sixth Issue: No Material Issue Of Fact Exists That TriHealth Did Not Unlawfully Retaliate.

On appeal, Shahbabian argues that he engaged in the following protected activities: 1) beginning in 2015, he challenged the necessity that he undergo a medical

exam; 2) throughout 2016, he indicated he did not intend to retire at the insistence of TriHealth executives; and 3) in May of 2017, Steve Gracey, TriHealth General Counsel, was informed that Shahbabian believed he was a victim of unidentified discrimination. (Appellant's Brief, Doc. 36 at 83-84). He alleges that "thereafter," (not because of) TriHealth threatened to take his medical license, cancelled his surgeries and clawed back his wage overpayment. (Id., 84). The district court correctly found: "He does not point to record evidence showing that these statements are accurate or cite law that shows those activities are indeed protected." (Order, RE 213, PageID 16787).

The alleged protected activities have no basis in the record. Shahbabian did not challenge a medical exam. Rather he specifically told TriHealth that he had undergone three exams by three specialists. He did not "challenge;" he pretended to agree. Lying to your employer is not a protected activity, nor is resisting an appropriately requested medical exam. *Sloan*, 310 F.Supp.3d at 900 ("A retaliation claim cannot stand where an employee refuses a proper request for a medical exam or a medical inquiry…").

Shahbabian did not deny an intent to retire. As set forth above, in myriad conversations, Shahbabian discussed his intent to do just that. Indeed, in his First Amended Complaint, he pleads: "As Shahbabian got older (He is now 75), he began to focus on a succession plan for his practice." (Amended Complaint, RE 21, PageID 104, ¶11). In any event, there is no protected activity. Indicating a retirement timeframe is not "opposition to an unlawful practice." *Caskey v. Cty. of Ontario*, 800

72

F.Supp.2d 468, 472 (W.D. N.Y. 2011) (employee complaining to HR about repeated questions about her retirement date was not protected activity); *see also Boston v. Blue Cross and Blue Shield*, 431 Fed. Appx. 763, 767 (10th Cir. 2011) (succession planning is not pretext for age discrimination, and "succession planning is obviously necessary for a corporation to have"); *Ranowsky v. Nat'l Railroad Passenger Corp.*, 244 F.Supp.3d 138, 145 (D.C. Dist. 2017) ("[T]here is nothing even vaguely discriminatory about a company engaging in succession planning, as companies are required to prepare for change and maintain operational continuity.")

Similarly inaccurate is Shahbabian's statement that in May 2017 Gracey was told Shahbabian believed he was a victim of discrimination. The record establishes that Shahbabian's attorney told Gracey – <u>after</u> the events of May 18, 2017 – that Shahbabian felt he had been treated "unfairly." (Gracey Depo., RE 151, PageID 7224-7227; Response in Opposition, RE 186, PageID 13974). The alleged retaliatory act must occur after, not before, the alleged protected activity. See *Blizzard*, 698 F.3d at 290. Nor is a complaint of general unfairness "protected activity." *Speck v. City of Memphis,* 370 F.App'x 622, 626 (6th Cir. 2010) (where plaintiff complained of being targeted for unfair treatment, but not of being targeted because of her protected status, she failed to establish that she engaged in protected activity).

There is no evidence in the record that TriHealth threatened to take Shahbabian's license or canceled surgeries against his will. Shahbabian's self-serving hearsay statements from his own journal do not suffice. More importantly, Shahbabian has

offered no evidence that any of the alleged retaliation would not have occurred "but for" his "protected activities." *Goodsite v. Norfolk Southern Ry. Co.,* 573 Fed. Appx. 572, 583 (6th Cir. 2014). He shows no evidence of a causal connection. Indeed, he fails to even argue that such a connection exists.

### H.    Seventh Issue:  No Material Fact Exists:  There Was No Fraud.

Shahbabian asserts that in 2014, he signed his contracts with TriHealth in reliance on the promises of John Robinson, M.D., then Senior Vice President of Hospital Operations, that he would become the "Director of the Department of Neurosurgery in 2014" and TriHealth would hire three neurosurgeons to assume his practice. Had he known these promises were false, he claims he would not have signed the Employment or Asset Purchase Agreement. (Appellant's Brief, Doc. 36 at 84). Shahbabian raised the fraud claim he now appeals for the first time in his opposition to TriHealth's motion for summary judgment. As noted, a plaintiff cannot raise a new claim at that stage. *Vaughn v. City of Lebanon*, 18 Fed. Appx. 252, 272 (6th Cir. 2001); *Hubbard v. Select Portfolio Servicing Inc.*, No. 16-cv-11455, 2017 WL 3725475 at *3 (E.D. Mich. Aug. 30, 2017).[13]

---

[13] It fails in any case. Shahbabian at no point identified the promise of a Directorship or the hiring of three neurosurgeons as a reason he sold his business. Rather he explained that he was losing money due to a decline in referrals and patients. (Shahbabian Depo., RE 181, PageID 13175, 13186-13187). His employment agreement was crystal clear that he would be serving as a staff surgeon not as the "Director of the Department of Neurosurgery." There was no Department of Neurosurgery at GSH. There was a Department of Surgery chaired by Kerlakian. Within that Department, there was a Division of Neurosurgery, chaired by Ringer since

The district court correctly dismissed the fraud claim that Shahbabian actually did bring below, i.e., that he would not have agreed to the clawback if he had known that Mayfield was going to steal his practice. First, it fails – like all the state-law claims – under the immunity statute. Second, the evidence does not support the required elements under Ohio law: a knowing material misrepresentation or omission, fraudulent intent, justifiable reliance and proximately caused injury. *Stuckey v. Online Resources Corp.,* 909 F. Supp. 2d 912, 940-41 (S.D. Ohio Nov. 9, 2012).

At his deposition, Shahbabian was extensively questioned about the negotiations that led to the sale of his practice and employment by TriHealth. He said TriHealth's negotiator was honest. He was well aware that GSH primarily provided neurosurgery services through Mayfield and that Mayfield would be in the best position to serve some of his patient base when he inevitably retired.

Neither the employment agreement or the asset purchase agreement made any reference to Shahbabian becoming the Director of a non-existent department. However, both the employment agreement and asset purchase agreements did provide that any previous understandings or agreements were null and void. (Shahbabian Depo., RE 181-2; PageID 13648). Such language defeats any claimed intent to mislead and any reasonable reliance by Shahbabian. Nor can he establish a proximately caused

---

2009. Shahbabian's sham post-hoc affidavit on this point does not suffice to create a genuine issue of material fact. *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir. 1986); *Aerel, S.R.L. v. PCC Airfoils, LLC.,* 448 F.3d 899, 903 (6th Cir. 2006).

injury.  The harm alleged is the clawback of overpaid wages.  That is unconnected to his becoming an employed versus staff surgeon in 2014.  He would have owed the money in either case.

I.    **Eighth Issue:  There Is No Genuine Issue Of Fact That TriHealth Is Entitled To Recover The Amount Of Money Overpaid To Shahbabian.**

On appeal, Shahbabian claims for the first time that TriHealth should not recover the gross amount of money paid "pursuant to [the] physician contract" but only the after-tax amount.  The argument comes too late.  The district court ordered the parties to agree on the amount owed and submit it to the district court with a proposed order.  The parties did so.  (Proposed Order, RE 216, PageID 16808-16809).  Shahbabian should not be permitted to appeal his own agreement and proposed order.  Nor does Shahbabian point to any evidence in the record that the amount sought is not the after-tax amount.

Shahbabian's second point is that TriHealth's counterclaim is somehow barred by the Anti-Kickback Statute.  Shahbabian first made that claim in response to TriHealth's motion for summary judgment.  The district court correctly disposed of this untimely claim as baseless.  Shahbabian does not dispute the Court's analysis or explain how it erred.  There is nothing illegal about his employment contract.  It is a standard TriHealth physician employment contract with the normal "boilerplate" language.  (Oliphant Depo., RE 165, PageID 10971).  Upon the contract's expiration, Shahbabian had the right to refer patients as he chose, and he exercised that right.  To

require Shahbabian to repay TriHealth what he owes under a valid contract in no way violates the Anti-Kickback Statute. There is no evidence that the employment agreement negotiated in 2013-2014 was a vehicle to effect an unlawful quid pro quo, i.e., Shahbabian's practice went to Mayfield in exchange for Mayfield surgeons bringing surgery patients to GSH. Those TriHealth employees involved in the negotiation of Shahbabian's employment agreement played no role in the peer review process or the events of 2017. In 2013-2014, TriHealth had no idea that the dissolution of the Mayfield-UCMC co-management agreement would occur in 2017. There is ample evidence that there was no such quid pro quo arrangement. (Cercek Depo., RE 159, PageID 10135-10142; Robinson Depo., RE 177, PageID 12825-12826; Ringer Depo., RE 171, PageID 11771-11772, 11797-11798).

Shahbabian filed this Complaint alleging personal harms to him. He testified away his claims at his deposition. On appeal, he continues the attempt to usurp the role of the government. *U.S. ex rel. Villafane v. Solinger*, 543 F.Supp.2d 678, 700 (W.D. Ky. 2008) ("[N]either the Anti-Kickback law nor the Stark law provides for a private right of enforcement. Nor does the *qui tam* statute, which allows private persons to bring civil claims for violation of the FCA, authorize private persons to bring civil claims for violations of the Anti-Kickback and Stark laws *outside* the context of the FCA.") He is an individual self-seeking plaintiff who offers self-serving conclusions in lieu of facts. The trial court was right to treat him accordingly.

## CONCLUSION

TriHealth respectfully requests that this Court affirm the district court's Order

and Entry Granting Defendant's Motion for Summary Judgment.

Respectfully submitted,

/s/ Deborah S. Adams
Deborah S. Adams (0005607)
FROST BROWN TODD LLC
Great American Tower
301 East Fourth Street, Suite 3300
Cincinnati, OH 45202
Phone: (513) 651-6800
Email: dadams@fbtlaw.com

*Counsel for Defendants/Appellees TriHealth, Inc. and TriHealth G, LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C), Counsel for Appellees certifies that Appellees'

Brief contains 18,768 words between pages 1 and 78.

*/s/ Deborah S. Adams*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2022, I electronically filed

the Brief of Appellees TriHealth, Inc. and TriHealth G, LLC with the Clerk of the Court

using the CM/ECF system, which will send notification of such filing to all registered

counsel of record.

*/s/ Deborah S. Adams*

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

Pursuant to Sixth Circuit Rule 30(b), Appellees TriHealth, Inc. and TriHealth G,

LLC designate the following relevant District Court documents:

| Description of Entry | Record Entry Number | Page ID# |
|---|---|---|
| Plaintiff's First Amended Complaint with Jury Demand | 21 | 102-166 |
| Deposition and exhibits of Stephen M. Gracey, Esq. | 151 | 7197-7710 |
| Deposition and exhibits of Gail F. Donovan | 152 | 7711-8742 |
| Deposition and exhibits of Mark David Farrington | 153 | 8743-9415 |
| Deposition and exhibits of Thomas A. Tami, M.D. | 154 | 9416-9557 |
| Deposition and exhibits of Zachary J. Tempel, M.D. | 155 | 9558-9773 |
| Deposition and exhibits of Mark C. Clement | 157 | 9776-10112 |
| Deposition and exhibits of J. Robert Cercek | 159 | 10115-10467 |
| Deposition and exhibits of James J. Koch | 162 | 10476-10655 |
| SEALED deposition and exhibits of Set Shahbabian, M.D. | 164 | 10658-10938 |
| Deposition and exhibits of Gerald Oliphant | 165 | 10939-11222 |
| Deposition and exhibits of Robert H. Collins, M.D. | 169 | 11236-11582 |
| Deposition and exhibits of Andrew J. Ringer, M.D. | 171 | 11585-12159 |
| Deposition and exhibits of Helen K. Koselka, M.D. | 173 | 12162-12491 |
| Deposition and exhibits of George M. Kerlakian, M.D. | 175 | 12494-12782 |

| Description of Entry | Record Entry Number | Page ID# |
|---|---|---|
| Deposition and exhibits of John Robinson, M.D. | 177 | 12785-12926 |
| Deposition and exhibits of Christopher M. McPherson, M.D. | 179 | 12929-13132 |
| Deposition and exhibits of Set Shahbabian, M.D. | 181 | 13135-13884 |
| Plaintiff's Memorandum and exhibits in Opposition to Defendants TriHealth G LLC and TriHealth Inc.'s Motion for Summary Judgment and Mayfield Clinic Inc.'s For Summary Judgment with Declarations of Set Shahbabian, M.D. and Mark J. Byrne | 186 | 13912-15501 |
| Deposition and exhibits of Brad Hall | 202 | 15683-16169 |
| Joint Memorandum and exhibits in Opposition to Plaintiff's Motion for Leave to File the Declaration of Tim Murphy | 204 | 16171-16221 |
| SEALED Documents to be filed under seal from Dr. Ringer and Dr. McPherson depositions | 208 | 16307-16484 |
| Order Denying Plaintiff's Motion for Reconsideration | 212 | 16761-16763 |
| Memorandum Opinion and Order | 213 | 16764-16803 |
| Order Awarding Calculated Prejudgment Interest | 216 | 16808-16809 |

2900010.0663147   4876-6900-1730v8