# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

Case No. 21-3762
Consolidated with No. 22-3479

_____

SET SHAHBABIAN, M.D.,

Plaintiff – Appellant,

v.

TRIHEALTH, INC., ET AL.,

Defendants – Appellees.

_____

ON APPEAL FROM THE U.S. DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION
No.: 1:18-cv-00790

_____

**BRIEF OF APPELLEE MAYFIELD CLINIC, INC.**

_____

Fred G. Pressley, Jr. (0023090)
Zachary A. El-Sawaf (0089524)
PORTER, WRIGHT, MORRIS &
ARTHUR LLP
41 South High Street
Columbus, Ohio 43215
Tel: (614) 227-2233
Fax: (614) 227-2100
email:fpressley@porterwright.com
        zelsawaf@porterwright.com
*Attorneys for Appellee Mayfield Clinic,
Inc.*

Mark J. Byrne (0029243)
JACOBS, KLEINMAN, SEIBEL &
MCNALLY, LPA
30 Garfield Place, Suite 905
Cincinnati, Ohio 45202
Tel: (513) 381-6600
Fax: (513) 381-4150
Email: mbyrne@jksmlaw.com
*Attorney for Appellant Set Shahbabian*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 21-3762_____          Case Name: Set Shahbabian v. TriHealth, Inc., et al.

Name of counsel: Fred G. Pressley, Jr._____

Pursuant to 6th Cir. R. 26.1, Mayfield Clinic, Inc._____
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____Fred G. Pressley_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Fred G. Pressley, Jr._____
_____
_____

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT REGARDING ORAL ARGUMENT ............................................. 1

STATEMENT OF ISSUES ......................................................................... 1

I.     STATEMENT OF THE CASE ...................................................... 2

       A.    Introduction ................................................................. 2

       B.    Statement of Facts ........................................................ 3

             1.    Mayfield and TriHealth, Inc. enter into a Co-
                   Management Agreement ...................................... 3

             2.    Shahbabian hires TriHealth at age 70 .................... 5

             3.    Shahbabian has an increasing number of quality concerns ........ 6

             4.    The plan of correction is initially successful, but
                   Shahbabian continues to have quality issues ........... 13

             5.    Shahbabian, in consultation with his attorney, voluntarily
                   resigns his surgical privileges ............................ 16

             6.    TriHealth considers a post-surgical role for Shahbabian .......... 17

       C.    Procedural History ...................................................... 18

II.    SUMMARY OF THE ARGUMENT ............................................. 18

       A.    Ohio's Peer Review Immunity Statute (and alternatively,
             immunity under HCQIA) Require that Shahbabian's Claims
             Against Mayfield Be Dismissed ...................................... 18

       B.    Shahbabian Cannot Prove Mayfield Aided and Abetted Age
             Discrimination ........................................................... 19

III.   ARGUMENT ......................................................................... 20

       A.    Standard of Review ..................................................... 20

B. The District Court correctly found that Ohio's Peer Review Immunity Statute defeat's Shahbabian's tortious interference and civil conspiracy claims against Mayfield ....................20

 1. Mayfield is entitled to immunity under Ohio's peer review immunity statute.........................................................20

 2. Shahbabian has failed to demonstrate that the Peer Review Immunity Statute does not apply .................................23

 3. Mayfield is also immune from liability under the Health Care Quality Improvement Act..................................................28

C. The District Court correctly held that Shahbabian failed to prove Mayfield discriminated against him or aided and abetted TriHealth's alleged discrimination......................................................31

 1. Shahbabian presents no argument that the district court erred by granted summary judgment in Mayfield's favor on his aiding and abetting claim .................................................33

 2. Shahbabian's attempts to obfuscate the law and facts fail to show that Mayfield discriminated against him....................34

  a. Shahbabian's cherry-picked, out-of-context statements do not demonstrate age animus or discriminatory intent on the part of Mayfield ...............34

  b. Shahbabian's ill-fated attempt to gin up a non-existent conflict in this Court's precedent demonstrates that Mayfield acted appropriately and did not discriminate against him..............................37

 3. Shahbabian cannot rebut the legitimate, nondiscriminatory actions taken by the QA Committee...........39

IV. CONCLUSION..............................................................................43

CERTIFICATE OF COMPLIANCE.......................................................45

CERTIFICATE OF SERVICE ...............................................................46

ADDENDUM ...........................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Airline Prof'ls Assn. of the International Bhd. of Teamsters, Local Union No. 1224 v. Airborne, Inc.*,
332 F.3d 983 (6th Cir.2003) ..............................................................28

*Allman v. Eastern Co.*,
No. 87-3322, 1988 U.S. App. LEXIS 8042 (6th Cir.1988)................................36

*Austin v. McNamara*,
979 F.2d 728 (9th Cir.1992) ..............................................................30

*Bryan v. James E. Homes Reg'l Med. Ctr.*,
33 F.3d 1318 (11th Cir.1994) ....................................................29, 30

*Criss v. Kent*,
867 F.2d 259 (6th Cir.1988) ..............................................................20

*Dandridge v. Williams*,
397 U.S. 471, 90 S.Ct. 1153 (1970)....................................................28

*Denoewer v. UCO Indus.*,
No. 2:17-CV-660, 2018 U.S. Dist. LEXIS 65250
(S.D. Ohio Apr. 18, 2018) .........................................................19, 31

*Emlich v. OhioHealth Corp.*,
Case No. 2:14-cv-1697, 2016 WL 7406536 (S.D. Ohio Dec. 22, 2016) ...........30

*Gosbin v. Jefferson Cty. Commrs.*,
725 F.App'x 377 (6th Cir.2018).......................................................34

*Luke v. City of Cleveland*,
No. 1:02-CV-1225, 2005 U.S. Dist. LEXIS 49630
(N.D. Ohio Aug. 22, 2005) ............................................................31

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)......................................................................40

*Metz v. Titanium Metals Corp.*,
   475 F.App'x 33 (6th Cir.2012) ..............................................................35

*Meyers v. Columbia/HCA Healthcare Corp.*,
   341 F.3d 461 (6th Cir. 2003) ...............................................19, 29, 30

*Miles v. South Center Human Resource Agency, Inc.*,
   946 F.3d 883 (6th Cir.2020) ...............................................20, 40, 41

*NCUA Bd. v. Zovko*,
   728 F.App'x 567 (6th Cir.2018) ..........................................................34

*Pittman v. Parillo*,
   No. L-16-1140, 2017 Ohio App. LEXIS 1482
   (Ohio Ct. App. Apr. 21, 2017)............................................................32

*Pompy v. DEA*,
   6th Cir. No. 19-4090, 2020 U.S. App. LEXIS 38492 (Dec. 9, 2020) ...............35

*Rosenthal v. Faygo Bevs., Inc.*,
   701 F.App'x 472 (6th Cir.2017) ..........................................................35

*Scottsdale Ins. Co. v. Flowers*,
   513 F.3d 546 (6th Cir.2008) ...........................................................19, 24

*Semertzides v. Bethesda N. Hosp.*,
   No. C-180659, 2020 Ohio App. LEXIS 150
   (Ohio Ct. App. Jan. 22, 2020)..........................................19, 21, 25

*Sloat v. Hewlett-Packard Enter. Co.*,
   18 F.4th 204 (6th Cir.2021) ...............................................37, 38, 39

*State v. Sims*,
   10 Ohio App.3d 56, 460 N.E.2d 272 (1983) .....................................32

*Talwar v. Catholic Healthcare Partners*,
   258 Fed. Appx. 800 (6th Cir.2007)...................................19, 25, 27

*Texas Dep't of Community Affairs v. Burdine*,
   450 U.S. 248, 101 S.Ct. 1089 (1981)................................................40

*Thurman v. Yellow Freight Sys., Inc.*,
   97 F.3d 833 (6th Cir.1996) ................................................................24

*Wall v. Ohio Permanente Medical Group, Inc.*,
    119 Ohio App. 3d 654 (1997)............................................................19, 25, 26, 27

*Woolf v. City of Streetsboro*,
    No. 5:09 CV 1570, 2010 WL 4105550 (N.D. Ohio Oct. 18, 2010) .............20, 32

*Woythal v. Tex-Tenn. Corp.*,
    112 F.3d 243 (6th Cir.1997) ...................................................................*passim*

## Statutes

42 U.S.C.S. § 11101, *et seq.* .............................................................................19, 28

42 USCS § 11111(a) .............................................................................................29

42 U.S.C. § 11111(a)(1) ........................................................................................29

42 U.S.C. § 11112(a) ............................................................................................29

O.R.C. § 2305.251 ................................................................................................19

O.R.C. § 2305.251(A) ...................................................................................*passim*

O.R.C. §2305.251(D)...........................................................................24, 25, 26, 28

O.R.C. § 4112.02(J) ..............................................................................................31

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not necessary because the facts and legal arguments are adequately presented in the briefs and record. There are no novel or significant Constitutional issues this Court must address. Accordingly, the decisional process would not be significantly aided by oral argument.

## STATEMENT OF ISSUES

1. Did the district court err when it granted summary judgment in favor of Mayfield on Appellant Set Shahbabian's claims? No.

## I.   STATEMENT OF THE CASE

### A.   Introduction

This is a straightforward case about physicians in a hospital taking appropriate action to protect their patients. Mayfield and Appellee TriHealth, Inc. (jointly referred to with Appellee TriHealth G, LLC as "TriHealth") monitored and evaluated Appellant Dr. Set Shahbabian's ("Shahbabian") performance through a proper and well documented peer review process. When Shahbabian's increasingly problematic surgical outcomes reached the breaking point, he was asked to refrain from performing surgeries pending a formal evaluation and review. Rather than wait for a formal review, and after consultation with counsel, Shahbabian voluntarily relinquished his surgical privileges, never once having challenged any of the findings of the peer-review committee regarding his poor performance.

After his contract with TriHealth expired and was not renewed, Shahbabian brought this suit against Appellees, with claims of tortious interference with contract, civil conspiracy, and aiding and abetting age discrimination against Mayfield. Mayfield moved for summary judgment and the district court correctly found Mayfield was immune from liability for Shahbabian's tortious interference and conspiracy claims based on Ohio's peer review immunity statute, which provides immunity from "liability for acts, decisions, and other conduct that fall within the scope of the functions of the peer review committee…" (Order, RE 213,

Page ID # 16777-16778); O.R.C. §2305.251(A). The district court also appropriately found that, because Shahbabian's age discrimination claim against TriHealth failed, so too did his aiding and abetting claim against Mayfield. (Order, RE 213, Page ID # 16784.)

### B.   Statement of Facts

#### 1.   Mayfield and TriHealth, Inc. enter into a Co-Management Agreement

Mayfield is an independent physician group that provides brain and spine care to patients in hospitals in the greater Cincinnati area, including those affiliated with TriHealth (Good Samaritan Hospital ("GSH") and Bethesda North Hospital). (Ringer Deposition Excerpts (the "Ringer Dep."), Exh. 20, RE 138-2, Page ID # 4447-4501.) Mayfield's relationship with TriHealth is governed by a Neurosurgical, Neurovascular and Spine Services Agreement, which went into effect in June 2014, and was replaced in May 2017 with the Neurosciences Service Line Clinical Co-Management Agreement[1] (collectively, the "Co-Management Agreement".) (Ringer Dep. Exh. 20, RE 138-2, Page ID # 4447-4501; Ringer Dep. Exh, 67, RE 138-2, Page ID # 4526-4576.)

The Co-Management Agreement established a core panel of Mayfield physicians who, along with certain TriHealth-employed neurosurgeons, provide on-

---

[1] The 2017 agreement was amended in July 2018. (Farrington Deposition Excerpts (the "Farrington Dep."), Exh. 102, RE 138-1, Page ID # 4389.)

3

call services and attend to patients who are admitted through TriHealth emergency departments. (Farrington Dep., RE 138-1, Page ID # 4374-4375, 4379, pp. 56-57, 100.) It also named a Mayfield physician to be the Medical Director of Neurosurgical Services at each of the TriHealth hospitals and required Mayfield to provide certain administrative and quality-improvement services, including services designed to enhance the quality and efficiency of patient care. (Ringer Dep., RE 138-2, Page ID # 4426, pp. 10-11; Ringer Dep. Exh. 20, RE 138-2, Page ID # 4474; Ringer Dep. Exh. 67, RE 138-2, Page ID # 4558.) The Co-Management Agreement specifically provides that Mayfield physicians may serve on TriHealth's Surgery Quality Assurance ("QA") Committee, a peer review committee made up of a panel of physicians that evaluates concerns relating to the clinical competence or behavior of individuals with clinical privileges at each of the TriHealth hospitals. (Ringer Dep. Exh. 20, RE 138-2, Page ID # 4476; Ringer Dep. Exh. 67, RE 138-2, Page ID # 4560.)

Pursuant to the Co-Management Agreement, Andrew Ringer, MD, a Mayfield neurosurgeon, serves as the Chief of Neurosciences for TriHealth's Neuroscience Institute, Medical Director of Neurosurgical Services at GSH, and is on a number of GSH committees, including GSH's QA Committee. (Ringer Dep., RE 138-2, Page ID # 4426, pp. 10-11; Ringer Dep. Exh. 1, RE 138-2, Page ID # 4446; Deposition of Set Shahbabian (the "Shahbabian Dep."), RE 181, Page ID # 13254.)

### 2.    Shahbabian hires TriHealth at age 70

Shahbabian practiced neurosurgery for approximately 40 years on the West Side of Cincinnati and performed most of his surgeries at GSH. (Shahbabian Dep., RE 181, Page ID # 13152, 13192; Shahbabian Dep. Exh. 1, RE 181-2, Page ID # 13517-13518.) He was a solo practitioner until May 1, 2014, when, at age 70, he sold his practice to and was hired by TriHealth. (Shahbabian Dep., RE 181, Page ID # 13148; Shahbabian Dep. Exh. 3, RE 181-2, Page ID # 13523; Shahbabian Dep. Exh. 16, RE 181-2, Page ID # 13650.) Shahbabian's employment with TriHealth was governed by a written employment agreement ("Employment Agreement") with a term of five years, a productivity-based compensation scheme, and allowed either party to end their employment relationship after the third year without cause. (Shahbabian Dep. RE 181, Page ID # 13189, 13193-13194; Shahbabian Dep. Exh. 16, RE 181-2, Page ID # 13650-13660.)

Shahbabian's decision to sell his practice to and be hired by TriHealth was in part made because he was unable to find a young neurosurgeon willing to join his practice and eventually take over his patient base. (Shahbabian Dep., RE 181, Page ID # 13166-13173, 13175-13178, 13342-13343, 13358; Shahbabian Dep. Exh. 59A, RE 181-4, Page ID # 13851.) After joining TriHealth, Shahbabian began considering slowing down his practice as he approached retirement. As early as January 2013, Shahbabian told TriHealth representatives a "couple of times" he wanted to work

less in a couple of years and take more time with his wife. (Shahbabian Dep., RE 181, Page ID # 13342; Shahbabian Dep. Exh. 59A, RE 181-4, Page ID # 13851.) In 2015, he told his psychologist he was "planning to – or finish the career in a different capacity," and he told a group of TriHealth physicians he would be willing to have a neurosurgeon "come into [his] office, gradually, over the next 2-3 years, [so he could] introduce [his] patients." (Shahbabian Dep., RE 181, Page ID # 13356-13358; Shahbabian Dep. Exh. 59A, RE 181-4, Page ID # 13851.)

At an October 31, 2016, meeting at TriHealth, Shahbabian said that, after May 2017, "[he] will slow down much more and enjoy things. [Mayfield] can take over at that point." (Shahbabian Dep., RE 181, Page ID # 13380; Shahbabian Dep. Exh. 59, RE 181-3, Page ID # 13833.) According to Shahbabian, "[he] still ha[d] the capability to do mostly office work and bring patient[s] to TriHealth" rather than do surgery during the two years then remaining on the Employment Agreement. (Shahbabian Dep., RE 181, Page ID # 13381-13382; Shahbabian Dep. Exh. 59, RE 181-3, Page ID # 13834.)

### 3.    Shahbabian has an increasing number of quality concerns

Shahbabian had a long history of problematic surgeries, complications, and outcomes while operating out of GSH. He received corrective actions from TriHealth/GSH at least as far back as 1988 for a variety of behavioral reasons, including his failure to complete medical records, yelling at nurses, calling nurses

names, swearing, using racial slurs, and other inappropriate behaviors. (Shahbabian Dep. Exhs. 26-38, RE 181-3, Page ID # 13741-13762.) Similar concerns were addressed with him in 2013, when he was told his "generally difficult behavior with yelling, cursing and name calling ma[de] it a difficult environment with staff" and "his deliberate actions caus[ing] loss of cell saver blood by contamination" were unacceptable. (Shahbabian Dep. Exh. 49, RE 181-3, Page ID # 13786.)

Beginning in 2010, the QA Committee assess more serious concerns regarding possible issues relating to Shahbabian's surgical competence. The QA Committee conducts TriHealth's quality assurance peer review process, which is made up of several steps. The Clinical Quality Resources Department initially identifies quality issues and forwards them to the appropriate department or section chair for further evaluation. (Ringer Dep. Exh. 20, RE 138-2, Page ID # 4498; Koselka Deposition Excerpts (the "Koselka Dep."), RE 138-3, Page ID # 4578, pp. 41-43.) In this case, George Kerlakian, MD, served as the QA Committee Chair at all relevant times and would have received the initial referrals on Shahbabian's cases. (Koselka Dep., RE 138-3, Page ID # 4583, pp. 97-100.) The Committee Chair (Kerlakian) can either determine close the case or, if he concludes further review is necessary, he would refer the case to the appropriate Section/Department Chair, which was Ringer for matters relating to Shahbabian. (Koselka Dep., RE 138-3, Page ID # 4583, pp. 97-100.) The Section/Department Chair (Ringer) then reviews the

matter and determines whether it should be presented to the QA Committee for a formal review. (Koselka Dep., RE 138-3, Page ID # 4583, pp. 97-100.) If the matter is referred to the QA Committee, a letter of inquiry is sent to the physician under evaluation, who is asked to provide written responses to the issues raised in the review. (Ringer Dep., RE 138-2, Page ID # 4433, pp. 137-138; Ringer Dep. Exh. 20, RE 138-2, Page ID # 4498; Koselka Dep., RE 138-3, Page ID # 4583, 99-100.) After the QA Committee completes its evaluation,  the Section Chair (Ringer) assigns the matter a case weight from 0 (least severe) to 3 (most severe).[2] (Ringer Dep. Exh. 20, RE 138-2, Page ID # 4498-4450.) The physician is entitled to appeal any adverse action or case weight designation, and any quality issue assigned a case weight 3 is automatically referred for review to the Patient Care Committee ("PCC"), which, again, is made up of a group of TriHealth-employed and independent surgeons. (Shahbabian Dep., RE 181, Page ID # 13261; Shahbabian Dep. Exh. 42, RE 181-3, Page ID # 13769; Ringer Dep. Exh. 20, RE 138-2, Page ID # 4498-4450.)

Between 2010 and 2015, at least ten issues relating to surgeries performed by Shahbabian were identified by the nurse clinical quality reviewer:

---

[2] Possible case weights, from least to most concerning, are 0 through 3: 0 – Care Appropriate; 1 – Improvement Opportunity; 2 – At Risk Behavior (inappropriate care); and 3 – Reckless Behavior/Recurrent At Risk Behavior. (Ringer Dep. RE 138-2, Page ID # 4434, pp. 142-143; Ringer Dep. Exh. 20, RE 138-2, Page ID # 4498).

1.  In 2010, because of an inconsistency in the scheduling documentation versus his operative notes, it appeared Shahbabian operated on the wrong disc in a patient's spine. After reviewing Shahbabian's response to this concern, Ringer assigned it a case weight 1 and did not refer it to the QA Committee. (Shahbabian Dep. Exh. 40, RE 164-2 SEALED, Page ID # 10718.)

2.  In 2011, the estimated blood loss ("EBL") for certain of Shahbabian's surgeries was noted to be substantially higher than his colleagues. (Shahbabian Dep. Exh. 42, RE 181-3, Page ID # 13769.) Shahbabian testified at his deposition "[t]here was a time I did a lot of blood loss and what I did, after this, I used a cell saver" to reduce blood loss. (Shahbabian Dep., RE 181, Page ID # 13257.) Ringer assigned a case weight 1, a focused review was conducted (which Shahbabian reported he "would appreciate"), and the nurse reviewer tracked Shahbabian's EBL for a period of six months. (Shahbabian Dep. Exh. 42, RE 181-3, Page ID # 13774; Shahbabian Dep. Exh. 43, RE 181-3, Page ID # 13775.) Because of Shahbabian's required use of the cell saver, Ringer informed Shahbabian the review revealed "no quality issues/concerns" relating to EBL. (Shahbabian Dep. Exh. 45, RE 181-3, Page ID # 13778.)

3.  In 2012, a patient who was having difficulty walking prior to surgery was rendered quadriplegic following surgery performed by Shahbabian, had significant complications, and died less than a month later. (Shahbabian Dep. Exh. 46, RE 164-3 SEALED, Page ID # 10720.) Kerlakian recommended that the matter be assigned a case weight 3, but Ringer assigned only a 2. (Shahbabian Dep. Exh. 46, RE 181-3, Page ID # 10721.) The PCC overruled Ringer and determined that the most serious weight, a **case weight 3** (Reckless Behavior/Recurrent At Risk Behavior), be assigned. (Shahbabian Dep., RE 181, Page ID # 13264-13266; Shahbabian Dep. Exh. 46, RE 164-3 SEALED, Page ID # 10721, 10727.)

4.  In 2012, a patient experienced a rare complication following a surgery performed by Shahbabian. Ringer spoke to Shahbabian informally and determined that a letter of inquiry was not necessary. No case weight was assigned. (Shahbabian Dep., RE 181, Page ID # 13266; Shahbabian Dep. Exh. 47, RE 181-3, Page ID # 13781.)

5.      In late 2012, a patient had an excessive EBL during a surgery performed by Shahbabian. A **case weight 2** (At Risk Behavior (inappropriate care)) was assigned, with which Shahbabian said he had "no argument." Indeed, Shahbabian noted that "[y]our criticism has helped me because I am now doing cell saving." (Shahbabian Dep. Exh. 48, RE 164-4 SEALED, Page ID # 10733.)

6.      In 2013, Shahbabian prescribed an unapproved antibiotic to a patient. Shahbabian admitted that he was not aware of the applicable standard of care relating to the use of antibiotics. (Shahbabian Dep., RE 181, Page ID # 13273-13274; Shahbabian Dep. Exh. 51, RE 164-5 SEALED, Page ID # 10735-10736.) The case received a case weight of 1. (Shahbabian Dep. Exh. 51, RE 164-5 SEALED, Page ID # 10735.)

7.      In 2013, Shahbabian did not give a patient a prophylactic antibiotic as required. Shahbabian "assure[d]" Kerlakian that he had given the antibiotic, but it was not documented, and Shahbabian could not explain why the documentation was missing from the record. Shahbabian received a case weight of 1 for this issue. (Shahbabian Dep., RE 181, Page ID # 13275; Shahbabian Dep. Exh. 54, RE 164-6 SEALED, Page ID # 10737-10739.)

8.      In 2014, a patient was given an unapproved antibiotic during a surgery performed by Shahbabian. Following the surgery, it was discovered that the patient was leaking spinal fluid, but Shahbabian merely ordered the use of an abdominal binder to treat the leak. When the leak did not resolve, the patient was returned to surgery, and, again, an unapproved antibiotic was given during the surgery. The patient had to be readmitted to the hospital a third time after developing a surgical site infection. Because Shahbabian waited nine days from leak diagnosis and six days from hospital readmission to repair the leak (which the QA Committee believed placed the patient at greater risk of meningitis), and because of Shahbabian's repeated use of unapproved antibiotics, a **case weight 3** (Reckless Behavior/Recurrent At Risk Behavior) was assigned. (Shahbabian Dep. Exh. 55, RE 164-6 SEALED, Page ID # 10741-10743, 10746; Ringer Dep., RE 138-2, Page ID # 4435, p. 155.)

9.      In late 2014, a patient was rendered impotent and unable to walk independently following surgery performed by Shahbabian. (Ringer Dep., RE 138-2, Page ID # 4440, p. 231; Shahbabian Dep. Exh. 56, RE

164-6 SEALED, Page ID # 10759.) Shahbabian described this issue as a "horrible complication" at his deposition. (Shahbabian Dep., RE 181, Page ID # 13283). Quality concerns included taking two hours during surgery to repair a dural tear, not using a microscope during surgery, and not returning the patient to the operating room the next day to complete the surgery. (Shahbabian Dep. Exh. 56, RE 164-6 SEALED, Page ID # 10759.) Ringer performed a revision surgery less than two weeks later, during which he used a microscope, to improve the patient's condition. (McPherson Deposition Excerpts (the "McPherson Dep."), RE 138-4, Page ID # 4682-4683, pp. 12-13; Shahbabian Dep. Exh. 56, RE 164-6 SEALED, Page ID # 10755-10757.) A **case weight 3** (Reckless Behavior/Recurrent At Risk Behavior) was assigned because of Shahbabian's failure to seek additional physician assistance when complications arose and for failing to use a microscope during surgery.[3] (Shahbabian Dep. Exh. 56, RE 164-6 SEALED, Page ID # 10759-10760, 10766.)

10. In early 2015, Shahbabian was unable to retrieve a catheter (again, he did not use a microscope) that had been inserted in a patient's spine during surgery and chose to instead leave it in place. The patient also suffered a brain hematoma as a result of the surgery. Six weeks later, Shahbabian performed a second surgery on the patient, following which the patient experienced leg weakness and urinary retention consistent with an incomplete spinal injury. (Shahbabian Dep. Exh. 57, RE 164-6 SEALED, Page ID # 10770-10774.) A **case weight 3** (Reckless Behavior/Recurrent At Risk Behavior) was assigned. (Shahbabian Dep. Exh. 57, RE 164-6 SEALED, Page ID # 10774.) Shahbabian testified that he had no dispute with this assignment. (Shahbabian Dep., RE 181, Page ID # 13291.)

---

[3] This quality concern was the only one presented to the QA Committee by McPherson rather than Ringer. (McPherson Dep., RE 138-4, Page ID # 4683, p. 15).

Shahbabian failed to appeal any of these matters and did not object to or disagree with any of these decisions. (Shahbabian Dep., RE 181, Page ID # 13261-13267, 13282-13283, 13291.)

These were not the only issues raised during that time frame. In 2010, Ringer had to intervene in a surgery when Shahbabian was unable to find the brain tumor he was attempting to remove. (Ringer Dep., RE 138-2, Page ID # 4440, p. 231.) In 2014, Shahbabian fainted during a surgery, and Ringer had to take over. (Ringer Dep. RE 138-2, Page ID # 4440, pp. 231-32; Ringer Dep. Exh. 66, RE 138-2, Page ID # 4525.) Due to the concerns relating to Shahbabian's quality of care, particularly the three case weight 3 assignments in short succession, the QA Committee placed Shahbabian on a plan of correction that limited the length and complexity of his surgeries and required that any intra-cranial cases (brain, as opposed to spine, surgeries) be reviewed with Ringer prior to surgery. (Shahbabian Dep., RE 181, Page ID # 13197; Shahbabian Dep. Exh. 17, RE 181-2, Page ID # 13667-13670; Shahbabian Dep. Exh. 56, RE 164-6 SEALED, Page ID # 10766; Shahbabian Dep. Exh. 57, RE 164-6 SEALED, Page ID # 10792; Ringer Dep., RE 138-2, Page ID # 4437, pp. 166-68.) Shahbabian was represented by counsel during discussions relating to the plan of correction and accepted the limitations placed on him, choosing to not appeal them as was his right pursuant to TriHealth's medical staff bylaws, just as he chose to not pursue appeals on any of the quality issues that had

been previously identified. (Shahbabian Dep., RE 181, Page ID # 13197, 13261, 13267, 13282-13283, 13291; Ringer Dep. Exh. 20, RE 138-2, Page ID # 4498-4450).

### 4. The plan of correction is initially successful, but Shahbabian continues to have quality issues

Although the nurse clinical quality reviewer identified three of Shahbabian's cases in 2015 that she believed may have been inconsistent with the plan of correction, Ringer disagreed and they moved no further in the QA process. (Shahbabian Dep. Exh. 62, RE 164-7 SEALED, Page ID # 10797; Shahbabian Dep. Exh. 65, RE 164-7 SEALED, Page ID # 10803; Shahbabian Dep. Exh. 66, RE 164-7 SEALED, Page ID # 10804.) The nurse also identified a complication in 2015, but Ringer found no issues with Shahbabian's care for the patient and no further review was needed. (Shahbabian Dep. Exh. 64, RE 164-7 SEALED, Page ID # 10802.) For approximately a year and a half, the plan of correction worked well to improve Shahbabian's surgical outcomes.

However, in January 2017, Shahbabian performed surgery on a patient who had been advised by a different neurosurgeon only two weeks earlier that non-operative treatment was appropriate. (Shahbabian Dep. Exh. 69, RE 164-8 SEALED, Page ID # 10808-10810.) The surgery was more complex than permitted by the plan of correction, and Shahbabian also ignored the patient's MRI results, which showed that there was no spinal contusion, insisting that "to my experience, I see – I know it's a contusion." (Shahbabian Dep., RE 181, Page ID # 13389-13390).

13

A **case weight 2** (At Risk Behavior (inappropriate care)) was assigned because Shahbabian's treatment of the patient was more aggressive than his peers, who would not have performed any surgery. (Shahbabian Dep. Exh. 69, RE 164-8 SEALED, Page ID # 10809-10810; Ringer Dep., RE 138-2, Page ID # 4438-4439, pp. 224-226.) Shahbabian testified at his deposition that he had "no objection" to the findings of the QA Committee or PCC. (Shahbabian Dep., RE 181, Page ID # 13395.)

Two months later, in March 2017, Shahbabian performed an elective surgery that left the patient "severely disabled" from a "severe spinal cord injury." (Ringer Dep., RE 138-2, Page ID # 4440, pp. 230-231.) A **case weight 2** (At Risk Behavior (inappropriate care)) was assigned. (Shahbabian Dep. Exh. 70, RE 164-9 SEALED, Page ID # 10827-10828, 10831.) Again, Shahbabian testified at his deposition that he had "no objection" to the assigned weight or the QA Committee and PCC conclusions that he had engaged in "at-risk behaviors." (Shahbabian Dep., RE 181, Page ID # 13396-13397.)

Aside from the rise in bad outcomes in Shahbabian's surgeries, Ringer had grown concerned that Shahbabian was not complying in good faith with the terms of the plan of correction. He testified about his concerns at his deposition:

> I helped [Shahbabian] review his cases, until that process fell apart and he decided to ask for further review five minutes before he walked into the operating room. This was not an effective process. The process had fallen apart. It was clear that it was not going the way we wanted it to.

14

(Ringer Dep., RE 138-2, Page ID # 4441, p. 233.)

Another new quality issue was presented to the QA Committee on May 18, 2017, and it was also noted at the meeting that a second quality issue relating to Shahbabian had been identified by the nurse clinical quality reviewer. (Shahbabian Dep. Exh. 70, RE 164-9 SEALED, Page ID # 10827; Shahbabian Dep. Exh. 71, RE 164-9 SEALED, Page ID # 10832.) The significant volume of Shahbabian's cases being reviewed led members of the QA Committee to

> express[] concern that [Ringer] was so frequently presenting cases of Dr. Shahbabian's, that his practice pattern seemed to be so different than that of most neurosurgeons in the community, and that they were frustrated that two previous focused correction plans had not prevented these outcomes and that they felt [they] were simply running into the same problem over and over again. And they were concerned about the safety of the patients being treated at Good Samaritan Hospital.

(Ringer Dep., RE 138-2, Page ID # 4440, pp. 229-230.) Further discussion centered on "the recurring concerns and quality issues related to Dr. Shahbabian's practice." (Shahbabian Dep. Exh. 73, RE 181-4, Page ID # 13865.) The consensus among the QA Committee members was that "there was enough concern that patient safety was in question and Dr. Shahbabian should not be operating." (*Id*.; Ringer Dep., RE 138-2, Page ID # 4441-4442, pp. 236-37.)

15

### 5.     Shahbabian, in consultation with his attorney, voluntarily resigns his surgical privileges

Senior members of TriHealth's medical staff met with Shahbabian later that same day, May 18, 2017, to discuss the QA Committee's concerns. (Shahbabian Dep. Exh. 73, RE 181-4, Page ID # 13865; Koselka Dep., RE 138-3, Page ID # 4585, pp. 119-120.) During the conversation, Shahbabian was asked to voluntarily resign his surgical privileges and negotiate a clinical practice arrangement that would not include surgery. (*Id.*). The option of temporarily suspending his surgical privileges pending a performance review was also raised in the meeting. (Shahbabian Dep. Exh. 73, RE 181-4, Page ID # 13865.) Rather than pursue the appeal process, after consulting with his attorney, Shahbabian agreed to voluntarily resign his surgical privileges. (Shahbabian Dep., RE 181, Page ID # 13416; Shahbabian Dep. Exh. 78, RE 181-4, Page ID # 13874.) On June 8, 2017, Shahbabian submitted a letter drafted by his attorney and signed by him in which he stated that he "ha[d] decided to voluntarily relinquish [his] surgical privileges" so that he could "take care of [his] patients without the rigor of being in the operating room every day." (Shahbabian Dep. Exh. 78, RE 181-4, Page ID # 13874.) Shahbabian could have appealed the recommendation of the QA Committee, but he and his attorney elected not to. (Shahbabian Dep., RE 181, Page ID # 13261; Shahbabian Dep. Exh. 73, Page ID # 13865; Ringer Dep. Exh. 20, RE 138-2, Page ID # 4498-4450.)

16

### 6. TriHealth considers a post-surgical role for Shahbabian

Following Shahbabian's decision to voluntarily relinquish his surgical privileges, the role(s) available for him was given consideration. McPherson initially suggested that a neurosurgery hospitalist[4] role might be appropriate. (McPherson Dep., RE 138-4, Page ID # 4688, pp. 61-62; Ringer Dep., RE 138-2, Page ID # 4442, pp. 238-239.) However, there was concern among the physicians at Mayfield that there was a "clear difference in surgical indications [the frequency with which a surgical rather than non-surgical approach was recommended] for Dr. Shahbabian and most of the other surgeons in the hospital."[5] (Ringer Dep. RE 138-2, Page ID # 4442-4443, pp. 240-241.) As a result, the Mayfield neurosurgeons practicing at GSH "weren't sure that the consulting services [Shahbabian] would provide would be consistent with what others would recommend." (Ringer Dep., RE 138-2, Page ID # 4443, p. 241.)

---

[4] A neurosurgery hospitalist provides non-surgical care and advice to hospitalized neurosurgical patients, regardless of the identity of the operating surgeon.

[5] Indeed, it was estimated that "400 cases done by Shahbabian would be approximately 200 cases done by any Mayfield physician" because "Mayfield physicians are more conservative in doing surgery than Dr. Shahbabian" and would have concluded that surgery was necessary only half as often as Shahbabian. (Farrington Dep., RE 138-1, Page ID # 4384, p. 201; Farrington Dep. Exh. 75, RE 138-1, Page ID # 4386).

17

Nevertheless, the neurosurgery hospitalist role was discussed with Shahbabian. Shahbabian flatly rejected the role and described it, both when initially presented with the idea and at his deposition, as "insulting." (Shahbabian Dep., RE 181-1, Page ID # 13424-13425; Shahbabian Dep. Exh. 59, RE 181-3, Page ID # 13848.) During the two years remaining on his Employment Agreement, Shahbabian continued to see patients in his West Side office, referring those who needed surgery to other neurosurgeons throughout the city, including to some Mayfield physicians. His employment with TriHealth ended on April 30, 2019, when his Employment Agreement expired by its own terms and was not renewed. (Shahbabian Dep., RE 181-1, Page ID # 13400-13401; Shahbabian Dep. Exh. 16, RE 181-2, Page ID # 13655; Shahbabian Dep. Exh. 80, RE 181-4, Page ID # 13876.) He was 75 years old.

### C.   Procedural History

Shahbabian's Statement of the Case provided an accurate procedural history of this matter. (Appellant's Br., Doc. 36 at 3, Page ID # 14).

## II.   SUMMARY OF THE ARGUMENT

### A.   Ohio's Peer Review Immunity Statute (and alternatively, immunity under HCQIA) Require that Shahbabian's Claims Against Mayfield Be Dismissed

The crux of all of Shahbabian's claims against Mayfield is Ringer's involvement in the peer review committee decision to recommend that Shahbabian's surgical privileges be revoked. Mayfield is immune from liability under Ohio's Peer Review Immunity Statute (or, alternatively, under the federal Health Care Quality

Improvement Act) relating to any decisions made as part of the peer review process. *Semertzides v. Bethesda N. Hosp.*, No. C-180659, 2020 Ohio App. LEXIS 150, at *2-3 (Ohio App. Jan. 22, 2020); 42 U.S.C.S. § 11101, *et seq*.; O.R.C. §2305.251; *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 468 (6th Cir.2003). Shahbabian has failed to demonstrate that immunity the Ohio Peer Review Immunity Statute (or, alternatively, HCQIA) does not apply. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008); *Semertzides*, 2020 Ohio App. LEXIS at *5; *Talwar v. Catholic Healthcare Partners*, 258 Fed. Appx. 800, 809 (6th Cir.2007) (*quoting Wall v. Ohio Permanente Medical Group, Inc.*, 119 Ohio App. 3d 654, 666 (1997)).

### B.    Shahbabian Cannot Prove Mayfield Aided and Abetted Age Discrimination

Shahbabian's claim that Mayfield aided and abetted age discrimination by TriHealth must fail because he cannot prove the existence of any age discrimination by TriHealth, because he is unable to prove that Mayfield intentionally engaged in any wrongful act for the purpose of facilitating TriHealth's alleged age discrimination, because there is no evidence that Mayfield held any age animus towards him, because Shahbabian cannot identify anyone at Mayfield who aided and abetted TriHealth's alleged age discrimination, and because he cannot rebut the legitimate, nondiscriminatory reasons for Appellees' actions addressing his poor performance and bad outcomes. *Denoewer v. UCO Indus.*, No. 2:17-CV-660, 2018

19

U.S. Dist. LEXIS 65250, at *7-8 (S.D. Ohio Apr. 18, 2018); *Woolf v. City of Streetsboro*, No. 5:09 CV 1570, 2010 WL 4105550, at *15 (N.D. Ohio Oct. 18, 2010); *Woythal v. Tex-Tenn. Corp.*, 112 F.3d 243, 247 (6th.Cir.1997); *Miles v. South Center Human Resource Agency, Inc.*, 946 F.3d 883, 888-889 (6th Cir.2020).

## III.    ARGUMENT

### A.    Standard of Review

"The standard of review on appeal from the grant of a motion for summary judgment is the same as that utilized by the District Court -- whether examining the evidence and all reasonable inferences therefrom in a light most favorable to the party opposing the motion, a genuine issue of material fact existed in the record below." *Criss v. Kent*, 867 F.2d 259, 261 (6th Cir.1988).

### B.    The District Court correctly found that Ohio's Peer Review Immunity Statute defeat's Shahbabian's tortious interference and civil conspiracy claims against Mayfield

#### 1.    Mayfield is entitled to immunity under Ohio's peer review immunity statute

Ohio state law provides that:

> No health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity.

O.R.C. §2305.251(A) ("Peer Review Immunity Statute"). The statute defines a "health care entity" to include any entity acting:

> on behalf of or in affiliation with other health care entities, that conducts as part of its regular business activities . . . quality review activities

involving the competence of, professional conduct of, or quality of care provided by health care providers. . .

O.R.C. §2305.25(A). The statute thus protects Mayfield from any claims relating to "any acts" or "other conduct" of its physicians "within the scope of the functions of a peer review committee." The protection afforded under the Peer Review Immunity Statute was expressly contemplated in the Co-Management Agreement:

> The Parties intend that any individual who attends a meeting of a peer review committee, serves as a member of a peer review committee, works for or on behalf of a peer review committee, or provides information to a peer review committee shall be afforded the full privilege accorded by Ohio's peer review statute.

(Ringer Dep. Exh 20, RE 138-2, Page ID # 4452).

Ohio's First District Court of Appeals recently applied the Peer Review Immunity Statute in a case factually similar to this one.

> . . . [M]embers of an entity known as Queen City Surgical Consultants, Inc. ("Queen City"), competitors of [plaintiff physician], became part of the executive management overseeing the hospitals' surgical practice. The complaint alleged that, via their executive management role, these Queen City members became [plaintiff]'s accusers, as well as the determiners of fact as to whether [plaintiff] had violated hospital bylaws . . . The complaint alleged that the hospitals' peer review was initiated to sever [plaintiff]'s relationship with the hospitals and reduce competition, rather than to improve patient care, and that the hospitals had acted with malice and bad faith.

*Semertzides v. Bethesda N. Hosp.*, No. C-180659, 2020 Ohio App. LEXIS 150, at *2-3 (Ohio Ct. App. Jan. 22, 2020). The plaintiff in *Semertzides* brought claims for breach of contract and tortious interference with a business contract because the

hospitals revoked his privileges following a peer review committee investigation. *Id.* at *1. However, the First District found that the immunity provided by Ohio's Peer Review Immunity Statute applied and dismissed his claims. *Id.* at *4-5.

Here, the district court's analysis and application of the Peer Review Immunity Statute demonstrates why Shahbabian's claims for tortious interference and civil conspiracy are likewise barred:

> Dr. Shahbabian's reduction in work was based on the recurring reviews by the Quality Committee, that committee's concern for patient safety based on several negative case weights, and the committee's consequent request that the doctor suspend surgical operations. Dr. Shahbabian complied with that request. It is hard to see how any part of this process falls outside the peer review's normal functions.

> The next question is which of the state law claims arise from conduct that fell within the scope of the peer review process. See O.R.C. § 2305.251(A) (providing for immunity for "conduct within the scope of the functions of a peer review committee"). Although practically all of the doctor's claims stand with at least one foot on the peer review proceedings, [two of the claims against Mayfield] stand entirely on those proceedings.

> * * *

> *Tortious interference* (Count 9). Dr. Shahbabian alleges that Mayfield tortiously interfered with contract and prospective business relationships. According to him, Mayfield was behind the scenes persuading certain committee members to manufacture quality-of-care issues in his practice. If successful, the theory goes. Dr. Shahbabian's surgical practice would dry up and Mayfield could absorb his patients. The problem with this theory,

22

> besides being conjectural, is that the reduction in his work still remains the centermost fact. And the reduction in his work stemmed directly from the peer review proceedings. So Mayfield is immune from this claim.
>
> * * *
>
> *Common law civil conspiracy* (Count 10). Again, this claim emerges from the reduction in work available to Dr. Shahbabian based on the Quality Committee's numerous findings of at-risk behavior, so it cannot proceed.

(Order, RE 213, Page ID # 16775-16776.) (emphasis in original.) The district court appropriately determined that Mayfield was entitled to immunity under the Peer Review Immunity Statute and should be affirmed.

### 2.    Shahbabian has failed to demonstrate that the Peer Review Immunity Statute does not apply

There was no dispute at the district court as to whether Mayfield was a "health care entity" or whether the QA Committee constituted a "peer review committee" as those terms were defined by the statute. (Order, RE 213, Page ID # 16774.) Shahbabian's only argument below was that his claims were "related to activities outside the peer review process." (*Id.*; Shahbabian Opposition, RE 186, Page ID # 13992.) The district court properly held that this argument was without merit because Shahbabian "[did] not offer any evidence in support of [it]." (Order, RE 213, Page ID # 16774.) Rather than retread that futile argument here, Shahbabian instead argues that Mayfield acted with actual malice and therefore loses the immunity granted by the statute. That argument fails for several reasons.

First and foremost, Shahbabian did not raise the actual-malice issue at the district court and it is therefore waived before this Court. It is well settled that failure to raise an argument to the district court waives that argument on appeal. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("[T]raditional rules regarding the waiver of issues…generally provide that an argument not raised before the district court is waved on appeal to this Court."); *Thurman v. Yellow Freight Sys., Inc.*, 97 F.3d 833, 835 (6th Cir.1996) ("[V]ague references to an issue fail to clearly present it to the district court so as to preserve the issue for appeal.") The district court noted that the only issue Shahbabian raised in opposition to the application of the Peer Review Immunity Statute was "whether the actions he complains of fell within the peer review process at all. Indeed, *that is his only counterargument*: he claims that the 'actions of which [he] complained in this case were outside of the peer review process.'" (Order, RE 213, Page ID # 16774.) (emphasis added) Mayfield further highlighted in its Reply in Support of its MSJ that Shahbabian did not raise an actual-malice argument because the record did not support it. (Reply, RE 192, Page ID # 15622, fn. 6.)  As a result, Shahbabian's actual-malice argument cannot be raised for the first time here.

Second, even if the actual-malice claim was properly before the Court, Shahbabian's argument still fails because it misconstrues O.R.C. §2305.251(D). That section provides that "[n]o *person who provides information* under this section

24

without malice and in the reasonable belief that the information is warranted by the facts known to the person shall be subject to suit for civil damages *as a result of providing the information*." (O.R.C. §2305.251(D)) (emphasis added). A reading of the statute's plain language demonstrates it only applies to individuals providing information to the peer review committee, not to the committee itself, and Ohio courts interpreting that provision have agreed. *See Semertzides*, 2020 Ohio App. LEXIS 150, at *5 (finding that §2305.251(D) was inapplicable because the plaintiff had "not filed suit against the persons who provided information to the peer-review committee, but rather…against the hospitals that revoked his privileges.") Consequently, Shahbabian cannot overcome the Peer Review Immunity Statute through a showing of actual malice because his claims are against Mayfield and not the individuals who provided information to the QA Committee.

Finally, there is no evidence that anyone from Mayfield, or anyone involved with the QA Committee, provided any information or made any statements that could be construed as acting with malice towards Shahbabian. Courts in the Sixth Circuit have held that a finding of actual malice requires "'proof that defendants made statements in connection with the peer review process with knowledge they were false or with reckless disregard for whether they were true or false.'" *Talwar v. Catholic Healthcare Partners*, 258 Fed. Appx. 800, 809 (6th Cir.2007) (*quoting Wall v. Ohio Permanente Medical Group, Inc.*, 119 Ohio App. 3d 654, 666, 695

N.E.2d 1233 (1997)). "[M]ere inaccuracies in statements and alleged improper motivations by speakers are insufficient to show actual malice." *Wall*, 119 Ohio App. 3d at 666. The party claiming actual malice "must present evidence that defendants knew the statements were false, entertained serious doubts about whether they were false, or disregarded a high probability that they were false."[6] *Id.*

There is no evidence in the record that suggests anyone from Mayfield or anyone involved with the QA Committee or peer review process made or relied on any false statements, much less *knowingly* false statements, regarding Shahbabian; that anyone entertained any doubt about whether any statements regarding Shahbabian were false; or that anyone disregarded a high probability that any statements regarding Shahbabian were false.

Shahbabian's attempt to manufacture such evidence is unavailing. His only evidence of actual malice is one doctor's statement, provided without citation to the record, that Shahbabian was not a danger to patients. (Appellant's Br., Doc. 36 at 68, Page ID # 79.) He then baselessly asserts that the district court "ignored the facts which show Mayfield and TriHealth were using the peer review process to involuntarily transition Shahbabian's surgical practice" to Mayfield and "ignored

---

[6] That Courts analyzing malice under §2305.251(D) focus on an individual's understanding of the veracity of their statements further demonstrates that §2305.251(D) applies only to individuals providing information to the committee and not the committee itself.

that the principal proponent of the peer review process to reduce Shahbabian's surgical practice was Ringer who was intimately involved beginning in May of 2016 through May of 2017 to transition Shahbabian's practice to Temple." (*Id.*) Not only does Shahbabian fail to provide a scintilla of evidence or one record cite to support these claims, his accusation that Ringer was the "principal proponent" of a scheme to steal his practice is contradicted by his own sworn testimony that he "likes" Ringer and was not accusing him of any conspiracy.[7] (Shahbabian Dep., RE 181-1, Page ID # 13444-13445.) Furthermore, none of these pieces of "evidence" point to any falsity or reckless disregard for the truth on the part of Mayfield and are just the kind of "inaccuracies in statements and alleged improper motivations by speakers" that the court in *Wall* and this Court in *Talwar* found were insufficient to show actual malice. *Wall*, 119 Ohio App. 3d at 666; *Talwar*, 258 Fed. Appx. at 809.

In sum, the district court properly granted summary judgment in favor of Mayfield on Shahbabian's tortious interference and civil conspiracy claims based on immunity under O.R.C. §2305.251(A). Shahbabian's claim of actual malice on the part of Mayfield defeating that immunity fails because 1) he did not raise that

---

[7] Shahbabian also ignores the fact that, on multiple occasions, Ringer supported him in the peer review process and overrode issues identified by the nurse clinical quality reviewer, finding that Shahbabian had acted appropriately. *See* Shahbabian Dep. Shahbabian Dep. Exh. 62, RE 164-7 SEALED, Page ID # 10797; Shahbabian Dep. Exh. 65, RE 164-7 SEALED, Page ID # 10803; Shahbabian Dep. Exh. 66, RE 164-7 SEALED, Page ID # 10804; Shahbabian Dep. Exh. 64, RE 164-7 SEALED, Page ID # 10802.)

argument to the district court and therefore waived the issue before this Court, 2) O.R.C. §2305.251(D) only applies to individuals providing information to the peer review committee and not to the peer review committee itself, and 3) Shahbabian failed to identify any evidence in the record that shows Mayfield acted with actual malice. As a result, this Court should affirm the district court's grant of summary judgment in favor of Mayfield on Shahbabian's tortious interference and civil conspiracy claims.

### 3.    Mayfield is also immune from liability under the Health Care Quality Improvement Act

In addition to immunity under the Peer Review Statute, Mayfield is also entitled to immunity under the federal Health Care Quality Improvement Act (HCQIA), 42 U.S.C.S. § 11101, *et seq.*[8] HCQIA provides that:

> If a professional review action . . . meets all the standards specified in section 412 (a) [42 USCS §11112(a)] . . . (A) the professional review body, (B) any person acting as a member or staff to the body, (C) any person under a contract or other formal agreement with the body, and (D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any law of the United States or of any State . . . with respect to the action. . . .

_____

[8] Although the district court did not address this argument in its Order granting Mayfield's MSJ, it is "well-established that a prevailing party may 'assert in a reviewing court any ground in support of [its] judgment, whether or not that ground was relied upon or even considered by the trial court." *Airline Prof'ls Assn. of the International Bhd. of Teamsters, Local Union No. 1224 v. Airborne, Inc.*, 332 F.3d 983, 986 n.3 (6th Cir.2003) (*quoting Dandridge v. Williams*, 397 U.S. 471, 475 n.6, 90 S.Ct. 1153 (1970)).

42 U.S.C. § 11111(a)(1). HCQIA sets four standards that must be met:

> . . . [A] professional review action must be taken –
> (1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). *A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 411(a) [42 USCS § 11111(a)] unless the presumption is rebutted by a preponderance of the evidence.*

42 U.S.C. § 11112(a) (emphasis supplied).

The presumption that all four standards have been met and immunity will be granted "'creates an unusual summary judgment standard' that can be stated as follows: 'Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?'" *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 468 (6th Cir.2003) (*quoting Bryan v. James E. Homes Reg'l Med. Ctr.*, 33 F.3d 1318, 1333 (11th Cir.1994)). "The plaintiff has the burden of overcoming the presumption of immunity by showing that the review process was not reasonable." *Id*. This "reasonable belief" standard is an objective, rather than subjective, good faith requirement. *Id*. It is "satisfied if 'the reviewers, with the information available to them at the time of the professional review action,

would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.'" *Id*. (quoting *Bryan*, 33 F.3d at 1323).

*Meyers* is factually similar to this case in that the plaintiff "argue[d] that genuine issues of fact exist[ed] regarding the veracity of the underlying allegations against him." *Meyers*, 341 F.3d at 468, fn. 5. The court made clear that its analysis was "not directed at whether each of the complaints were undisputedly true, but whether Defendants acted reasonably in considering and relying upon them." *Id*. Because of "the volume of incidents and the seriousness of the complaints, there [wa]s no genuine issue with respect to the reasonableness of Defendants' belief that their action was taken in furtherance of quality health care." *Id*.

As noted by the court in *Emlich v. OhioHealth Corp.*, Case No. 2:14-cv-1697, 2016 U.S. Dist. LEXIS 177373, at *28 (S.D. Ohio Dec. 22, 2016), "the court's primary focus is on the sufficiency of the basis for the review body's action rather than any alleged bad faith, hostility or personal animosity on the part of the members of the review body." *Emlich*, *citing Bryan*, 33 F.3d at 1335; *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir.1992).

Here, the record is clear that the actions taken by the QA Committee as part of the peer review process were appropriate and based on information that could be reasonably relied upon when making its decisions. Given the significant volume of serious cases reviewed by the QA Committee; the concerns with repeat and

increasingly problematic bad outcomes; Shahbabian's admission that he did not dispute or otherwise object to almost all of the quality concerns raised with the QA Committee; and that Shahbabian voluntarily relinquished his surgical privileges, there is no doubt that the QA Committee's actions were reasonable and taken in furtherance of quality health care. As such, Mayfield is entitled to immunity under HCQIA and Shahbabian's claims for tortious interference and civil conspiracy against Mayfield are barred.

### C. The District Court correctly held that Shahbabian failed to prove Mayfield discriminated against him or aided and abetted TriHealth's alleged discrimination

Mayfield was not Shahbabian's employer and therefore cannot be held liable for employment discrimination against him. Instead, Shahbabian claims that Mayfield aided and abetted TriHealth's alleged discrimination. (Amended Complaint, RE 21, Page ID # 125-126.) O.R.C. § 4112.02(J) makes it an unlawful discriminatory practice "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . ."

Establishing a violation of this subsection requires proof that the alleged aider and abettor intentionally incited or encouraged something they knew to be unlawful. *Denoewer v. UCO Indus.*, No. 2:17-CV-660, 2018 U.S. Dist. LEXIS 65250, at *7-8 (S.D. Ohio Apr. 18, 2018); *Luke v. City of Cleveland*, No. 1:02-CV-1225, 2005 U.S.

Dist. LEXIS 49630, at *19 (N.D. Ohio Aug. 22, 2005). The alleged aider and abettor must "actively participate in, or otherwise facilitate" the wrongful act. *Pittman v. Parillo*, No. L-16-1140, 2017 Ohio App. LEXIS 1482, at *51 (Ohio Ct. App. Apr. 21, 2017). "Mere association with the principal is not enough." *State v. Sims*, 10 Ohio App.3d 56, 58, 460 N.E.2d 272 (1983). Moreover, if the plaintiff is unable to prove the elements of the underlying allegedly wrongful act, then the claim for aiding and abetting that wrongful act must also fail. *Woolf v. City of Streetsboro*, No. 5:09 CV 1570, 2010 U.S. Dist. LEXIS 110446, at *47 (N.D. Ohio Oct. 18, 2010).

The district court correctly found that "Dr. Shahbabian has failed to show that there is a triable issue of fact on his age discrimination claims [against TriHealth]" and "[s]ince his aid-and-abetting claim is tied up with his age discrimination claims, that claim fails too." (Order, RE 213, Page ID # 16784.) However, even if Shahbabian were able to establish a prima facie claim of discrimination against TriHealth, he is unable to prove that Mayfield intentionally engaged in any wrongful act for the purpose of facilitating such alleged discrimination. There is no evidence in the record that anyone at Mayfield held any age animus against Shahbabian, nor is there any evidence in the record that anyone at Mayfield "actively participate[d] in, or otherwise facilitate[d]" any alleged discrimination. Indeed, Shahbabian himself admitted under oath in his deposition that he could not identify anyone at Mayfield who aided and abetted TriHealth's alleged age discrimination of him.

(Shahbabian Dep., RE 181, Page ID # 13492-13493.) This Court should affirm the district court's grant of summary judgment in favor of Mayfield on Shahbabian's aiding and abetting age discrimination claim.

> **1.    Shahbabian presents no argument that the district court erred by granted summary judgment in Mayfield's favor on his aiding and abetting claim**

On appeal, Shahbabian presents no evidence, or even argument, in support of his claim that Mayfield discriminated against him or aided and abetted TriHealth in doing so. In fact, his devotes all of **one sentence** to this issue – "The facts in this case demonstrate that Mayfield and TriHealth conspired, and aided and abetted with each other, to discriminate against Shahbabian, force his retirement, and transition his practice to Mayfield." (Appellant's Br., Doc. 36 at 65, Page ID # 76.) He provides no citations to the record, cites no specific facts or allegations showing any wrongful or discriminatory acts by Mayfield, and cites no specific facts or allegations showing Mayfield "actively participate[d] in, or otherwise facilitate[d]" any wrongdoing on the part of TriHealth. Nor does Shahbabian otherwise provide any context or analysis showing that the district court erred in granting summary judgment to Mayfield. Nor can he – the record is clear that Mayfield took no improper actions or was otherwise involved in any decision to discriminate against Shahbabian.

2.   **Shahbabian's attempts to obfuscate the law and facts fail to show that Mayfield discriminated against him**

a.   **Shahbabian's cherry-picked, out-of-context statements do not demonstrate age animus or discriminatory intent on the part of Mayfield**

Shahbabian knows that he does not have the evidence to meet the high threshold necessary to show that Mayfield "actively participate[d] in, or otherwise facilitate[d]" any discrimination – he conceded as much by not citing any such evidence in the briefing on his aiding and abetting claim. Instead, Shahbabian tries to muddle the issue by listing purportedly ageist statements made by Mayfield to prop up the section of his brief on his direct age discrimination claim against TriHealth. Not only do these references clearly fail to show age animus or discriminatory intent on their face, they're also legally insufficient to maintain a claim for age discrimination if Mayfield had been his employer.

Shahbabian has identified eight instances that he alleges show Mayfield's age animus. (Appellant's Br., Doc. 36 at 54, Page ID # 65.) Like the assertions he claims support a finding of Mayfield's actual malice, however, none of these references contain citations to the record.[9] (*Id.*) All but one of the references are from 2014 or

---

[9] Fed.R.App. 28(a)(8)(A) requires arguments be made "with citations to the authorities and parts of the record on which the appellant relies[.]" Courts in the Sixth Circuit have made clear that failure to cite to the record is fatal to an appellant's argument on appeal, as the "court is not obligated to search the record for support of [appellant's] argument." *NCUA Bd. v. Zovko*, 728 F.App'x 567, 569 (6th Cir.2018); *see also Gosbin v. Jefferson Cty. Commrs.*, 725 F.App'x 377, 388 (6th Cir.2018)

earlier – more than three years removed from when Shahbabian voluntarily relinquished his surgical privileges. (*Id.*) Six of these references relate to how Shahbabian's case load will be handled once he retires, none of which were communicated to Shahbabian, and none of which suggested or encouraged Shahbabian to retire. (*Id.*)

Shahbabian places particular weight on the references to retirement, but to no avail. It is well settled in the Sixth Circuit that mere inquiries or comments about potential retirement do not show pretext or otherwise create an inference of discrimination. *See Woythal v. Tex-Tenn. Corp.*, 112 F.3d 243, 247 (6th Cir.1997) (holding that mere inquiry about retirement without suggesting or encouraging retirement does not amount to pressuring the employee to retire, and does not constitute evidence of pretext for age discrimination); *Rosenthal v. Faygo Bevs., Inc.*, 701 F.App'x 472, 480 (6th Cir.2017) (inquiries about retirement without suggesting or otherwise pressuring the plaintiff to retire fails to demonstrate pretext); *Metz v. Titanium Metals Corp.*, 475 F.App'x 33, 35 (6th Cir.2012) (comments about retirement without more do "not show age-based animus.").

Nothing in the record suggests that these comments or discussions were

---

(where appellant failed to provide record citations for many of the thirteen items listed in support of its claim, the court would "address only those allegations for which there is cited record support."); *Pompy v. DEA*, No. 19-4090, 2020 U.S. App. LEXIS 38492, at *8 (6th Cir. Dec. 9, 2020) ("[Appellant's] failure to provide a citation to supporting evidence forecloses his argument.")

anything other than Mayfield appropriately planning for the eventuality that Shahbabian would retire, which Shahbabian previously indicated he planned on doing in the near term and was a motivating factor behind his decision to join TriHealth in the first place. (Shahbabian Dep., RE 181, Page ID # 13356-13358; Shahbabian Dep. Exh. 59A, RE 181-4, Page ID # 13851.) Notably, *none* of these comments were made directly to Shahbabian or show that anyone at Mayfield suggested or encouraged Shahbabian to retire. As such, under settled precedent in this circuit, these instances do not rise to the level of demonstrating anti-age bias on the part of Mayfield. As the district court correctly noted, "discussions about or plans for someone's eventual retirement, without more, do not show age-based animus…Compliance with the ADEA and succession planning are not mutually exclusive." (Order, RE 213, Page ID # 16782-16783.)

Finally, most of the purportedly ageist assertions listed by Shahbabian were comments made more than three years before Shahbabian voluntarily relinquished his surgical privileges and all of the comments are, at best, vague generalities, which cannot serve as the basis of an age discrimination claim. Such a separation in time between when the comments were made and when the adverse employment action took place, as well as the vague, insubstantial nature of the comments, negates their impact as showing age discrimination. *See Allman v. Eastern Co.*, No. 87-3322, 1988 U.S. App. LEXIS 8042, at *7-8 (6th Cir.1988) (affirming a trial court's

determination that comments made by the decision maker three years before an adverse employment action did not show discriminatory intent because "[a]n age-related comment may 'ring true' and yet be too remote in time or too insubstantial, vague, or abstract to support a judgment of age discrimination.")

> **b.**    **Shahbabian's ill-fated attempt to gin up a non-existent conflict in this Court's precedent demonstrates that Mayfield acted appropriately and did not discriminate against him**

Shahbabian goes to great pains to raise an issue of fact based on the retirement issue by asking this Court to reconcile a non-existent conflict between the holdings in *Woythal* and *Sloat v. Hewlett-Packard Enter. Co.*, 18 F.4th 204 (6th Cir.2021). (Appellant's Br., Doc. 36 at 1, Page ID # 12.) In both cases, the plaintiffs were suing their former employers alleging age discrimination. *Woythal*, 112 F.3d at 244; *Sloat*, 18 F.4th at 207. In *Woythal*, the employer inquired about the plaintiff's plans for retirement on numerous occasions, but there was no evidence that the employer ever made direct reference to the plaintiff's age or suggested that the plaintiff should retire. *Woythal*, 112 F.3d at 247. The trial court granted summary judgment in favor of the employer, finding that these comments and inquiries did not amount to evidence of age discrimination, and this Court agreed. *Id*. In affirming the trial court's decision, this Court emphasized that cases in which comments about retirement were found to raise an inference of discriminatory intent were those in which the employer repeatedly initiated questioning about and suggested retirement

in a manner that amounted to undue pressuring of the employee to retire. *Id*.

In *Sloat*, the employer made several direct comments about the plaintiff's age, over the plaintiff's objection; gave plaintiff a greatly reduced bonus and no raise despite consistent positive performance evaluations; and, on at least ten occasions, inquired as to when plaintiff was going to retire. *Sloat*, 18 F.4th at 210-211. The trial court granted summary judgment in favor of the employer, which this Court reversed, finding that the trial court's decision was based "substantially on the post-hoc explanations of [the employer's] own witnesses." *Id*. at 209. Turning to the evidence of age animus or discriminatory intent, this Court characterized the volume and frequency of the employer's inquiries about retirement as "badgering" the plaintiff in a way that was tantamount to a "campaign" to force him to retire. *Id*. at 211. This Court held that the concerted campaign, especially viewed in conjunction with the age related comments and other actions taken by the employer, supported an inference that the employer had acted with discriminatory intent. *Id*. at 211-212.

*Sloat* and *Woythal* in no way conflict, as Shahbabian wrongly contends. Instead, these two cases complement one another and properly define the type of behavior that is and is not appropriate when addressing retirement related issues in the workplace. *Woythal* stands for the proposition that general inquiry about an employee's retirement plans, without more, is not indicative of discrimination, especially when those comments are not communicated to the employee or do not

38

suggest or encourage the employee to retire. *Woythal*, 112 F.3d at 247. On the other hand, *Sloat* places an appropriate limit on an employer's discussion with an employee about retirement. That case holds that an employer cannot engage in a "campaign" of conduct and harassment to create undue pressure on an employee to retire. *Sloat*, 18 F.4th at 211-212. Such concerted effort on the part of an employer can serve as the basis of an age discrimination claim. *Id*.

The eight uncited, out-of-context instances raised by Shahbabian in this case 1) were not made by Shahbabian's employer/decision maker, 2) were not communicated to Shahbabian, and therefore could not be said to be said to pressure him into retiring (unlike the badgering in *Sloat*), and 3) are the type of vague, insubstantial, and too remote-in-time references that this Court has found do not constitute evidence of age discrimination. These comments plainly fall in line with the type of appropriate discussion of an employee's eventual retirement that this Court approved of in *Woythal*. Shahbabian has failed to demonstrate that Mayfield acted with any discriminatory intent or aided and abetted discrimination against him. The district court's grant of summary judgment in its favor should be affirmed.

### 3. Shahbabian cannot rebut the legitimate, nondiscriminatory actions taken by the QA Committee

Assuming, *arguendo*, that Shahbabian had presented sufficient evidence to make a prima facie case of age discrimination, he has failed to rebut the legitimate, nondiscriminatory reasons for the actions taken by TriHealth and the QA

Committee. Once a plaintiff alleging age discrimination establishes a prima facie case, the burden shifts to the "employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant successfully meets that burden, it then shifts back to the plaintiff to show that the stated reason is pre-textual and not the real reason for the employer's decision. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089 (1981). As this Court recently noted, establishing pretext is no small task: "For a plaintiff's challenge to the factual basis of an employer's proffered termination rationale to establish pretext, the plaintiff must provide evidence that the employer's allegations never happened." *Miles v. South Center Human Resource Agency, Inc.*, 946 F.3d 883, 888-889 (6th Cir.2020).

Shahbabian has failed to prove that the actions of the QA Committee were pretext for age discrimination. As the district court held, "the inferences Dr. Shahbabian draws upon still fail to unseat the peer review findings and resulting concerns as the chief reasons leading up to the committee's conversation with him about suspending, at least temporarily, his surgeries." (Order, RE 213, Page ID # 16783.) Shahbabian attempts to rebut this unassailable fact by showcasing his positive reviews and times he met the standard of care. But, as the district court noted, "he does not attempt to show that the outcomes for which he received negative

case weights did not happen . . . the fact that he had some favorable reviews does not cancel out the other fact that, in several cases, he received poor peer reviews." (Order, RE 213, Page ID # 16783-16784.) Thus, he has not "provide[d] evidence that the employer's allegations never happened." *Miles*, 946 F.3d at 889.

Shahbabian also argues that he was not provided due process, that his own explanations to the QA Committee for *some* of his cases show he acted appropriately, and that a third party reviewing *some* of his cases may have reached a different conclusion than the QA Committee. (Appellant's Br., Doc. 36 at 60-62, Page ID # 71-73.) These assertions miss the mark in several crucial ways. First, none of these vague assertions refute the vast majority of bad outcomes and concerns the QA Committee had about Shahbabian's practice, which included leaving a patient impotent and unable to walk, rendering a patient a quadriplegic, repeatedly failing to properly administer antibiotics, and repeatedly failing to use a microscope during surgery. (*See supra*, Section I(B)(3), pp. 8-11.) Again, from the district court, "the fact that he had some favorable reviews does not cancel out the other fact that, in several cases, he received poor peer reviews." (Order, RE 213, Page ID # 16784.)

Second, Shahbabian admitted he knew of his right to appeal any of the findings by the QA Committee, but chose not to. (Shahbabian Dep., RE 181, Page ID # 13261). If Shahbabian had exercised his administrative appeal rights, his surgical privileges would have been only temporarily suspended pending review of

his performance, but he declined this option by voluntarily relinquishing his privileges after consultation with counsel. (Shahbabian Dep., RE 181, Page ID # 13416; Shahbabian Dep. Exh. 73, Page ID # 13865; Shahbabian Dep. Exh. 78, Page ID # 13874.) Shahbabian's acknowledgment and refusal to participate in the appeal process show he was given due process, but chose not to exercise his appeal rights.

Finally, Shahbabian voluntarily relinquished his surgical privileges and remained employed by TriHealth for the duration of his Employment Agreement. He was not forced out, demoted, or fired. His employment simply ended with the expiration of his Employment Agreement, which terminated by its own terms on April 30, 2019. (Shahbabian Dep., RE 181-1, Page ID # 13400-13401; Shahbabian Dep. Exh. 16, RE 181-2, Page ID # 13655; Shahbabian Dep. Exh. 80, RE 181-4, Page ID # 13876.) The only action that impacted his employment in any way was his own voluntary decision to relinquish his surgical privileges without waiting for a formal review. At bottom, the district court correctly summarized Shahbabian's failure to rebut the legitimate reasons for the QA Committees actions:

> The hard facts of his negative performances, his peers' resulting concern, and his subsequent suspension from surgery all combine to dissolve Dr. Shahbabian's inference filled image of subterfuge and discrimination . . . No reasonable juror would think that reckless or recurring at-risk behavior in a neurosurgical context did not actually motivate or was insufficient to warrant the committee's discussion with Dr. Shahbabian about temporarily abstaining from operating. So he fails to show that TriHealth's reasons for reducing his workload were a

pretext for discrimination.

(Order, RE 213, Page ID # 16783-16784.)

In sum, the QA Committee ultimately requested that Shahbabian refrain from performing surgeries due to the QA Committee's justifiable concern for the high number of poor outcomes and recurring problems Shahbabian had experienced. Although he had the right to appeal, and the QA Committee specifically provided Shahbabian an opportunity to temporarily abstain from performing surgeries while that appeal took place, he chose to voluntarily relinquish his surgical privileges after consultation with counsel. Nothing in the record indicates that any of the actions taken by the QA Committee were performed without the safety and care of patients as the sole driving force behind them or that the QA Committee's actions were anything but reasonable. Consequently, Shahbabian has failed to rebut the legitimate, nondiscriminatory reasons for the actions of TriHealth and the QA Committee. This Court should affirm the district court's grant of summary judgment in Mayfield's favor on Shahbabian's aiding and abetting claim.

## IV.   CONCLUSION

For the forgoing reasons, Mayfield respectfully request that this Court affirm the district court's decision.

Respectfully submitted,

*/s/ Fred G. Pressley, Jr.*

Fred G. Pressley, Jr. (0023090)
Zachary A. El-Sawaf (0089524)
PORTER, WRIGHT, MORRIS &
ARTHUR LLP
41 South High Street
Columbus, Ohio 43215
Tel: (614) 227-2233
Fax: (614) 227-2100
email:fpressley@porterwright.com
     zelsawaf@porterwright.com
*Attorneys for Appellee Mayfield Clinic,
Inc.*

Mark J. Byrne (0029243)
JACOBS, KLEINMAN, SEIBEL &
MCNALLY, LPA
30 Garfield Place, Suite 905
Cincinnati, Ohio 45202
Tel: (513) 381-6600
Fax: (513) 381-4150
Email: mbyrne@jksmlaw.com
*Attorney for Appellant Set Shahbabian*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 32(a)(7)(B) and Sixth Circuit Rule 32(f), I hereby certify that the foregoing brief contains 10,955 words, as counted by a word processing system, including headings, footnotes, quotations, and citations in the court, but excluding certificates and other items properly excludable under Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1), and there is within the word limit set by the Court.

The brief complies with the typeface requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure as it was prepared using the Microsoft Word 2010 word processing program in 14-point Times New Roman font.

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2022, this brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Fred G. Pressley*
Fred G. Pressley

# ADDENDUM

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g), Mayfield designates the following

documents from the district court's docket as relevant to this appeal:

| Case No. 1:18-cv-00790 | | | |
|---|---|---|---|
| Record Entry No. | Description of Document | Date Filed | PAGEID # |
| 1 | Complaint | November 14, 2018 | 1-32 |
| 21 | First Amended Complaint | January 8, 2019 | 102-133 |
| 23 | Appellee Mayfield's Answer | January 22, 2019 | 171-225 |
| 24 | Appellee TriHealth's Answer and Counterclaim | February 5, 2019 | 226-242 |
| 26 | Appellant's Answer to Counterclaim | February 17, 2019 | 273-276 |
| 88 | Appellee TriHealth's Amended Counterclaim | October 24, 2019 | 711-716 |
| 93 | Appellant's Answer to Amended Counterclaim | November 14, 2019 | 828-833 |
| 136 | Appellant's Motion for Summary Judgment on Appellee TriHealth's Counterclaim | February 28, 2020 | 3821-3827 |
| 137 | Appellee TriHealth's Motion for Summary Judgment | February 28, 2020 | 3828-3864 |
| 138 | Appellee Mayfield's Motion for Summary Judgment | February 28, 2020 | 4333-4370 |
| 138-1 | Deposition Excerpts and Exhibits of Mark Farrington, M.D. | February 28, 2020 | 4371-4423 |
| 138-2 | Deposition Excerpts and Exhibits of Andrew Ringer, M.D. | February 28, 2020 | 4424-4576 |

| 138-3 | Deposition Excerpts and Exhibits of Helen Koselka, M.D. | February 28, 2020 | 4577-4680 |
|---|---|---|---|
| 138-4 | Deposition Excerpts and Exhibits of Christopher McPherson, M.D. | February 28, 2020 | 4681-4689 |
| 164 | SEALED Deposition and Exhibits of Set Shahbabian, M.D. | March 13, 2020 | 10658-10938 |
| 181 | Deposition and Exhibits of Set Shahbabian, M.D. | March 19, 2020 | 13135-13884 |
| 186 | Appellant's Opposition to Appellees' Motions for Summary Judgment | April 1, 2020 | 13912-15501 |
| 188 | Appellant's Reply in Support of Motion for Summary Judgment on Appellee TriHealth's Counterclaim | April 2, 2020 | 15511-15513 |
| 191 | Appellee TriHealth's Reply in Support of Motion for Summary Judgment | April 29, 2020 | 15527-15609 |
| 192 | Appellee Mayfield's Reply in Support of Motion for Summary Judgment | April 29, 2020 | 15610-15645 |
| 213 | Order Granting Appellees' Motions for Summary Judgment | July 22, 2021 | 16764-16803 |
| 214 | Appellant's Notice of Appeal | August 23, 2021 | 16804 |
| 216 | Order Awarding Calculated Prejudgment Interest | December 8, 2021 | 16808-16809 |
| 217 | Appellant's Subsequent Notice of Appeal | May 19, 2022 | 16810 |